Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

*Additional Counsel Identified on Signature Page*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; OREGON WILD, an Oregon non-profit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, an administrative agency of the United States Department of Interior, <br><br> Defendant. | Civ. Case No. <br><br> **COMPLAINT** |

COMPLAINT                         1

## INTRODUCTION

1.     Plaintiffs, Cascadia Wildlands and Oregon Wild (collectively "Plaintiffs"), bring this civil action arising under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., challenging the United States Bureau of Land Management's ("BLM") issuance of the February 2020 Thurston Hills Non-Motorized Trails and Forest Management Project ("Thurston Hills Project" or "the Project") Environmental Assessment ("EA")/Finding of No Significant Impact ("FONSI") and Decision Record for violations of federal laws and regulations intended to protect the public's natural resources and ensure informed, well-reasoned decision-making.

2.     This action seeks: 1) a declaration that the BLM violated the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 302 *et seq*., by (a) authorizing regeneration harvesting of the Recreation Management Zone ("RMZ") within the Willamalane Non-Motorized Trails Extensive Recreation Management Area ("ERMA"), and (b) allowing further logging within the Willamalane Non-Motorized ERMA that is incompatible with meeting recreation objectives, interferes with recreation opportunities, and fails to maintain the setting characteristics; 2) a declaration that BLM violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations by (a) failing to take the requisite 'hard look' at the Project's potential environmental impacts, (b) proceeding under an unreasonably narrow purpose and need, (c) failing to consider a reasonable range of alternatives; and 3) the vacatur and remand of the Project to the BLM.

3.     The requested relief is necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

4.      If Plaintiffs are the prevailing party in this action, they will seek an award of fees and costs pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant). This cause of action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.; the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 302 *et seq*.; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*. An actual, justiciable controversy exists between Plaintiffs and Defendant, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

6.      Venue in this court is proper under 26 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiffs and Defendant reside in this district, and the public lands and resources at issue are located in this district. The BLM official who authorized this decision is headquartered in Springfield, Oregon, which is located within this district. This case is filed properly in Eugene, Oregon pursuant to Local Rules 3.3 and 3.4 because the Thurston Hills Project is located within Lane County, Oregon.

## PARTIES

7.      Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 10,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in

COMPLAINT                              3

the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia

Bioregion.

20.    Cascadia Wildlands' members and supporters have used and will continue to use the

Thurston Hills Project area for activities such as hiking, bird watching, and other recreational and

professional pursuits. Cascadia Wildlands' members and supporters also own real property that

adjoins the Thurston Hills Project area and are justifiably concerned about impacts to that real

property if the Project is allowed to proceed.

8.    Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000

members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild

and its members are dedicated to protecting and restoring Oregon's wild lands, wildlife, and

waters as an enduring legacy.

9.    Oregon Wild's staff and members regularly visit the Thurston Hills area and surrounding

federal lands and seek to ensure that the BLM faithfully and fully implements and complies with

federal law in managing the natural resources of the Project area as a means of protecting their

interests. Oregon Wild's staff and members hike, bike, photograph scenery and wildlife, use, and

engage in other vocational, scientific, and recreational activities in and around the Thurston

Hills Project area. Oregon Wild's staff and members derive recreational, inspirational, scientific,

and aesthetic benefit from their activities within the Thurston Hills Project area. Oregon

Wild's staff and members intend to continue to use and enjoy the Thurston Hills Project area and

surrounding forested lands, waters, and trails frequently and on an ongoing basis in the future.

10.    All Plaintiffs have organizational interests in the proper and lawful management of the

Northwest District of the Bureau of Land Management's public lands. Plaintiffs' aesthetic,

recreational, scientific, economic and religious interests have been and will be adversely affected

and irreparably injured if Defendant engages in activities detrimental to forest ecosystems and late-successional habitat in the Project area. Plaintiffs' and their members use and enjoyment the Thurston Hills area will be degraded and impaired if the Thurston Hills Project is implemented as planned with aggressive logging. Plaintiffs' members and supporters that own adjoining property to the Thurston Hills Project area will suffer aesthetic damages, increased wildfire hazard for the next forty years, and potential decreases in property value. Plaintiffs' injuries are also predicated on unlawful BLM actions that have diminished the trust between BLM, Springfield residents, and the conservation community; facilitated the risk of unsupported and uninformed management and decision-making; increased the risk of actual, threatened, and imminent environmental harm and public safety risks; and created actual, concrete injuries to Plaintiffs and their interests. Because Plaintiffs seek to ensure informed decision-making, compliance with federal law, and the prevention of unacceptable harm to the Project area, the City of Springfield and the specific residences adjoining the Project area, Plaintiffs' injuries would be redressed by the relief sought.

