Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

*Additional Counsel Identified on Signature Page*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; OREGON WILD, an Oregon non-profit corporation; | Civ. Case No. 6:20-cv-01395 |
| Plaintiffs, vs. | PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT |
| UNITED STATES BUREAU OF LAND MANAGEMENT, an administrative agency of the United States Department of Interior, | |
| Defendant, | |
| and | |
| SENECA SAWMILL COMPANY, an Oregon Corporation, | |
| Defendant-Intervenor. | |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, Plaintiffs Cascadia Wildlands and Oregon Wild respectfully request that this Court grant summary judgment and relief in Plaintiffs' favor in the above-captioned action. Pursuant to Local Rule 7-1, the undersigned hereby certifies that the parties have conferred and have been unable to reach an agreement on the subject matter of this motion.

Plaintiffs seek declaratory relief finding that the Thurston Hills timber sale, as authorized by the United States Bureau of Land Management ("BLM") under the revised Thurston Hills Non-Motorized Trails and Forest Management Project (the "Project") Decision Record and Finding of No Significant Impact ("FONSI"), violates the Federal Land Management and Policy Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). Because Defendant-Intervenor, the timber sale purchaser Seneca Sawmill Company, has indicated that it intends to begin logging operations challenged hereunder as early as March 2021, Plaintiffs further respectfully request that the Court rule on this matter prior to that date.

In support of this motion, Plaintiffs refer the Court to the Memorandum in Support of Plaintiffs' Motion for Summary Judgment, the administrative record lodged by Federal Defendant with this Court, Plaintiffs' Complaint, and such other and further matters as may be presented to the Court before the decision hereon.

## JURISDICTION AND STANDING

BLM's Thurston Hills Project Decision Record and associated Finding of No Significant Impact ("FONSI") are final agency actions as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(13). This challenge is brought pursuant to the APA's

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

i

judicial review provisions, 5 U.S.C. §§ 701-706. This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 2201 (declaratory relief).

Plaintiffs' standing to pursue this action is set forth in Plaintiffs' Complaint at ¶¶ 7-22, and explained further in the standing declarations of Ronna Frank, Ian Petersen, Doug Heiken, and Courtney Kaltenbach, filed herewith.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7-2(b)(2), the undersigned hereby certifies that the following memorandum contains 10,263 words including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

**MEMORANDUM IN SUPPORT OF MOTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................v

LIST OF ACRONYMS ............................................................................................ viii

INTRODUCTION...........................................................................................................1

FACTUAL BACKGROUND ..........................................................................................2

    I.    Thurston Hill Project Area ...............................................................................2

    II.   Thurston Hill Non-Motorized Trails and Forest Management Project I ......................4

    III.  Thurston Hill Non-Motorized Trails and Forest Management Project II....................6

STANDARD OF REVIEW .............................................................................................9

ARGUMENT .................................................................................................................10

    I.    BLM VIOLATED THE FEDERAL LAND POLICY & MANAGEMENT
           ACT AND THIS COURT'S ORDER BY AGAIN
           PROPOSING TO LOG TRAILS ................................................................10

          A.  Failure to Protect/Preserve Recreation Management Zone
              From Harvest..................................................................................12

          B.  Failure to Amend the Resource Management Plan................................13

          C.  Failure to Analyze/Demonstrate Compliance with
              Planning Framework Standards ......................................................16

    II.   BLM'S FIRE HAZARD ANALYSIS ON REMAND VIOLATES
          THE COURT'S ORDER AND NEPA .....................................................19

          A.  Failure to Analyze No Action Alternative ...........................................20

          B.  Failure to Provide a Rational Explanation for Change in Position .......24

**III.    BLM FAILED TO ANALYZE REASONABLE ALTERNATIVES**....................27

**CONCLUSION** ..............................................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Anaheim Mem'l Hosp. v. Shalala*,
    130 F.3d 845 (9th Cir. 1997) ............................................................9

*Bob Marshall Alliance v. Hodel*,
    852 F.2d 1223 (9th Cir. 1988) .........................................................27

*Cascadia Wildlands v. Bureau of Land Mgmt.*,
    410 F. Supp. 3d 1146 (D. Or. 2019) ....................................... *passim*

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) .........................................................27

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    746 F. Supp. 2d 1055 (N.D. Cal. 2009) ...........................................26

*Ctr. for Biological Diversity v. U.S. Dept. of Interior*,
    623 F.3d 633 (9th Cir. 2010) ..............................................20, 21, 23

*Citizens Against Burlington v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) .........................................................28

*City of Carmel by the Sea v. U.S. Dept. of Trans.*,
    123 F.3d 1142 (9th Cir. 1997) .........................................................28

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...............................................................24, 27

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) .............................................21, 23, 24

*Friends of Yosemite Valley v. Scarlett*,
    439 F. Supp. 2d 1074 (E.D. Cal. 2006)............................................24

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
    373 F. Supp. 2d 1069 (E.D. Cal. 2004)............................................31

*Marsh v. Or. Natural Res. Council*,

490 U.S. 360 (1989) ........................................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...............................................................................9, 25

*Native Ecosystems Council v. United States Forest Service*,
    418 F.3d 953 (9th Cir. 2005) ......................................................................12

*Nw. Coalition for Alternatives to Pesticides v. EPA*,
    544 F.3d 1043 (9th Cir. 2008) .....................................................................9

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ....................................................................24

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004)....................................................................................10

*Oregon Nat'l Desert Ass'n v. BLM*,
    625 F.3d 1092 (9th Cir. 2010) ...........................................................11, 17, 18

*Oregon Nat'l Desert Ass'n v. Rose,*
    921 F.3d 1185 (9th Cir 2019) .....................................................................17

*Ore. Natural Resources Council v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) .............................................................10, 17, 18

*Oregon Nat. Res. Council Action v. U.S. Forest Serv.*,
    445 F. Supp. 2d 1211 (D. Or. 2006) .............................................................29

*Simmons v. U.S. Army Corps of Eng'rs*,
    120 F.3d 664 (7th Cir. 1997) ......................................................................28

*W. Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013) .....................................................................27

**Statutes**

5 U.S.C. § 706............................................................................................9

42 U.S.C. § 4332....................................................................................20, 27

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

43 U.S.C. § 1701 ...................................................................................................................10

43 U.S.C. § 1712 ...................................................................................................................10

43 U.S.C. 1732 .................................................................................................................10, 18

**Regulations**

40 C.F.R § 1500.8 .................................................................................................................27

40 C.F.R. § 1502.14 .........................................................................................................20, 27

40 C.F.R. § 1508.9 .................................................................................................................27

43 C.F.R. § 1601.0-5(b) .........................................................................................................10

43 C.F.R. § 1610.5-3(a) .....................................................................................................10, 18

43 C.F.R. § 1610.5-5 .............................................................................................................15

46 Fed. Reg. 18,026 (March 23. 1981) ..................................................................................21

## LIST OF ACRONYMS

APA                    Administrative Procedure Act

ASQ                   Allowable Sale Quantity

BLM                   Bureau of Land Management

DR                      Decision Record

EA                      Environmental Assessment

EIS                    Environmental Impact Statement

ERMA               Extensive Recreation Management Area

FEIS                Final Environmental Impact Statement

FLPMA             Federal Land Policy and Management Act

FONSI             Finding of No Significant Impacts

HLB                   Harvest Land Base

LSR                   Late-Successional Reserve

NEPA               National Environmental Policy Act

PRMP               Proposed Resource Management Plan

RMA                 Recreation Management Area

RMP                 Resource Management Plan

ROD                 Record of Decision

THNA               Thurston Hills Natural Area

WPRD              Willamalane Parks and Recreation District

WUI                 Wildland Urban Interface

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

## INTRODUCTION

On September 18, 2019, this Court ruled that the BLM's Thurston Hills Non-Motorized Trails and Forest Management Project was unlawful. Accordingly, the Court remanded the Project to BLM with unambiguous instruction to fully analyze and disclose the increased fire hazard to the public and to preserve the Recreation Management Zone prior to timber harvest activities. As explained herein, the BLM failed on both counts, approving what is essentially the same Project that this Court already rejected.