11.     Plaintiffs submitted timely written comments, formal protest letters, and formerly litigated the Thurston Hills Project, alleging, among other issues, that the BLM's failure to proceed under a reasonable purpose and need, adequately analyze the impacts of, or explore alternatives to, this timber sale and its failure to comply with the substantive requirements of FLPMA violated federal law.

12.     Defendant BLM is an agency or instrumentality of the United States and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations.

## STATEMENT OF LAW

*Administrative Procedures Act*

13.     The APA confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions…found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

*Federal Land Management and Policy Act*

14.     Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM must ensure that a site-specific project conforms to the Resource Management Plan ("RMP") including any alterations or amendments thereto. The FLPMA requires that all BLM lands be managed for multiple uses and to protect a wide range of natural resource values. *See, e.g.,* 43 U.S.C. § 1701; *see generally id.* §§ 1701–1782.

15.     The Thurston Hills Project was developed under the 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan. Pursuant to direction to "provide a diversity of quality recreational opportunities," the RMP designates a number of recreation areas including Extensive Recreation Management Areas ("ERMA"). Each designated ERMA must be managed in accordance with its specific planning framework.

16.     RMPs may go through plan "maintenance" without going to a formal NEPA process, but only to reflect minor changes in data. 43 C.F.R. § 1610.5-4. This plan "maintenance" is not considered a plan amendment and is therefore limited to refining or adding documentation—it may not result in "expansion in the scope of resource uses or restrictions, or change the terms, conditions, and decisions of the approved plan." *Id.*

*National Environmental Policy Act*

17.    Congress enacted the National Environmental Policy Act (NEPA) in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that have the potential to significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to ensure that the public has sufficient information to meaningfully participate in the decision-making process.

18.    The Council on Environmental Quality (CEQ) promulgated uniform regulations implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342, 40 C.F.R. §§ 1500 *et. seq*.

19.    NEPA requires federal agencies to prepare, consider, and approve an adequate Environmental Impact Statement (EIS) for "any major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4(a)(1). To determine whether an action requires an EIS as required by NEPA, an action agency may prepare an Environmental Assessment (EA). 40 C.F.R. § 1501.4(b). *Id.* To make a supportable determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40 C.F.R. § 1508.8. Direct effects are caused by the action and occur at the same time and place as the proposed project. *Id.* § 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distances but are still reasonably foreseeable. *Id.* § 1508.8(b). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." *Id.* § 1508. Cumulative impact results when the "incremental impact of the action [is] added to other

past, present, and reasonably foreseeable future actions" undertaken by any person or agency. *Id.* § 1508.7.

20.     NEPA requires that environmental information be available to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. 40 C.F.R. § 1500.1(b). The information released must be of high quality and sufficient to allow the public to question the agency rationale and understand the agency's decision-making process. *Id.*

21.     NEPA also requires agencies to consider a range of alternatives to each proposed action. The agency's analysis must consider the underlying "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "all reasonable alternatives" to the proposed action. 40 C.F.R. §§ 1502.13, 1502.14. The alternatives analysis is "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id*. § 1502.14. This requirement is critical to serving NEPA's primary purposes of ensuring fully informed decisions and providing for meaningful public participation in environmental analyses and decision-making. *Id*. § 1500.1(b), (c).