Recent events demonstrate the severity of the BLM's misjudgment in approving the Project. Just down the road from the Project area, the Holiday Farm conflagration utterly consumed the McKenzie River valley, claiming lives, destroying entire towns, and leaving an indelible mark on one of Oregon's most-treasured landscapes. Many Thurston-area residents, including a declarant in this case, *see, e.g.,* Frank Decl. ¶¶ 4-10, experienced the Holiday Farm fire firsthand, as they were forced to evacuate their homes for fear of losing their lives.

In the immediate aftermath of the disaster, residents of the McKenzie River valley are dismayed to find they face another threat: a BLM that is recklessly pushing forward with a timber harvesting project that would inexplicably *increase* the risk of fire danger to public lands, neighborhoods, and homes in the area. Predominantly, the land ravaged by the Holiday Fire was composed of large, uniform timber plantations, *id*. at ¶¶ 4-10, *the very same type* of flammable plantation that BLM will create by clearcutting the mature, fire-resistant forest stands that presently exist in the Thurston Hills Project Area. More troubling, these timber stands are adjacent to a community that has already been designated as having a "moderate to high" fire risk, and one that just barely escaped the brunt of Oregon's most destructive wildfires.

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

Instead of complying with the Court's prior order and addressing the public's concerns, the BLM proposes a near-identical logging project that it falsely claims will not increase wildfire danger for the Thurston community. AR 177-8 (BLM representing to the public that there will be no difference in wildfire impacts from the proposed logging and no action at all). Furthermore, in direct contravention to this Court's order, the BLM designated a Recreation Management Zone ("RMZ"), but will once again log it, failing to *preserve* the RMZ prior to harvest. The BLM's apparent impetus for disregarding the Court's clear commands is the mistaken assumption that the BLM's contract with Seneca is still valid despite the Court's remand, and that therefore the timber in the Project area remains Seneca's property. AR 4320 (BLM Decision Record stating "any timber that was sold under the contract belongs to the purchaser"). Not only is this assumption materially incorrect, this type of preordained outcome is illegal and, indeed, antithetical to the requirements of the National Environmental Policy Act.

Because the BLM is directly violating this Court's prior order—indeed, the agency repeats the same legal errors raised in the prior lawsuit—Plaintiffs seek an order vacating BLM's flawed environmental analysis and decision and remanding the matter back to the agency.

## FACTUAL BACKGROUND

### I.    Thurston Hills Project Area

The Thurston Hills project area is located approximately one-quarter of a mile east of the city limit of Springfield, Oregon, a portion of which is located within the Urban Growth Boundary of Springfield. AR 3647. The Thurston Hills area, including the Project Area, is identified as Wildland Urban Interface ("WUI"). AR 3643. Private residences surround the north, east, and south boundaries of the Project Area, and on the western boundary is Willamalane's Thurston Hill's Natural Area. AR 3647-8. Springfield is classified as a

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

"community at risk," and more specifically, Thurston Hills is identified as an area of concern by

the Lane County Community Wildfire Protection Plan. AR 3644. The Thurston Hills area has a

high probability of human caused fires compared to the statewide average. AR 3648. The land

surrounding the Project Area is being and will continue to be urbanized in the foreseeable future

as the population east of Interstate 5 is expected to reach 81,000 by 2030. AR 3646. As

population and urbanization increase, there will be a commensurate increase in the likelihood of

human-caused fires in the Thurston area. *Id.* BLM acknowledges that operating this close to

town is "unusual for BLM-administered lands because of the abundance of residences and

infrastructure near the project area." AR 3644.



Figure 1.    Thurston Hills EA Vicinity Map

AR 3594.

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

II.     **Thurston Hills Non-Motorized Trails Project and Forest Management Project I**

In 2016, after the Willamalane Parks and Recreation District ("WPRD") acquired the

665-acre Thurston Hills Natural Area, the BLM, recognizing the opportunity to meet the public

demand for outdoor recreation in the Eugene-Springfield region, agreed to formally collaborate

with WPRD to create a connected trail system. AR 1558-60. BLM thereafter designated the land

adjacent to the WPRD Thurston Hills Natural Area as the 1,058-acre Willamalane Non-

Motorized Trails Extensive Recreation Management Area ("ERMA") in its 2016 Resource

Management Plan ("RMP"). AR 3595, 16387-89 (Willamalane ERMA Planning Framework);

11641-42, 17076 (RMP directing BLM to develop and maintain partnerships with recreation-

based organizations to leverage resources for planning, implementing, and monitoring RMAs).

"As part of this RMP, the BLM has designated portions of the landscape as either

SRMAs or ERMAs. Within each of these designated areas, the BLM has established recreation

and visitor service objectives and identified supporting management actions and allowable uses."

AR 17239. Each Recreation Management Area has individualized planning frameworks, AR

16846-980, and the RMP requires that the BLM manage each "in accordance with their planning

frameworks." AR 17076.

Pursuant to the specific Willamalane ERMA, the BLM is required to establish a

Recreation Management Zone ("RMZ") for all designated trails in the ERMA. AR 16389.

RMZ's are subdivisions of the broader Recreation Management Areas which "further delineate

specific recreation opportunities or to ensure recreation and visitor services are managed

commensurate with the management of other resources and resource uses." AR 17239. Under

the Willamalane ERMA, timber harvest within the RMZ is only allowed to "**protect/maintain**

**recreation setting characteristics and/or achieve recreation objectives**." AR 16389 (emphasis

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

added). Within the broader Willamalane ERMA, the BLM is to allow fuel treatments or other vegetation modifications only "if compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics." *Id.*

In March 2017, BLM issued its public "scoping" notice for the Thurston Hills Project. AR 1539-41; 1338-41 (maps and description of types of potential fuels reduction treatments). Plaintiffs submitted scoping comments, noting the ambiguity in the BLM's public notice with regard to potential timber harvest, and urging the agency not to employ aggressive commercial logging for fuels reduction and to avoid regeneration logging. AR 1244-6. Plaintiffs also outlined many potentially adverse effects of regeneration logging, including the concern that such harvest results in dense, young, homogenous tree plantations that represent very hazardous fuel conditions, especially when compared to mature forests. *Id.*

In April 2018, BLM issued its first Thurston Hills Non-Motorized Trails and Forest Management Project Environmental Assessment (EA) and subsequently issued a revised EA in May 2018. AR 4311. While acknowledging that the proposed logging would increase fire hazard in the surrounding areas for the next 40 years, AR 3929, this final EA did not provide a site-specific detailed analysis of this issue. *See* AR 3928-29 (wildfire issues "Considered, but Eliminated from Detailed Analysis"). Opposition to the project was overwhelming, with the public, WRPD, City of Springfield, and Congressman Peter DeFazio all raising serious concerns with BLM's decision to authorize regeneration logging in the newly designated ERMA. AR 839-40 (Congressman Peter DeFazio stating "If the BLM proceeds with this project, it will inflict lasting damage to its reputation and will garner ill will from the community for decades. The agency will lose any trust or goodwill that has been built over the years by previous district managers."); AR 866-7 (WRPD and City of Springfield objection meeting notes); AR 878

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

5

(Valley Powersports objection to logging); AR 15754-7 (City of Springfield's and

Willamalane's joint formal protest of the project). Nonetheless, the BLM issued a Finding of No

Significant Impact ("FONSI") and Decision Record ("DR") selecting a modified Alternative 4.