## STATEMENT OF FACTS

### *The Willamalane Non-Motorized Trails Extensive Recreation Management Area*

22.     The Willamalane Park and Recreation District ("Willamalane") maintains and operates five recreation facilities and 46 parks and natural areas totaling nearly 1,500 acres around the City of Springfield. On November 6, 2012, Willamalane's Bond Measure 20-199 was approved. The $20 million bond measure highlighted ten priority projects for Willamalane, one of which

was acquisition of the Thurston Hills Ridgeline. The project was described as acquiring property in Springfield to preserve natural areas and develop a hiking and biking trail along the south Thurston Hills Ridgeline, roughly from Bob Straub Parkway to 79th and Main Street for the dual reasons of nature conservation and outdoor recreation.

23.     The BLM also manages federal public land on the Thurston Hills Ridgeline area that borders both Springfield residences and Willamalane's acquisition. Willamalane approached the BLM to coordinate on a connected trail system given the high demand for recreation and natural amenities and the nearby location of BLM managed sections. The BLM recognized the public demand and recreational benefits of the proposal.

24.     As the BLM was developing its new Northwestern and Coastal Oregon Record of Decision and Resource Management Plan ("RMP") in 2015, it also completed a spatial analysis of recreational needs that supported the agency's collaboration with Willamalane. Based on the recognized demand for new hiking and mountain biking opportunities, the regional RMP designated the Willamalane Non-Motorized Trails Extensive Recreation Management Area ("ERMA") and identified the partnership with Willamalane in the development of hiking and mountain biking trails.

25.     According to BLM's planning framework for the Willamalane Non-Motorized Trails ERMA, this area is intended for recreational development consistent with Willamalane's proposal to preserve views; enhance wildlife habitat and sensitive natural areas; and provide walking, hiking, and mountain biking opportunities. While the ERMA was designed to be commensurate with the management of other resources and resource uses, it requires specific management considerations in order to address recreational use, demand, visitor experiences and related program investments. The BLM must manage ERMAs to support and sustain the

principal recreation activities and the associated qualities and conditions for which each ERMA was designated.

26.     To these ends, the BLM's planning framework sets forth management actions and allowable use restrictions specific to the Willamalane Non-Motorized Trails ERMA. Accordingly, fuel treatments or other vegetation modifications (i.e. logging activities) are allowed in this ERMA only *if* such actions are compatible with meeting recreation objectives, do not interfere with recreation opportunities, and do not alter the scenic setting characteristics of the area.

27.     The BLM is also required to designate a Recreation Management Zone (RMZ) around trails in the ERMA. Timber harvest within the RMZ is only allowed to the extent it is needed to protect/maintain recreation setting characteristics and/or to achieve recreation objectives.

### BLM's Thurston Hills Non-Motorized Trails and Forest Management Project

28.     In 2016, following the finalization of the BLM's new RMP, Willamalane approached the BLM about initiating NEPA review for a trail building project that would fulfill the vision for "a premier regional destination for nature observation and outdoor recreation (focused on hiking and mountain biking) that is greatly needed in the Eugene-Springfield area."

29.     On March 17, 2017, the BLM issued its public "scoping" notice for the Thurston Hills Project. The scoping notice contemplated "forest management activities including sustainable-yield timber harvest and fuels-reduction" to the extent such harvest was in "harmony" with the non-motorized trail system being proposed in coordination with Willamalane.

30.     Willamalane requested to be a member of the interdisciplinary team that would develop the EA in order to better harmonize the proposed Project with its adjoining parcel. The BLM denied this request.

31.     At the public scoping meetings about the proposed Project and in numerous scoping comments submitted to the BLM, concerns were raised about the effects of timber harvest on the recreation opportunities and increased fire hazard in the area given its immediate proximity to homes within the City of Springfield. The BLM had a list of 341 addresses within and surrounding the Project area.

32.     The specter of timber harvest caused neighboring landowners interviewed by the BLM to oppose the Project and even consider selling their homes.

33.     Following the public scoping period, BLM increased its attention toward coupling the development of the non-motorized trails system with a timber sale that would generate substantial timber volume. The focus of the Project began to shift toward how the BLM would design the trails to facilitate long-term timber harvest and where the BLM could plan additional timber harvest within the next 10 years.

34.     The BLM also developed its proposal under the assumption that any logging that retained more than 15% live trees in the Project area would not be allowed.