AR 4327. This modified Alternative 4 proposed approximately 100 acres of regeneration harvest

within the ERMA that would increase fire risk and hazard for an already at-risk Thurston

community. AR 3887.

After the BLM denied Plaintiffs' protest, AR 15681-707, Plaintiffs were compelled to file

suit to protect their members' rights, interests, and community. This Court subsequently found

that BLM's Thurston Hills Project violated FLPMA by ignoring the Willamalane ERMA

framework's language by failing "to designate trails and establish a Recreation Management

Zone before logging begins to ensure adequate protection in the buffer area." *Cascadia*

*Wildlands v. BLM*, 410 F. Supp 3d 1146, 1156 (D. Or. 2019). This Court additionally found that

the Project violated NEPA by failing to take the requisite "hard look" and not fully analyzing

and publicly disclosing "the degree of fire hazard to adjacent community that the Project is likely

to increase." *Id.* at 1157. The Court remanded the matter to BLM to "issue a new environmental

assessment that adequately discloses and analyzes the likely increase to fire hazard to adjacent

communities, make it available for public review and comment, and – if the Project proceeds –

designate and preserve a Recreation Management Zone prior to harvest." *Id.* at 1161.

III.    **Thurston Hills Non-Motorized Trails Project and Forest Management Project II**

In violation of this Court's order, the BLM issued a new EA and Decision in February of

2020, less than six months after this Court's ruling, which authorizes logging that is virtually

identical to BLM's previous and unlawful proposal. AR 3586 (only changes are revised project

maps, analysis of fire hazard and risk, minor typo corrections). The preferred Alternative 4 again

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

proposes regeneration harvest on approximately 100-acres within the ERMA that would increase fire risk and hazard for the already at-risk Thurston community. AR 3618; AR 2299-30 (2019 Fuels Specialist Report highlighting increased wildfire danger from regeneration harvest prior to modifications). And despite the Court's order to "preserve a Recreation Management Zone prior to harvest," *Cascadia*, 410 F. Supp. 3d at 1161, BLM again proposes to construct the trail system "after the completion of harvest activities." AR 3619.

The BLM also misses the mark on its fire hazard and risk analysis. While the agency conducted a new analysis, it improperly attempts to dilute the Project's effects by claiming that the proposed logging, which remains unchanged, does not present an increase in fire hazard when compared to the "No Action" alternative, because the "No Action" alternative itself presumes logging will occur in the future. AR 3661 ("the effects on fire hazard would be the same under all alternatives").

Numerous public comments expressed concern that regeneration logging in the Thurston Hills area, coupled with more extreme fire weather, a growing population, and increased recreational use, could significantly increase the overall fire hazard and risk to immediately adjacent human communities. AR 4321-22 (EA); AR 14898. As BLM's Fuels Specialist Report for the Thurston Hills Project acknowledges, regeneration logging, by removing virtually all forest canopy, greatly increases surface fuels, resulting in higher rates of spread and greater flame lengths in the event of a fire, which in turn increases fire risk to the public and firefighting community. AR 2292-95 ("[b]rush fuel types are more volatile and are susceptible to high rates of fire caused mortality."); AR 13511-12 (FEIS/PRMP showing residual fuel load greatest with heavy/moderate clearcut types of harvest as called for here).

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

Urban development and population growth in the surrounding communities are also expected to increase, as is public use of newly developed recreational opportunities. AR 2288. The vast majority (96%) of fires are human caused and occur within close proximity to developed areas. AR 2296. The risk of human caused fires within the Thurston Hills Project area is already considered moderate to high. AR 2287; AR 5908 (SRTH WUI Project EA). Increased development of homes in the WUI, trails systems, recreation, and major travel corridors all serve to increase the risk of human-caused fires. AR 5908; AR 13504 (FEIS/PRMP).

Just this month, only miles from the Project area at issue here, the deadliest and most destructive wildfires in Oregon history ravaged the Cascade region, burning over a million acres, destroying thousands of homes, and killing at least nine people.[1] In fact, the fires are still burning—primarily in clearcuts and second growth forest.[2] Here, the Project's timber sale will convert predominantly mature forest stands that are currently a *low* fire hazard, AR 2371, 76 (BLM charts depicting "integrated hazard data" showing "lower to lowest" ratings), to slash and brush with *high* fire hazard ratings. AR 2341. Following replanting, in five to ten years these stands will transition to dense, young conifer plantations that *also* have a high fire hazard rating. AR 2292-95 ("Fires within homogenous young plantations would exhibit high flame lengths, rates of spread, and fire intensity."). Only after *fifty years* would stands that have been regeneration harvested transition back toward a mature structural stage with a low to mixed fire hazard rating. *Id*.

---

[1] https://www.washingtonpost.com/nation/2020/09/11/oregon-wildfires-clackamas-evacuation/, https://www.opb.org/article/2020/09/24/only-two-people-remain-missing-in-oregons-devastating-wildfires/
[2] https://www.opb.org/article/2020/09/25/wet-weather-holds-oregon-fires-in-check/

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

On May 20, 2020, ignoring the public and Thurston Hills Community's concerns, BLM announced its decision to move forward with the timber sale and the Project without any changes to the regeneration harvest plan, concurrently issuing another FONSI and DR. AR 4309. Plaintiffs, left again with no administrative recourse to protect their and their members' rights and interests, promptly availed themselves of judicial review and filed this suit.

## STANDARD OF REVIEW

This action is governed by the Administrative Procedure Act, which directs that the Court "shall" set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989). While review under the "arbitrary and capricious" standard is narrow, a court's inquiry must be "searching and careful," and an agency must articulate a rational connection between the facts found and the conclusions made. *Marsh*, 490 U.S. at 378. This Court "must disapprove the agency's action" "where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret." *Nw. Coalition for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (internal quotes omitted). A decision is arbitrary and capricious if the agency:

> "[H]as relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's decision can be upheld only on the basis of the reasoning found in that decision. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

## ARGUMENT

### I.     THE BLM VIOLATED THE FEDERAL LAND POLICY & MANAGEMENT ACT AND THIS COURT'S ORDER BY AGAIN PROPOSING TO LOG THE TRAILS

The BLM's Thurston Project violates FLPMA and this Court's prior order because it (A) fails to protect or preserve the RMZ prior to harvest, (B) fails to lawfully amend the Resource Management Plan, and (C) fails to analyze or otherwise demonstrate compliance with the planning framework standards.

As legal background, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*., requires BLM to prepare Resource Management Plans ("RMPs") for the various districts under its control. 43 U.S.C. § 1712. BLM must ensure that site-specific management actions are consistent with and conform to the governing RMP. 43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b); 1610.5-3(a); *Ore. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (observing that the statutory directive in 43 U.S.C. § 1732(a) "prevent[s] BLM from taking actions inconsistent with the provisions of a land use plan.").