35.     On April 23, 2018, the BLM issued its first Thurston Hills Non-Motorized Trails and Forest Management Project EA. The EA considered a No Action Alternative (as required by NEPA's regulations at 40 C.F.R. § 1502.14(d)) and four Action Alternatives. None of the alternatives considered the possibility of harmonizing goals related to recreation, timber production, and fire hazard by thinning instead of regeneration logging.

36.     Many public comments expressed concern that the proposed regeneration harvest would degrade the recreational experience. The mountain biking community specifically requested the BLM proceed with no logging and simply construct the trails.

COMPLAINT                                        11

37.    Numerous public comments also raised concerns that regeneration logging will increase fire hazard and urged the BLM to thoroughly evaluate in the Project EA how the regeneration harvesting would increase fire risk to adjacent homes and communities.

38.    On May 30, 2018, the BLM issued a revised EA to allegedly provide additional context for some of the issues raised in public comments. This revised EA was developed primarily in response to the official protests and concerns raised by the City of Springfield and Willamalane. While the new EA developed a new alternative (Alternative 4 – Trail Development and a 105-Acre Regeneration Harvest), which dropped 50 acres of logging to buffer the BLM's logging from Willamalane's Thurston Hills Natural Area, the BLM also developed (Alternative 5 – 155-Acre Regeneration Harvest only), which threatened to eliminate the trail construction altogether in order to force acquiesce from Willamalane and the mountain biking community.

39.    Public comments pointed to the current, relevant science on how different types of logging prescriptions can influence fire risk. Specifically, regeneration harvesting 85 to 90% of live trees from roughly 100-150 acres, as BLM's proposal called for, would remove thousands of trees with thick bark and high canopies (characteristics that make forests less prone to severe fire), replacing forest stands currently on a trajectory to become older, larger and more resilient to wildfire, with a dense young plantation consisting of continuous dense fuels close to the ground (fuel characteristics that make forests more prone to severe fire).

38.    On May 30, 2018, the BLM also simultaneously issued its Finding of No Significant Impact ("FONSI") for the Thurston Hills Project. The agency selected Alternative 3, which included a 155-acre regeneration harvest that would directly overlay the proposed trail network and border many residences in the Project vicinity.

COMPLAINT                                12

39.    Plaintiffs, other recreationists, landowners, Willamalane, the City of Springfield, and Congressmen Peter DeFazio all expressed concerns over the selected alternative. The BLM subsequently decided to withdraw its FONSI and associated Decision Record.

40.    On August 15, 2018, without preparing a new EA or considering any additional alternatives, the BLM issued another FONSI, instead selecting a modified Alternative 4. This Alternative results in a 100-acre regeneration harvest within the ERMA, which would still directly overlay the proposed trail network but would retain more trees along the border with Willamalane's property. This change did not alter the BLM's underlying fire analysis because the change just involved overall acreage, not logging prescriptions.

41.    All Plaintiff organizations filed timely protests and an appeal with the Interior Board of Land Appeals ("IBLA").

42.    Plaintiffs' protest letters raised numerous concerns, chief among them being that the BLM's stated "purpose and need" to conduct regeneration harvest was unreasonably narrow, precluding consideration of a thinning alternative that would have been consistent with the agency's own RMP directives concerning fire hazard and risk around adjacent communities.

43.    Plaintiffs and several other interested stakeholders also administratively challenged the regeneration harvest due to its negative effects on recreation, namely hiking and mountain biking opportunities. The BLM responded that logging will not conflict with recreation goals for the ERMA, because BLM plans to log first and before building the trails.

44.    Plaintiffs made numerous attempts to meet with the BLM and the prospective timber sale purchaser, Seneca Sawmill Company, to resolve differences over the sale, but the parties were unable to reach a resolution.

45.    The BLM denied Plaintiffs' protests on October 5, 2018.

COMPLAINT                                                13

46.     The BLM notified Plaintiffs, in response to their inquiries, that the agency intended to award the timber sale to the high bidder, Seneca Sawmill, on February 5, 2019. The BLM further indicated that the purchaser plans to begin logging operations that spring.

47.     Plaintiffs filed suit against the BLM in the United States District Court for the District of Oregon on February 19, 2019.