As such, the Project's timber sale must conform to the requirements of the Northwestern and Coastal Oregon RMP (2016). AR 4572 (DR). The 2016 RMP requires BLM to "[p]rovide a diversity of quality recreational opportunities" and to manage all ERMAs "in accordance with their planning frameworks." AR11475 (RMP). These planning frameworks are individualized to the specific recreation area and its unique needs.

The planning framework for the Willamalane Extensive Recreation Management Area contains several restrictions on logging activities within the "Management Actions and Allowable Use Restrictions" section:

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

10

1)     Allow firewood cutting and special forest product harvest if compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics.

2)     Allow sale of hazard trees if compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics.

3)     *Allow fuel treatments or other vegetation modifications if compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics.*

4)     *Establish a Recreation Management Zone (RMZ) distance (off of center line) for all designated trails.*

5)     *Allow timber harvest activity within zone to protect/maintain recreation setting characteristics and/or to achieve recreation objectives.*

AR 16389 (emphases added). Thus, logging and other vegetation management activities are only permitted within the Extensive Recreation Management Area if the BLM demonstrates that the logging will be "compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics." *Id.* More narrowly within the ERMA, the BLM is required to establish an RMZ around all designated trails, and timber harvest is only allowed here to "protect/maintain setting characteristics and/or achieve recreation objectives." *Id.*

BLM's RMP FEIS provides a framework to evaluate and demonstrate compliance with these substantive standards. AR 18268-83. The Ninth Circuit has held that the agency must demonstrate compliance with substantive plan standards in a NEPA document; otherwise, the agency is violating FLPMA. *Oregon Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1110–11 (9th Cir. 2010) (NEPA analysis must include "considerations made relevant by the substantive statute driving the proposed action"). While the analysis need not be perfect, the court "must still be able to reasonable ascertain from the record" that the agency is in compliance with the plan standard. *Native Ecosystems Council v. United States Forest Service*, 418 F.3d 953, 963 (9th Cir. 2005) (citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196-97 (1947)).

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

A.  Failure to Protect/Preserve Recreation Management Zone from Harvest

On September 18, 2019, this Court ruled in Plaintiffs' favor on the RMZ and buffering

issue and ordered the BLM on remand to "designate and preserve" an RMZ "prior to harvest."

Ex. A at 21. In response, the BLM prepared a new EA, published on February 4, 2020 ("2020

EA"). AR 3586-688. Incredibly, the 2020 EA proposes to log the identical area originally

outlined by the BLM in 2018. AR 3620 (Alternative 4 logging prescriptions unchanged).

Specifically, defendant states that:

> "BLM would develop and designate trails first and establish the RMZ 50 feet
> from the center line of the designated trail. *Within and adjacent to harvest areas,*
> *BLM would then implement the timber harvest activities*, followed by trail
> construction, in order to avoid trail investments that could be damaged by
> harvesting activities, and to prevent the need for recreational trail closures during
> the harvest."

AR 3619 (emphasis added). Only "after completion of harvest activities" would the BLM

"construct the trail system throughout the timber harvest areas[.]" *Id.*; *see also* AR 3695

(planning image showing that timber harvest will occur in designated RMZ areas).

The BLM's "preferred alternative 4" plainly violates the Court's prior order regarding

the establishment *and preservation* an RMZ prior to timber harvest. The Court explained in its

decision that:

> BLM initially said that it would establish a Recreation Management Zone as part
> of the Project's "purpose and need," then later concluded that they could not do so
> "in the absence of designated trails and an established [Recreation Management
> Zone]." AR 1444, 10262. But this "cut the trees first, zone the buffer later"
> argument ignores the Willamalane ERMA framework's language and certainly
> the expectations of the Willamalane Parks and Recreation District when they
> collaborated with BLM. At oral argument, Defendant argued that it makes more
> sense economically and operationally to designate trails and establish a
> Recreation Management Zone after logging. Defendant provided no basis or
> explanation for this argument. In essence, they argue that it is simply easier to
> paint on a blank canvas. But allowing logging and then establishing a Recreation
> Management Zone at some unspecified later date—if at all—seems to defeat the
> Zone's very purpose. The Court therefore requires BLM to designate trails and

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

establish a Recreation Management Zone before logging begins to ensure
adequate protection in the buffer area.

*Cascadia*, 410 F. Supp. 3d at 1156. The Court then held:

> The matter is REMANDED to the Bureau of Land Management to issue a new
> environmental assessment that adequately discloses and analyzes the likely
> increase of fire hazard to adjacent communities, make it available for public
> review and comment, and—if the Project proceeds—*designate and preserve a
> Recreation Management Zone prior to harvest*.

*Id*. at 1161(emphasis added). Despite the Court's explicit order, the BLM's 2020 EA designates

an RMZ but again plans to log the RMZ, a far cry from the Court's instruction to "preserve" the

RMZ "prior to harvest." To "preserve" means to maintain something in its original state. Under

the BLM's proposal, "preserving" the RMZ first requires altering that original landscape by

logging the forest within the RMZ and its fifty-foot buffer. This completely defeats the purpose

of the RMZ and violates this Court's remand order.

    B.  <u>Failure to Amend the Resource Management Plan</u>

To circumvent the allowable use restrictions identified *supra,* the BLM engages in an

unlawful attempt to amend the RMP without following proper administrative procedures.

Specifically, the BLM issued a "plan maintenance document" *days* before denying the

administrative protests filed by Plaintiffs, Willamalane Parks and Recreation District, and the

City of Springfield, AR 15761-65, AR 15754-6 (protests); AR3592-93 (Maintenance document

dated August 8, 2018); AR 15717 (Protest Denial dated August 15, 2018). This maintenance

document purports to amend all ERMA planning frameworks:

> Plan maintenance added the following text to the beginning of the Forest Management
> section: "Apply the following guidance to the extent it is consistent with the management
> direction for the underlying Land Use Allocation. Where ERMA designations overlap
> with the Harvest Land Base, implement actions as directed by the Harvest Land Base
> management direction and consider project design features that would minimize or avoid
> adverse effects to the recreational resources identified in the RMP's ERMA Planning
> Framework to the extent consistent with Harvest Land Base management direction." The

addition of this text provided clarification consistent with the ROD/RMP, which states that "the BLM will not defer or forego timber harvest of stands in the Harvest Land Base for reasons not described in the management direction or this appendix" (ROD/RMP, p. 105). The BLM therefore designed and would implement the Thurston Hills Project per the HLB-MITA management direction, while incorporating project design features that would minimize or avoid adverse effects to the recreational resources identified in the Willamalane Non-Motorized Trails ERMA and would achieve the recreation objectives of the ERMA.

AR 3592-93. The BLM's plan maintenance document is an illegal attempt to expand the scope of its resource uses, restrictions, and decisions without formally amending the RMP as required by law.

Indeed, while the RMP explicitly contemplates plan maintenance changes to Recreation Management Area Frameworks, like the Willamalane ERMA, such changes are "limited to further refining, documenting, or clarifying a previously approved decision." AR 17239. The reason these "maintenance documents" are so limited in scope is because "[p]lan maintenance does not require formal public involvement, interagency coordination, or the NEPA analysis required for making new RMP decisions." *Id.* The RMP is very clear that "**[p]lan maintenance will not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved plan.**" *Id.* (emphasis added).