48.     Plaintiffs claimed that the BLM violated FLPMA when it failed to ensure that the Thurston Hills Project conformed to the governing RMP and that it failed to manage the Project in accordance with the ERMA's specific planning framework. Plaintiffs also alleged that the BLM violated NEPA because it proceeded under an unreasonably narrow purpose and need for the Project, it failed to thoroughly consider and objectively evaluate an adequate range of reasonable alternatives, and it failed to take the requisite hard look at the Project's impacts, particularly regarding fire hazard and the ability of the Willamalane Non-Motorized ERMA to fulfill its objectives.

49.     The District Court ruled in Plaintiffs' favor on September 18, 2019 on two counts and ordered the BLM on remand to: (1) designate and preserve a Recreation Management Zone prior to harvest; and (2) to fully analyze and publicly disclose the degree of fire hazard to adjacent communities that the Project is likely to increase as required by NEPA.

50.     In response to the opinion and order from the District Court, the BLM prepared a new EA, published on February 4, 2020. BLM prepared this new EA under the assumption that the contract with Seneca was still valid and the timber sold was Seneca's property. BLM prepared this new EA under the assumption that the logging prescriptions could not be altered given that the already sold timbre was Seneca's property.

51.     This February 2020 EA includes a fire risk analysis, but concludes that the fire hazard impacts from implementing the regeneration harvest would be similar to the no-action alternative. The BLM's no-action alternative assumes a timber sale very similar to or the same as the current project being analyzed will occur in the near future.

52.     The BLM represented to members of the public and elected officials that there would not be an increase in fire hazard impacts stemming from the regeneration harvest. The BLM released a promotional video to the public on August 13, 2020 describing in part the fire impacts of the Thurston Hills timber sale. In the video, the BLM represents that there "there is going to be a short term increase in fire hazard in the immediate harvest area, however because there is a buffer between the harvest area and where the homes are, there will not be a risk increase to the neighboring homes."

53.     Additionally, while the February 2020 EA does contain alternatives that designate an RMZ around the trails, the EA does not contain any alternatives or analysis that preserve the RMZ prior to harvest, as ordered by this Court.

54.     Further, the February 2020 EA does not analyze whether the logging within the ERMA maintains setting characteristics, interferes with recreation opportunities, meets recreation objectives, or violates the court order regarding the designation and protection of the trails from timber harvest.

55.     The EA provides a map of the proposed trails and establishes an RMZ, but again, it does not protect and preserve the RMZ as is required by the RMP and this Court's order; rather, all of the proposed logging alternatives include clearcutting the RMZ.

COMPLAINT                                    15

56.    All of the proposed logging in the alternatives is identical to the proposed logging previously found by this Court to be unlawful. The logging prescriptions in 2020 Thurston EA are unchanged.

57.    Under the trails only alternative, the BLM will provide sustainable non-erodible surfaces that would hold up to biking as well as hiking and trail running. The proposed trail system would be designed to provide a range of difficulty that combines quality scenery, a diversity of natural features, a quality trail experience, and the opportunity for physical exercise. The trail would be open year-round and would be expected to be used year-round for non-motorized uses. The trail bed would be a single-track, on an organic layer that provides a natural "drift" feeling of the trail tread derived from the organic layer of soil found below dense canopies. This area is particularly conducive for trails because of its (existing) mature conifer forest and because the ERMA is primarily north-facing and forested with conifers, which makes for excellent trail conditions from late spring through fall.

58.    The trails in the regeneration harvest areas would lose the natural "drift" feeling of the trail tread derived from the organic layer of soil found below dense canopies. The loss of tree canopy associated with the timber harvest would result in a loss of natural variation in vegetation type and terrain, and loss of the natural "drift" feeling of the trail tread derived from the organic layer of soil found below dense canopies. The loss of mature tree canopy would lead to trail exposure reducing the trails availability and desirability for use in the late spring through fall. The trail segments in the regeneration harvest areas would be subject to increased direct rainfall, wind erosion, freeze-thaw, and seasonal over-drying. These conditions reduce the ability of the trail system to withstand heavy use during the preferred spring-to-fall season. The mountain biking experience would not have the highest quality tread, particularly for the Play experience.