The BLM admits that it adopted this plan maintenance document to expand the scope of resource use in the ERMAs: "[w]ithout this clarification, the guidance in the Recreation Management Area Frameworks would appear to restrict the implementation of timber harvest." AR 16382. Such a stated intention is beyond the limitations of "plan maintenance," as it "expand[s] the scope of resource uses or restrictions" and "change[s] the terms, conditions, and decisions of the approved plan." AR 17239.

A similar issue was addressed by the Ninth Circuit in *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006). There, the BLM attempted through a plan maintenance

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

document to downgrade the survey and manage designation of the red tree vole from Category C to Category D. *Id.* at 556. The practical effect of this change was that the BLM would no longer need to survey for or protect red tree vole nest sites with a ten-acre buffer. *Id.* at 558. The Court held that eliminating the buffering requirement impermissibly "altered the terms and conditions of the Roseburg and Medford district's resource management plans," because "[u]nder FLPMA, if BLM wishes to change a resource management plan, it can only do so by formally amending the plan pursuant to 43 C.F.R. § 1610.5-5." *Id.* at 556-8.

Here, the BLM repeats the same mistake. The agency's "plain maintenance document" not only eliminates the requirement to buffer the RMZ from harvest—as directly called for in the RMP and this Court, AR 16389; *Cascadia*, 410 F. Supp. 3d at 1161.—but also eliminates all allowable use restrictions found within the 44 different ERMA frameworks. AR 16381, 16708. These allowable use restrictions on harvest and mining would be reduced to a requirement to simply "consider project design features that would minimize or avoid adverse effects to the recreational resources." AR 16381. Under *Klamath Siskiyou Wildlands Ctr.,* the elimination of substantive protections and buffers unquestionably alters the terms and conditions of the RMP, and as such, "can only be accomplished by formally amending the plan pursuant to 43 C.F.R. § 1610.5-5." 468 F.3d at 556.

Nevertheless, the BLM proposes to proceed exactly as it did before, only this time under the mistaken presumption that its impermissible "plan maintenance document" somehow supersedes the explicit restrictions of the RMP. Not only is this legally wrong, *id.*, but it also ignores the instruction provided by the Court that cutting first, buffering later *is unlawful* under the RMP and, consequently, FLMPA. *Cascadia*, 410 F. Supp. 3d at 1155-6. The BLM attempts to dodge this obvious dilemma by asserting that "the ERMA framework would be protected by

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

the RMZ, which would allow the trail to be realigned within the RMZ should resource concerns be encountered during trail construction or maintenance." AR 3627. This statement makes little sense and belies the absurdity of BLM's position, because the agency is required to *protect* the RMZ from timber harvest, not log it. AR 16389; *Cascadia*, 410 F. Supp. 3d at 1161.

    C.   Failure to Analyze/Demonstrate Compliance with Planning Framework Standards

The BLM's planning framework for the Willamalane ERMA establishes narrow guidelines identifying to what extent timber harvest is allowed. AR 16389. As such, logging is only permitted within the ERMA if the BLM demonstrates that the logging will be "compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics." *Id.* Furthermore, within the ERMA, the BLM is required to establish an RMZ around all designated trails, and timber harvest is only allowed within this zone if it is designed to "protect/maintain setting characteristics and/or achieve recreation objectives." *Id.* Thus, to log within an RMZ, the BLM must first demonstrate how the proposed logging within the ERMA will maintain setting characteristics, and must then establish how the timber harvest within the RMZ is designed to protect/maintain setting characteristics.[3] AR 16389; AR 18269-72. Here, the BLM fails both requirements.

_____

[3] Importantly, BLM's recreation objectives mandate should not be misconstrued with the setting characteristics mandate. While the recreation objectives mandate allows for some subjective consideration, BLM's RMP FEIS describes and sets forth objective means for exactly how the BLM is to evaluate the impacts of logging on "setting characteristics." AR 18269-74. Specifically, the BLM provides every acre under its management with a setting characteristic designation, AR 18274, which is calculated using two criteria, naturalness and remoteness. AR 18269. Exact criteria are provided to allow the objective ranking and itemization of these two values. *Id.*, AR 18270. Ultimate setting characteristic determinations fall on a spectrum (Primitive – Backcountry – Middle Country – Front County – Rural), which the BLM also visually depicts. AR 18271. The BLM then describes how logging would influence that designation and provides useful examples. AR 18272 ("the regeneration harvesting of older stands would modify the naturalness of an area from Primitive to Rural. These actions would influence the distribution of recreation for visitors who prefer these different settings.").

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

At the outset, it is indisputable that BLM was required to provide evidence in the EA that its proposed logging within the ERMA and RMZ is not at odds with the planning framework. *Or. Natural Res. Council Fund*, 492 F.3d at 1131-32. The Ninth Circuit has explained that "because NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. . . the considerations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis." *Oregon Natural Desert Ass'n*, 625 F.3d at 1109. For example, where the BLM has the obligation, under FLPMA, to manage for the protection and maintenance of setting characteristics within the ERMA and RMZ, then BLM also has the duty, under NEPA, to address and demonstrate whether, and to what extent, timber harvest activities are affecting the setting characteristics. Absent the essential and fundamental step of analyzing and disclosing the information about a project's effects on the environment, an agency cannot fulfill its substantive duties guiding how lands are managed. *See Oregon National Desert Association v. Rose*, 921 F.3d 1185, 1191 (9th Cir 2020) (explaining "[b]ecause we conclude that the Travel Plan is procedurally deficient under NEPA, we do not reach ONDA's substantive challenges to the Travel Plan under the Steens Act and the FLPMA.").

In *Ore. Natural Resources Council v. Brong*, the Ninth Circuit held that a timber sale, purportedly for research purposes, but proposed within a designated reserve area, violated FLPMA because the applicable BLM plan stated that there must not be any "equivalent opportunities outside Late-Successional Reserves" for research purposes. 492 F.3d at 1131-2. The Court found that the BLM "provided no evidence that equivalent opportunities are unavailable in non-LSR areas," other than making "little more than the conclusory statement that 'conducting this research in an LSR is appropriate' in supporting its proposed research projects."

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

*Id.* at 1132. The Court's decision illustrates the straightforward proposition that if the BLM is trying to log in an area where such activity is only allowed if certain plan standards are addressed, then the failure of the BLM to demonstrate compliance with those standards is a violation of FLPMA. *See* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

Here, the BLM has no way of knowing whether or to what extent its proposed timber harvest affects and/or protect/maintains the setting characteristics of the ERMA and RMZ. The EA "contains virtually no references to any material in support of or in opposition to its conclusion even though the EA is where the [Bureau's] defense of its position must be found." *Rose*, at 1191 (quoting *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (internal quotation marks omitted). Indeed, the BLM does not analyze, demonstrate, or even refer to the Project Area's "setting characteristics," the first prerequisite determination prior to logging within an RMZ. In fact, the only mention of "setting characteristic" in the entire EA is found in in the glossary under the definition for Recreation Management Zone. AR 3665. Courts "cannot defer to a void." *Oregon Natural Desert Ass'n*, 625 F.3d at 1121. Therefore, BLM's ignorance of its planning framework is at odds with its statutory directives, and a violation of FLPMA and NEPA is the result.