Logging would necessitate that additional construction efforts would be implemented to amend the soil with crushed rock and to manipulate the trail tread to accommodate more variable drainage conditions. Mountain biking on crushed rock or gravel and logging roads is less desirable than riding on natural organic trails. Trail hiking and running would also be less desirable on exposed, non-natural trails.

59.     During the public comment period on the February 2020 EA, Plaintiffs and stakeholders expressed their continued concern over the legality and impacts of the project. Among the chief concerns among were the continuing fire hazard implications of the project and the BLM's plan to clearcut the RMZ and degrade the recreational experience.

60.     The BLM argues in the EA that logging the RMZ is permissible because a subsequently issued amendment to the RMP states that the agency need only "consider" project design features that would minimize adverse effects to recreational resources. The BLM did not consider any alternatives that buffered and preserved the RMZ. Further, commenters responded that this plan amendment, which changes the scope of resource uses and restrictions, did not go through the NEPA process and is therefore void and without legal effect.

61.     Commenters also expressed their continued concern that the BLM is not fulfilling its duties to protect public health and safety, citing the proposed harvest's impact on climate change and fire risk to the adjacent Eugene-Springfield community. Commenters expressed their displeasure associated with the spread of noxious weeds, specifically blackberry throughout the clearcut.

62.     Stakeholders and Plaintiffs additionally asserted that the new EA still fails to manage the ERMA in accordance with its Planning Framework because it fails to properly balance the

COMPLAINT                                17

RMP's recreation objectives with its timber harvest objectives. In response to these comments, the BLM asserted in its decision that it is acting in compliance with the Court's order.

63.    Despite the numerous concerns expressed by stakeholders and Plaintiffs during the new EA's public commenting period, on May 20, 2020 the BLM announced its decision to move forward with the Project without any changes to the regeneration harvest plan and concurrently issued another FONSI.

64.    The protest letter submitted by Plaintiffs raised myriad concerns, including those mentioned above. Also alleged in Plaintiffs' protest was: the EA's failure to consider an alternative that would have better addressed all of the RMP's objectives; the EA's failure to consider conflicting studies concerning the effects of regeneration harvest on recreation; the EA's failure to follow Management Direction for the harvest land base regarding increasing fuel hazard; the EA's reliance on a flawed 2016 RMP which adopted a radical departure in riparian habitat policy without adequate explanation; the EA's failure to take a hard look at the effects of logging on carbon storage and climate change; the EA's violation of the RMP's snag retention standards; and the BLM's improper reliance on an existing contract that was based upon an invalidated decision and EA.

65.    On July 16, 2020, BLM denied Plaintiffs' protest.

66.    In the protest denial, BLM asserts that it is maintaining adequate protection from logging in the RMZ buffer area, despite not changing the logging prescriptions in the February 2020 EA. In the protest denial, BLM claims that the contract with Seneca is still valid and controlling. In the protest denial, BLM claims it was appropriate for the 2020 EA to include the effects of logging "substantially similar" in the No Action Alternative or project analysis baseline. In the protest denial, BLM asserts that there is "no evidence that visitors would be deprived of

"quality" experiences because portions of the trails pass through regeneration harvest areas." Numerous public comments raised this exact concern to the BLM. BLM did not provide any evidence to the contrary.

67.     BLM granted Plaintiffs' protest point related to snags and downed woody debris. Plaintiffs raised the concern to the BLM that the snowstorm in 2019 created snags and downed woody debris that the BLM is required to retain under the RMP. BLM asserted in the Decision Record that it did not have to retain newly created snags and woody debris because "any timber that was sold under the contract belongs to the purchaser." BLM ultimately granted Plaintiffs' protest point, but still maintains that the contract with Seneca is valid and controlling, albeit modified to address the decrease in volume from the newly created snags and downed wood.

## FIRST CLAIM FOR RELIEF

### *Violation of FLPMA*

68.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

69.     Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM must ensure that a site-specific project conforms to the governing Resource Management Plan ("RMP"). The Thurston Hills Project was developed under the 2016 Northwestern and Coastal Oregon RMP. Pursuant to direction to "provide a diversity of quality recreational opportunities," the RMP designates several Extensive Recreation Management Areas. Each designated ERMA must be managed in accordance with its specific planning framework.