## II.    THE BLM'S FIRE HAZARD ANALYSIS ON REMAND VIOLATES THE COURT'S ORDER AND NEPA

The BLM again fails to take the requisite "hard look" at the effects of the Project's regeneration logging on fire risk and hazard by again manipulating it analysis to marginalize the Project's effects. The Court previously concluded that the BLM, in its 2018 Environmental Assessment, improperly "attempted to marginalize the effects of regeneration logging" on wildfire danger and fire hazard. *Id.* at 14. The Court found that this increase in fire hazard was "crucial information" for the Thurston community because:

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

> The fuels specialist reported that the change from a "mature" to an "early
> successional" stand structural stage would change the associated stand-level
> hazard from low to moderate/high. AR 2292. The stands would go from a timber
> model to a slash fuel model with higher predicted flame length, fire duration, and
> intensity and decreased ability to control a fire, with the greatest risk of a fire start
> during the first 5 years following harvest. *Id.*; *see also* AR 4178–95, 1040–53.
> Over the next 10 to 40 years, stands would transition through stages associated
> with high stand-level fire hazard rating and go from a slash fuel to a brush fuel
> type, which are more volatile and susceptible to high fire-caused mortality rates.
> AR 2293. These potential fires would have high flame lengths, rates of spread,
> and intensity and would be difficult to initially attack and control. *Id.* Overall fire
> hazard would increase for 5 to 20 years following planting, then drop from high to
> moderate after the next treatment. *Id.*

*Cascadia*, 410 F. Supp. 3d at 1158.

This information came from the 18-page Fuels Specialist Report authored by the BLM in

2018, AR 3342-59, but as highlighted by the Court, the BLM scrubbed this information from the

final Environmental Assessment, "reduced the fuels report to a single sentence," eliminated any

reference to the report in the EA, and waited until "after the public's opportunity to comment

had closed, to disclose the fuels specialist's identity." *Cascadia*, 410 F. Supp. 3d at 1158-9. The

Court found this violated the hard look requirements under NEPA. *Id.* Pursuant to the Court's

Order, on remand the BLM was to "issue a new environmental assessment that adequately

discloses and analyzes the likely increase of fire hazard to adjacent communities [and] make it

available for public review and comment[.]" *Id.* at 1161.

Instead of simply including the material from the 2018 fuels report in the 2020

Environmental Assessment, the BLM ignored the Court's Order and again "attempted to

marginalize the effects of regeneration logging" on wildfire danger violating NEPA in two

respects: A) failing to analyze a true "no action" alternative by manipulating baseline conditions,

and B) failing to provide a reasoned explanation for its change in position regarding fire effects.

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

A.  BLM Failed to Analyze a True "No Action" Alternative

NEPA and its implementing regulations require federal agencies to take a "hard look" at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts, or enhance the quality of the human environment. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508. In both an EA and Environmental Impact Statement ("EIS"), NEPA requires the agency to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The alternatives analysis "is the heart of the [NEPA document]." 40 C.F.R. § 1502.14. This analysis must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.*

The required inclusion of the no action alternative "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 642 (9th Cir. 2010). Where the agency is evaluating a proposal for a project, "'no action' . . . would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981). The Ninth Circuit has been emphatically clear that the no action alternative cannot incorrectly assume the same or similar consequences and effects of the proposed project. *See, e.g., Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1026-27 (9th Cir. 2008) (finding a NEPA violation where the "no-

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

action" alternative assumed the existence of the very plan being proposed); *Ctr. for Biological Diversity*, 623 F.3d at 642-643 (finding that the BLM's assumption that the environmental consequences of the proposed action and the no action alternative would be the same was arbitrary and capricious).

Here, the BLM does precisely that—manipulates the Project's no action alternative to assume the same or very similar effects of the proposed logging. The BLM's Fuels Specialist Report from October 31, 2019 analyzes a lawful "no action" alternative where "under the No-Action Alternative, trail construction, timber harvest, and reforestation activities would not occur on BLM lands." AR 2296. As a result, the Fuels Specialist Report concludes that "relative to current conditions, the no action alternative would result in a decrease in relative fire hazard at the stand level." AR 2297. More importantly, the Fuels Specialist Report concludes "[w]hen compared to the No Action Alternative…Alternative 4 will increase stand level fire hazard and risk condition." AR 2302. The BLM, however, again scrubbed this information from the upcoming 2020 EA for the public, and instead, at the direction of the regional officer during a meeting on January 23, 2020, manipulated the no action alternative to assume the same or very similar effects as the proposed logging. AR 1893 ("there needs to be a clear assumption that a future harvest would take place . . . under no action").

Thus, as part of the no-action alternative, the BLM unlawfully incorporates a "timber harvest project in the Thurston Hills area 10-20 years from now [that] would be the same or very similar to the current project." AR 3611. In other words, BLM assumes as part of its baseline analysis that a logging project with the same effects as the Thurston Hills timber sale will occur within 10 to 20 years in the Project Area. This manipulation is arbitrary, capricious, and otherwise not in accordance with law for three reasons.

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

First, given the assumption that the proposed logging with the same or very similar effects will occur regardless, the BLM predetermines that the fire hazard impacts of the Thurston Hills logging project would be the same in all circumstances, and that there would be no increased fire hazard impacts to the Thurston community, contradicting its own Fuel Specialist Report. *See* AR 2302. For example, in the 2020 Environmental Assessment and the Finding of No Significant Impact, the BLM concludes about fire hazard that:

> "Because regeneration harvest is reasonably foreseeable in the intermediate timeframe under the No Action alternative, Alternative 2, and the unharvested portions of the project area under Alternative 4, the same effects on fire hazard would occur under these alternatives, except 10 to 20 years later. Therefore, the effects on fire hazard would be the same under all alternatives, although the timing of these effects would differ."

AR 3661; AR 3571 ("the effects on fire hazard would be the same under all alternatives"). The record reveals this to be untrue. AR 2302 ("When compared to the No Action Alternative and Alternative 2, Alternative 4 will increase stand level fire hazard and risk conditions."); *see also* AR 3337 (same); *Cascadia*, 410 F. Supp. 3d at 1158-9. Due to its manipulation of the no-action alternative, BLM can now conclude and represent to the public that there is no increase in fire hazard from the project, which is objectively not true.

Second, the BLM contravenes the Court's prior order, which recognized and required disclosure of the fact that the proposed logging will increase fire hazard. *Cascadia*, 410 F. Supp. 3d at 1158-9. As described above, this Court remanded this matter because the BLM in its 2018 EA improperly "attempted to marginalize the effects of regeneration logging" on fire hazard and "deprived the public of meaningful participation." *Id*. The Court found that the fire hazard impact was "crucial information" because the logging would increase fire hazard for the next 40 years resulting in fires that would have "high flame lengths, rates of spread, and intensity and would be difficult to initially attack and control" and "susceptible to high fire-caused mortality

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

rates." *Id.* (citing the 2018 fuels specialist report). The BLM, by manipulating the no-action

alternative, once again "marginalize[s] the effects" and confuses and disrupts public discourse on

the topic. *See* Frank Decl. ¶¶ 14-16 (discussing confusion among elected officials regarding fire

impacts and BLM response).[4]

Finally, the BLM manipulates the baselines conditions by assuming the same or very

similar effects as the proposed project. *See Ctr. for Biological Diversity*, 623 F.3d at 642

(providing that the no action alternative is intended to "provide a baseline against which the

action alternative" is evaluated); *Friends of Yosemite Valley*, 520 F.3d at 1026-27 (finding a

NEPA violation where the "no-action" alternative assumed the existence of the very plan being

proposed). The no action alternative is a measuring stick that allows for meaningful comparison

between the purported benefits of the proposed action and its environmental impacts. Without

"[accurate baseline] data, an agency cannot carefully consider information about significant

environment impacts . . . . resulting in an arbitrary and capricious decision." *N. Plains Res.*

*Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011); *see also Friends of*

*Yosemite Valley*, 520 F.3d at 1038 (similar).