70.     The Thurston Hills Project is planned within the Willamalane Non-Motorized Trails Extensive Recreation Management Area. The planning framework for this ERMA includes a description of the recreation values, what type of visitors are targeted, the outcome objectives,

the recreation setting characteristics, and the applicable management actions and allowable use restrictions. Within this ERMA, the BLM is tasked with recreational development consistent with the District's proposal to preserve views; enhance wildlife habitat and sensitive natural areas; and provide walking, hiking, and mountain biking opportunities. The recreation objectives in the Willamalane Non-Motorized Trails ERMA include the following activities: mountain biking, hiking, picnicking, day use, environmental education, wildlife viewing, and geocaching.

71.    Vegetation management, including any timber harvest, is only allowed within the ERMA to the extent it is compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics.

72.    The RMP describes setting characteristics by degrees of naturalness along a continuum from Primitive to Rural. This ERMA's setting characteristic is "Front Country." Timber management activities affect the naturalness aspects of the recreation setting (i.e., mid seral forest ecosystems will be converted into piles of logging slash and stumps, followed by replanting that will result in a homogenous tree plantation). The proposed regeneration harvest would convert the current "Front Country" setting to "Rural" – characterized as the lowest naturalness setting. This change in setting characteristics is not in accordance with the RMA Framework. Under the RMP, thinning "Front Country" forest stands, in contrast to regeneration harvesting, would up-list the area designation to "Middle Country" by creating age class diversity within the stands rather than removing them entirely.

73.    The BLM argues that the reduction in naturalness caused by regeneration harvest would not impact recreation objectives. However, the agency evaluates the impacts of regeneration harvest only on mountain biking; the RMA requires the BLM to take all objectives into account,

which for this project include preserving views, providing hiking opportunities, and enhancing

wildlife habitat. The BLM failed to analyze a regeneration harvest's effects on these objectives.

74.     The RMA Framework for the Willamalane Non-Motorized Trails ERMA requires the

BLM to designate a Recreation Management Zone ("RMZ") around any designated trails.

Specifically, within these zones, timber harvest is only permitted to protect/maintain recreation

setting characteristics and/or to achieve recreation objectives.

75.     The Thurston Hills Project designates trails and, in response to the Court's order, now

establishes an RMZ. However, the BLM's decision proposes clearcutting the RMZ. This is a

violation of the Court's order, which "requires BLM to designate and *preserve* a Recreation

Management Zone prior to harvest." (emphasis added).

76.     BLM argues that "timber harvest has no impact on realizing recreation objectives,"

however the BLM fails to recognize that in order for logging to occur in the RMZ, it must be

designed to "achieve recreation objectives."

77.     The BLM argues that logging the RMZ is legal due to plan maintenance language in the

2016 RMP that was added to the document on August 8, 2018: "Where ERMA designations

overlap with the Harvest Land Base, implement actions as directed by the Harvest Land Base

management direction and consider project design features that would minimize or avoid adverse

effects to the recreational resources […]"

78.     The BLM's plan "maintenance" statement changes substantive protections in the RMP.

The BLM's plan "maintenance" statement alters the 2016 RMP's management directions. The

BLM did not "consider" any viable alternatives that protect or preserve the RMZ.

79.     The proposed logging associated with the Thurston Hills Project does not protect or

maintain recreation setting characteristics or achieve recreation objectives. The proposed logging

associated with the Thurston Hills Project is not compatible with meeting recreation objectives, interferes with recreation opportunities, and degrades setting characteristics. The proposed logging is not designed or needed to achieve recreation objectives.

80.     The BLM's failure to develop a Project in accordance with the direction and allowable uses in the Willamalane Non-Motorized Trails ERMA is a violation of FLPMA and is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF

### *Violation of NEPA and 5 U.S.C. § 706(2)(A)*

81.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

82.     NEPA and its implementing regulations require federal agencies to take a hard look at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508.

83.     An EA must provide sufficient information for determining whether to prepare an EIS or issue a Finding of No Significant Impact. The information presented in the EA must be of "high quality," and include "accurate scientific analysis." 40 C.F.R. 1500.1(b). The agency must adequately explain its decision not to prepare an EIS by supplying a convincing statement of reasons why potential effects are insignificant.