This is precisely what occurred here, because the BLM's no action alternative "assume[d]

the existence of the very plan being proposed." *Friends of Yosemite Valley*, 520 F.3d at 1037-38

(quoting *Friends of Yosemite Valley v. Scarlett*, 439 F. Supp. 2d 1074, 1105 (E.D. Cal. 2006)).

---

[4] The BLM represented to community leaders and entities that the Project would not increase fire hazard or wildfire related danger. *See* AR 172-3 (BLM representing to the Mayor Lundberg of Springfield, Oregon Forest Resources Institute, the Springfield Chamber of Commerce, Springfield County Commissioners, the Springfield School District, Willamalane Recreation District, Seneca, and the American Forest Resource Council that "[t]he analysis found that the effects on fire hazard would be the same under all alternatives," including the no-action alternative); *see also* AR 176-84. BLM's ability to make this misrepresentation is solely the product of its illegal manipulation of the no-action alternative, which itself came at the express direction of regional BLM decision-makers following the Court's remand.

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

To establish as the baseline the existence of a speculative project functionally identical to the very project being analyzed "is logically untenable" and renders the no action alternative "meaningless." *Id.* The BLM cannot circumvent the requirements of NEPA by defining the "status quo" to assume the same or a very similar project under analysis.

Consequently, the BLM's formulation of the no action alternative is fundamentally flawed and deprives the decisionmaker and the public of a meaningful opportunity to assess the impacts of the Thurston Hills timber sale. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1091 (N.D. Cal. 2009) ("To fulfill NEPA's goal of providing the public with information to assess the impact of a proposed action, the 'no action' alternative should be based on the status quo."). The BLM's no action alternative is logically untenable and invalid under NEPA, because a lawful "status quo" no-action alternative measures the fire risks of harvest against the currently-existing landscape.

### B.  BLM Failed to Provide a Reasoned Explanation for Changing its Fuels Report

One of the most fundamental principles of administrative rulemaking is that an agency must provide adequate reasoning for its decisions. *Motor Vehicle Mfrs. Assn. of United States, Inc.,* 463 U.S. 29 at 43 (explaining the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."). Agencies are, however, allowed to change positions, but in doing so, the agency must at least "display awareness that it is changing position" and provide a good reason for the change. *Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2125-6 (2016) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Accordingly, an unexplained inconsistency in position is reason enough for holding the agency action to be arbitrary and capricious and deserving of no deference. *Id.*

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

Here, as previously acknowledged by the Court, BLM's initial fuels report (removed from the 2018 EA) explained that the proposed regeneration logging would change the associated stand level fire hazard from low to moderate/high. *Cascadia*, 410 F. Supp. 3d at 1158-9. To again downplay the increased fire danger to the public, the BLM modified the 2018 fuels report and created a new 2019 fuels report which changed the entire analysis without any explanation, reasoned or not. *Compare* AR 3342-59 (2018 Fuels Specialist Report) with AR 2328-56 (2019 Fuels Specialist Report). As one of the most important examples, BLM manipulates the description of the Project Area from the 2018 fuels report to the 2019 fuels report:

> 2018 Fuels Specialist Report - "relative fire hazard was ranked at the stand-level (FEIS pg. 254). Using this ranking, stands in sec 1 and 31 are predominantly *mature stands* and are categorized as *mixed to low* fire hazard." AR 3345 (emphasis added).

> 2019 Fuels Specialist Report - "Currently, proposed harvest stands are a combination of *young high density* and mature multi-canopy structural stand stages. These structural stand stages are associated with *high to mixed* fire ratings." AR 2291 (emphasis added).

BLM has changed its description of the current forest stands from "mature" in 2018 to "young high density" in 2019 and uses this change in description to change baseline fire related conditions, "mixed to low" in 2018 to "high to mixed" in 2019. *Id.* This change allows BLM to cast a favorable light on its proposed logging, because under the manipulated Fuels Report, the BLM is seemingly replacing one young high-density plantation with another. The description of the Project area as "young high density" in the new fire analysis, however, conflicts with every other description of the Project area in the EA. *See* AR 3627 ("This area is also particularly conducive for trails because of its (existing) mature canopy forest"); *id.* (the entire trail system would be located in mature predominantly evergreen forest"); AR 3628 (logging would result in the loss of "mature tree canopy"); AR 3635 ("mature evergreen canopy"). The BLM even admits

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

in the new fuels report that "in 50 years, stands that have been regeneration harvested would be transitioning from young stands to a mature structural stage and the stand level would have a low to mixed rating." AR 2300. The Thurston Hills area was previously clearcut and recently thinned, AR 1956, and now falls within the 70-year age class, AR 3570, which pursuant to the BLM's assessment, would consist of mature stands that "generally lack a developed understory." AR 1952.

This change in the BLM description of the Project area has implications for the fire risk analysis as well. The BLM in 2018 states that fire risk in the project area is low: "Using the FEIS criteria the current fire risk in sec 1 and 31 is ranked as low." AR 3346. The BLM in 2019 states that the "[f]ire risk in the area is moderate." AR 2292. This change in fire risk assessment conflicts with the data relied upon by the BLM's fuels specialist. *See* AR 2792-3 (map and graph depicting the entire project area as "low" "burn probability.").

These manipulations by BLM improperly marginalize the impacts of logging the Project area. They conflict with the Court's prior Order that BLM redo its fire analysis because of defendant's prior attempts at marginalization. Moreover, these changes are inconsistent with the BLM's analysis elsewhere in the EA and underlying data as explained above. And most importantly, this change is illegal under NEPA because it is completely unexplained. *Encino Motorcars, LLC,* 136 S. Ct at 2126 ("a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy").

### III.    BLM FAILED TO ANALYZE REASONABLE ALTERNATIVES

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives" to a proposed project when the agency is preparing an EA. 42 U.S.C. § 4332(2)(E); *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988); 40 C.F.R. § 1508.9. "[C]onsideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process." *Hodel*, 852 F.2d at 1228-29. The discussion of alternatives is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. This requirement is critical to serving NEPA's primary purposes of ensuring fully informed decisions and providing for meaningful public participation in environmental analyses and decision-making. *See* 40 C.F.R. § 1500.1(b), (c).

All reasonable alternatives must receive a "rigorous exploration and objective evaluation…particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects." 40 C.F.R. § 1500.8(a)(4). This requirement applies to EAs in addition to EISs. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). Despite this lesser obligation for an EA, the Ninth Circuit made clear in *W. Watersheds Project v. Abbey*: "The existence of a viable but unexamined alternative renders an EA inadequate." 719 F.3d 1035, 1050 (9th Cir. 2013). Viable alternatives are feasible, meet the stated goals of the project, or are reasonably related to the purposes of the project. *Id*. at 1052 ("Feasible alternatives should be considered in detail.").