84.     In both an EA and EIS, NEPA requires the agency to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 102(2)(E). Further, agencies "shall rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives, which were eliminated from detailed study, briefly discuss the reasons for

COMPLAINT                                    22

their having been eliminated." 40 C.F.R. § 1502.14(a). The alternatives analysis "is the heart of the [NEPA document]." *Id.* This analysis must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.*

85.     A no action alternative "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 642 (9th Cir. 2010). Where the agency is evaluating a proposal for a project, "'no action' . . . would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

86.     A Project's purpose and need must not be unreasonably narrow as to preclude the consideration of reasonable alternatives. *Muckleshoot Indian Tribe v. United States Forest Service*, 177 F.3d 800, 811 (9th Cir. 1999) (citing 40 C.F.R. § 1502 .13).

87.     BLM has violated NEPA and its implementing regulations through issuance of the Thurston Hills Non-Motorized Trails and Forest Management EA/FONSI and Decision Record. These violations include, but are not limited to:

     a)     Failing to take the requisite hard look at the Project's impact to fire hazard. The BLM's no-action alternative and baseline for project analysis assumes the existence of the very timber sale being proposed skewing conclusions about fire hazard impacts and project significance and depriving the public of meaningful participation.

b)      Failing to take the requisite hard look at the Project's impacts on recreation. The BLM's conclusions about recreation impacts conflict with its own analysis.

c)      Proceeding under an unreasonably narrow purpose and need for the Project;

d)      Failing to thoroughly consider and objectively evaluate an adequate range of reasonable alternatives, including an alternative that would preserve the RMZ from logging activities within the ERMA and an alternative that maintains setting characteristics within the ERMA. Such an alternative could include regeneration harvest but exclude that style of harvest from the designated RMZ. Such an alternative is feasible and would harmonize the diverse goals for the public lands in this project area by producing some timber volume while significantly reducing the adverse impacts to aesthetics (i.e. setting characteristics) and the recreational experience that would result from a clear-cut style of timber harvest, and would avoid or mitigate the negative fire hazard and risk implications associated with aggressive regeneration harvesting that removes 85% of all live trees.

e)      Otherwise failing to take the requisite hard look at the Project's impacts.

88.     The BLM's decision to implement and proceed with the proposed action under an unreasonably narrow purpose and need, without first analyzing an adequate range of alternatives, and failing to take the requisite hard look at the Project's potential environmental consequences is arbitrary, capricious, and not in compliance with NEPA, the statute's implementing regulations, and therefore must be reversed and remanded for the reasons identified above. 5 U.S.C. § 706(2)(A).

89.     These violations of NEPA are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a)  Adjudge and declare that the Defendants' approval of the February 2020 Thurston Hills Project violates FLPMA, NEPA, those statutes' implementing regulations, and thus are arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

b)  Vacate and set aside the 2020 Decision Record, FONSI, and EA for the Thurston Hills Project, and order the Defendants to withdraw the DR, FONSI, and EA and any associated contracts until such time as Defendants demonstrate that they have complied with the law;

c)  Remand the decision to Defendants so it may revise the Project in line with the requirements of FLPMA and NEPA;

d)  Enjoin Defendants and their contractors, assigns, and other agents from proceeding with commercial logging prescriptions unless and until the violations of federal law set forth herein have been corrected;

e)  Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

f)  Award Plaintiffs their costs of suit, reasonable expenses and attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

g) Grant such further relief as the Court deems just and equitable in order to provide

Plaintiffs with relief and protect the public interest.

Respectfully submitted and dated this 17th day of August, 2020.

_____
Nicholas Cady (OSB # 113463)
P.O. Box 10455
Eugene, Oregon 97440
Phone: (541) 434-1463
nick@cascwild.org

_____
Daniel C. Snyder (OSB# 105127)
B. Parker Jones (OSB# 191163)
Law Offices of Charles M. Tebbutt
941 Lawrence St.
Eugene, OR 97401
Phone: (541) 344-3505
dan@tebbuttlaw.com
parker@tebbuttlaw.com

*Attorneys for Plaintiffs*

CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs disclose that they do not have parent corporations, nor do

the Plaintiff organizations have stock.

COMPLAINT                                    26