A project's statement of purpose and need is crucially important to the adequacy of an EA because it "delimit[s] the universe of the action's reasonable alternatives." *Citizens Against Burlington v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). While courts afford agencies discretion in defining the purpose and need of a project, a purpose and need statement fails if it

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

unreasonably narrows the alternatives in a manner that preordains the outcome. *Id.* at 196; *City of Carmel by the Sea v. U.S. Dept. of Trans.*, 123 F.3d 1142, 1155 (9th Cir. 1997) ("The stated goal of a project necessarily dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms."). As one appellate court aptly put it: "One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997).

Here, in light of the Court's prior Order, Plaintiffs requested that BLM analyze an alternative that buffered the trails from harvest within the RMZ or, at the very least, thinned within the RMZ to retain some canopy cover over the trails while allowing for additional volume. AR 145, AR 14856-7. Plaintiffs argued that this option moving forward represented a generous middle ground that would (1) comply with the Court's Order, (2) protect the majority of the recreation values offered and the usability and durability of the trails themselves, (3) allow the BLM to log in accordance with its purpose and need to conduct regeneration harvest and adjust age class, (4) generate commercial timber volume, and (5) increase tree retention across the project area as a whole which could potentially curb the negative wildfire danger effects associated with regeneration harvest logging. *Id.*

BLM did not analyze this suggested alternative, or any alternative that differed from BLM's prior EA with the exception of modifying the no-action alternative to presuppose this project will move forward in the near future regardless. AR 3621. While the BLM's protest response acknowledges this new suggested alternative, it leaves it unaddressed. AR 14856-7. Instead the BLM simply cites to the portion of the Court's Order finding the BLM did not need to consider a thinning alternative. *Id.* However, given that this is a new EA and a new decision,

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

with new specific directions from the Court on remand, Plaintiffs suggested a new alternative that responded to this direction from the Court. AR 145.

This Court has previously found that agencies on remand have an ongoing obligation under NEPA to evaluate viable alternatives, even if those alternatives go beyond the Court's initial order. *See Oregon Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1219-20 (D. Or. 2006). In *Oregon Nat. Res. Council Action,* the Court found that "NEPA obliges an agency to revisit its alternative analysis, including a true no action alternative, whenever there are changed circumstances that affect the factors relevant to the development and evaluation of alternatives. *Id.* at 1224 (citing *Natural Res. Def. Council v. United States Forest Serv.*, 421 F.3d 797, 809, 813-14 (9th Cir. 2005)). The Court found that its prior order requiring the buffering of certain survey and manage sites which would reduce logging acreage "represents the sort of changed legal or factual circumstance that warrants a reexamination of the no action alternative and other alternatives for proceeding with these logging projects. *Id.* at 1224-5.

Here, similarly, the Court ordered the BLM to preserve and protect a buffer for recreational trails as required by the RMP. *Cascadia*, 410 F. Supp. 3d at 1161. The most obvious way to comply with such an order would be to buffer the trails from logging, and regardless of BLM's ultimate decision or interpretation of the Court's Order, the agency should have at the very least considered an alternative that buffered the RMZ from logging as requested by Plaintiffs. The Court in *Oregon Nat. Res. Council Action* explained that on remand, the agency was required to "consider [a] full range of alternatives in light of survey and manage duties and other environmental impacts from the proposed logging, including objectively considering the alternative of abandoning these projects. 421 F.3d at 1125. Likewise, the BLM was obligated in

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

this case to consider a full range of viable alternatives, especially in light of the Court's order regarding the RMZ.

Another compelling similarity between these two cases is that both situations involved an agency developing a new EA on remand *after* the agency had already awarded timber sale contracts. In both of these cases, the agency improperly circumscribed its range of available alternatives due to its decision to uphold those existing contracts. *Id.* at 1216-17; AR 4320 ("The Pedal Power timber sale was sold in September of 2018. The BLM has not yet terminated cutting and removal rights for the purchaser of the Pedal Power timber sale, pending the final Decision. Therefore, any timber that was sold under the contract belongs to the purchaser."). The court in *Oregon Nat. Res. Council Action* held that the "agency decided to award the contracts based on an inadequate consideration of the environmental impacts of the project, including duties related to survey and manage species which existed at the time it made the decisions, but which it did not consider . . . [and] the agency was wrong to assume that the contracts in any way limited its obligation to thoroughly analyze the environmental effects of the six timber sales under NEPA." *Id*. at 1220. The court further stressed that "the Ninth Circuit has made it clear that an agency may not limit its obligations to prepare an environmental assessment that complies with NEPA by entering into a contract," especially because such an EA cannot be prepared with the prerequisite objectivity that NEPA requires. *Id*. at 1220-21 (citing *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000)). Here, BLM's existing contracts with Seneca cannot serve as a basis for not considering other viable alternatives that may reduce overall timber volume and taints the prerequisite objectivity that NEPA requires.

The BLM's Decision Record also acknowledges Plaintiffs' suggested alternative, but again does not explain why the alternative would be infeasible or why it was not even

considered. AR 4315. The Decision's response to comments simply states, *ipse dixit*, that "[t]imber harvest has no impact on realizing recreation objectives." AR 4316. Plaintiffs disagree with this statement and it conflicts with the record,[5] but even if treated as a verity, that assumption does not render the suggested alternative unviable. The alternative reduces the cost of trail construction and enhances the recreation experience, AR 1698; AR 1699; AR 1702-3, allows the BLM to conduct regeneration harvest, adjusts age classes in the forests, and generates commercial timber volume, while likely improving fire outlook given that increased overall retention would reduce the amount of acres moving to the slash fuel model. AR 3350.

In short, the BLM does not provide any rational justification or reasoning in the EA or Decision for not considering such an alternative. This is a violation of NEPA. *See Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv*., 373 F. Supp. 2d 1069, 1088-89 (E.D. Cal. 2004) (holding that the agency failed to consider an adequate range of alternatives or explain why they would not achieve the project's purpose and need where it "simply dismissed out of hand any proposal which would have reduced the amount of timber harvest" as "uneconomical.").

## CONCLUSION

The Court should grant summary judgment in Plaintiffs favor for reasons stated herein.

---

[5] Buffering or thinning the RMZ would not damage or eliminate the recreation objectives, in fact the trails-only alternative is described as the "optimized trails" alternative, AR 3424, and the loss of canopy over the trails would result in "increased direct rainfall, wind erosion, freeze-thaw, and seasonal over-drying. These conditions reduce the ability of the trail system to withstand heavy use during the preferred spring-to-fall season." AR 1698. Trails under forest canopy "provide high quality tread and enhance the play and challenge experiences." AR 1699. And it would be cheaper because trails within the regeneration harvest units have a "higher cost-per-mile." AR 1702-3. "The quality of trail tread for mountain biking would be high in this [trails only] alternative because the entire trail system would be located in mature predominantly evergreen forest. Under such a forest canopy, a thin organic layer builds up on the tread. Such a layer protects the trail from the elements and promotes a highly desired riding surface: the unrivaled 'drift.'" AR 1697.

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT

Respectfully submitted this 8th day of October, 2020.

/s/ Nicholas S. Cady
Nicholas S. Cady (OSB # 114363)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

/s/ Daniel C. Snyder
Daniel C. Snyder (OSB # 105127)
B. Parker Jones (OSB #191163)
Law Offices of Charles M. Tebbutt
941 Lawrence St.
Eugene, Oregon 97401
Tel: 541-344-3505
Email: dan@tebbuttlaw.com
parker@tebbuttlaw.com

PLAINTIFFS' MOTION AND MEMO IN SUPPORT OF SUMMARY JUDGMENT