BILLY J. WILLIAMS
United States Attorney
District of Oregon

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN P. TUSTIN (Texas State Bar No. 24056453)
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  (202) 305-3022 / Fax:  (202) 305-0506
john.tustin@usdoj.gov

*Attorneys for Federal Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| CASCADIA WILDLANDS and OREGON WILD | ) ) ) | Case No. 6:20-CV-1395-MK |
| Plaintiffs, | ) ) | FEDERAL DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |
| v. | ) ) ) | AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR |
| BUREAU OF LAND MANAGEMENT, | ) ) | SUMMARY JUDGMENT [ECF No. 10] |
| Federal Defendant, and | ) ) | |
| SENECA SAWMILL COMPANY, | ) ) ) | DATE: January 28, 2021 TIME: 9:00 am LOCATION: videoconference |
| Defendant-Intervenor. | ) ) | |

Plaintiffs Cascadia Wildlands and Oregon Wild challenge the Bureau of Land Management's ("BLM") May 2020 decision to authorize the Thurston Hills Non-Motorized Trails and Forest Management Project ("Project") under the Federal Land Management Policy Act, the National Environmental Policy Act, and the Administrative Procedure Act ("APA"). BLM cross-moves for summary judgment on all claims.

The Ninth Circuit has endorsed the use of Rule 56 motions for summary judgment in reviews of agency administrative decisions under the limitations imposed by the APA. *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994) (discussing the standards of review under both the APA and Fed. R. Civ. P. 56). Under Rule 56, "[t]he moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute." *Id.* at 1472. Because the role of the Court under the APA is not to "find facts" but is limited to reviewing the Administrative Record to determine whether the federal agencies considered the relevant factors and reached conclusions that were not arbitrary and capricious, there can be no genuine issue of material fact, and summary judgment is the appropriate resolution of this case.

In support of this cross-motion, BLM submits the following memorandum in support; the Administrative Record lodged on September 17, 2020 (ECF No. 8) and errata lodge concurrently with this motion; the Declaration of Rebecca Brooke, Field Manager for BLM's Upper Willamette Field Office, and any other pleadings or argument that may be presented in Court. As BLM will show, Plaintiffs' arguments in this action misconstrue this Court's prior order in *Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146 (D. Or. 2019), which challenged BLM's May 2018 authorization of the Project. In accordance with that order, BLM conducted additional

analysis of the fire hazard and fire risk on adjacent communities and made that analysis available for public review.  BLM also designated trails and an associated Recreation Management Zone prior to timber harvest.  BLM will also show that several of Plaintiffs' arguments are precluded by the doctrines of waiver, claim preclusion, and issue preclusion.

The Project satisfies all statutory requirements and enjoys local support.  The Court should grant judgment in favor of BLM on all claims, dismiss this action with prejudice, and grant any other such relief that is appropriate.


Respectfully submitted on this 3rd day of November, 2020.

BILLY J. WILLIAMS
United States Attorney
District of Oregon

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/  John P. Tustin*
JOHN P. TUSTIN
(he/him/his)
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  (202) 305-3022 / Fax:  (202) 305-0506
john.tustin@usdoj.gov

*Attorneys for Federal Defendant*

**MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Background ................................................................................................. 4

III.    Standard of Review .................................................................................... 6

        A.      The Federal Land Policy & Management Act ...................................... 6

        B.      The National Environmental Policy Act ............................................. 7

IV.     Argument ................................................................................................... 8

        A.      The Project complies with the Court's order because it designates trails and
                establishes a Recreation Management Zone prior to timber harvest ..................... 8

        B.      The Project complies with the Court's prior order because it provides
                additional analysis and disclosure of fire hazard to adjacent communities .......... 12

                1.      The revised fuels specialist report and EA disclose the effects of fire
                        hazard. ................................................................................................. 12

                2.      BLM evaluated a valid no action alternative. ........................................... 15

        C.      Plaintiffs' remaining claims are precluded or waived. ........................................ 22

                1.      The doctrines of claim preclusion and issue preclusion apply here .......... 23

                2.      Plaintiffs' challenge to the plan amendment is precluded. ....................... 25

                3.      Plaintiffs' challenge to setting characteristics and recreation
                        objectives is precluded. ........................................................................... 27

                4.      Plaintiffs' range of alternatives argument is precluded. ........................... 28

                5.      Plaintiffs waived their NEPA claim on stand condition. ......................... 31

        D.      BLM objects to Plaintiffs' post-decisional documents. ....................................... 34

V.      Conclusion ............................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Alaska Envtl. Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ................................................... 29

*All. for the Wild Rockies v. Savage*,
  897 F.3d 1025 (9th Cir. 2018) ................................................. 31

*All. for the Wild Rockies v. Weber*,
  979 F. Supp. 2d 1118 (D. Mont. 2013) .................................... 33

*Allen v. McCurry*,
  449 U.S. 90 (1980) ................................................................... 23

*Am. Rivers v. FERC*,
  201 F.3d 1186 (9th Cir. 1999) ................................................. 18

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979) ................................................................. 16

*Assoc. of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ................................................. 20

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983) ............................................................. 31, 32

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ............................................. 16, 30

*Cascadia Wildlands v. BLM*,
  410 F. Supp. 3d 1146 (D. Or. 2019) ................................ *passim*

*Costantini v. Trans World Airlines*,
  681 F.2d 1199 (9th Cir. 1982) ................................................. 24

*Ctr. for Biological Diversity v. U.S. Bureau of Land*
  746 F. Supp. 2d 1055 (N.D. Cal. 2009) .................................. 22

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  623 F.3d 633 (9th Cir. 2010) ......................................... 15, 16, 22

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004) ................................................................. 31

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ............................................................. 33

*Friends of Yosemite Valley v. Kempthorne*
  520 F.3d 1024 (9th Cir. 2008) ................................................. 21

*Havasupai Tribe v. Robertson*,
  943 F.2d 32 (9th Cir. 1991) ................................................ 31, 32

*Headwaters Inc. v. U.S. Forest Serv.*,
  399 F.3d 1047 (9th Cir. 2005) .............................................. 24

*Headwaters, Inc. v. BLM*,
  914 F.2d 1174 (9th Cir. 1990) ............................ 16, 17, 18, 29

*Hydranautics v. FilmTec Corp.*,
  204 F.3d 880 (9th Cir. 2000) ......................................... 25, 26

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) .............................................. 24

*In re Big Thorne Project*,
  93 F. Supp. 3d 1134 (D. Alaska 2015) ............................... 30

*Inland Empire Pub. Lands Council v. Glickma*n,
  88 F.3d 697 (9th Cir. 1996) .......................................... 32, 34

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,
  88 F.3d 754 (9th Cir. 1996) ................................................. 7

*Klamath Siskiyou Wildlands Center v. Boody*,
  468 F.3d 549 (9th Cir. 2006) .............................................. 27

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
  962 F. Supp. 2d 1230 (D. Or. 2013) .................................... 7

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ......................................... 32, 33

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ............................................................. 7

*Metro. Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) ............................................................. 3

*Montana v. United States*,
  440 U.S. 147 (1979) ........................................................... 23

*Native Ecosystems Council v. Tidwell*,
  No. CV 08-121-M-DWM, 2009 WL 10695236 (D. Mont. June 1, 2009) ............... 30

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ........................................................... 24

*Norton v. S. Utah Wilderness*,
  *All.*, 542 U.S. 55 (2004) ..................................................... 7

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
  18 F.3d 1468 (9th Cir. 1994) ............................................... 2

*Or. Nat. Res. Council Action v. U.S. Forest Serv.*
  445 F. Supp. 2d 1211 (D. Or. 2006) ................................. 30

*Or. Nat. Res. Council Fund v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) ............................................................... 6, 26

*Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of the Interior*,
    929 F. Supp. 2d 1039 (E.D. Cal. 2013) ............................................... 18, 19

*Pac. Rivers v. BLM*, No. 6:16-cv-1598-JR
    2019 WL 1232835 (Mar. 15, 2019) ............................................................ 18

*Pac. Rivers v. BLM*, No. 6:16-cv-1598-JR,
    2018 WL 6735090 (D. Or. Oct. 12, 2018)................................................... 18

*Plains Res. Council v. Lujan*,
    874 F.2d 661 (9th Cir. 1989) ..................................................................... 29

*Protecting Arizona's Res. and Children v. Fed. Highway Admin.*,
    718 F. App'x 495 (9th Cir. 2017) ............................................................... 20

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)...................................................................... 3, 8, 21

*Segal v. Am. Tel. & Tel. Co., Inc.*,
    606 F. 2d 842 (9th Cir. 1979) ..................................................................... 23

*Smith v. Marsh*,
    194 F.3d 1045 (9th Cir. 1999) ................................................................... 12

*Swanson v. U.S. Forest Serv.*,
    87 F.3d 339 (9th Cir. 1996) ....................................................................... 33

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
    322 F.3d 1064 (9th Cir. 2003) .............................................................. 23, 25

*Taylor v. Sturgell*,
    553 U.S. 880 (2008).................................................................................. 23

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996) ....................................................................... 24

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) ................................................................... 34

*Turtle Island Restoration Network v. U.S. Dep't of State*,
    673 F.3d 914 (9th Cir. 2012) ......................................................... 24, 26, 28

*United States v. Bhatia*,
    545 F.3d 757 (9th Cir. 2008) ..................................................................... 23

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978).............................................................................. 29, 30

*Westlands Water Dist. v. U.S. Dept. of Interior*,
    376 F.3d 853 (9th Cir. 2004) ............................................................... 19, 29

**Statutes**

16 U.S.C. § 1274(d) ............................................................................... 21

42 U.S.C. § 4332(2)(C) ............................................................................ 7

42 U.S.C. § 4332(2)(E) ............................................................................ 7

43 U.S.C. § 2601 ......................................................................... 1, 17, 21

43 U.S.C. §§ 1701–1785 .......................................................................... 6

**Regulations**

40 C.F.R. § 1500.3 (1978) ...................................................................... 16

40 C.F.R. § 1502.14(d) (1978) ............................................................... 16

40 C.F.R. § 1508.9 (2018) ........................................................................ 7

40 C.F.R. § 1508.9(a)(1) (2018) .............................................................. 7

40 C.F.R. §§ 1508.9(a), (b) (2018) .......................................................... 7

40 C.F.R. Pt. 1500 (2018) ........................................................................ 7

43 C.F.R. § 1610.5–3(a) ........................................................................... 6

43 Fed. Reg. 55,978 (Nov. 29, 1978) ...................................................... 7

46 Fed. Reg. 18,026 (Mar. 23, 1981) ..................................................... 16

51 Fed. Reg. 15,618 (Apr. 25, 1986) ....................................................... 7

## TABLE OF ACRONYMS

| APA | Administrative Procedure Act |
|-----|------------------------------|
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ERMA | Extensive Recreation Management Area |
| FLPMA | Federal Land Policy & Management Act |
| MMbf | Million Board Feet |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |

# I. <u>INTRODUCTION</u>

The Thurston Hills Non-Motorized Trails and Forest Management Project ("Project") encompasses two separate actions: a timber harvest named the Pedal Power Timber Sale, and a new non-motorized trail system for mountain biking and hiking.  The 1,058 acre Project area is located southeast of Springfield, Oregon, and on lands managed by the Bureau of Land Management ("BLM").  The Project authorizes variable-retention regeneration harvest on approximately 109 acres.  All of the harvest is located on the Harvest Land Base, a land use allocation that BLM manages for the express purpose of sustained yield timber production, as required by BLM's 2016 Northwest and Coastal Oregon Resource Management Plan ("RMP") and in accordance with the Oregon & California Revested Lands Act of 1937 (the "O&C Act"), 43 U.S.C. § 2601.  The Project also designates 8.5 miles of non-motorized trail where none existed before, and an associated Recreation Management Zone 50 feet from the centerline of the trails.  The trail system will contribute to the development of the Willamalane Extensive Recreation Management Area ("ERMA") authorized in the 2016 RMP and will connect to a trail system being developed by the Willamalane Park and Recreation District ("Willamalane") on adjacent land.

This is Plaintiffs' second challenge to the Project.  In September 2019, this Court granted in part and denied in part the parties' cross-motions for summary judgment.  *Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1161 (D. Or. 2019).  Plaintiffs prevailed on their challenge under the Federal Land and Policy Management Act ("FLPMA") that BLM was required to designate a Recreation Management Zone prior to timber harvest.  Plaintiffs also prevailed on their challenge under the National Environmental Policy Act ("NEPA") that BLM did not fully analyze and publicly disclose the degree of fire hazard to adjacent communities.  BLM and the Seneca

Sawmill Company – which intervened as a defendant – prevailed on all of Plaintiffs' other challenges under FLPMA and NEPA. In particular, the Court held that the regeneration harvest authorized by the Project is consistent with the 2016 RMP and Willamalane ERMA management directives; that BLM adequately evaluated the effects of the timber harvest on scenic quality and recreation experience; and that BLM analyzed a reasonable range of alternatives. The Court also expressly rejected Plaintiffs' preference for a thinning alternative.

Plaintiffs' claims in their latest challenge to the Project fall into two broad categories. The first category alleges BLM did not comply with the Court's order on remand. But Plaintiffs misconstrue the Court's instructions. The Court did not dictate what the Recreation Management Zone should look like and did not prohibit timber harvest within the Zone. Nor did the Court prohibit authorization of a Project that increases fire hazard in the short and intermediate term. In fact, the Court expressly rejected Plaintiffs' invitation to make a subjective finding that timber harvest harms visitor or recreation experiences. As directed by the Court, BLM designated trails and an associated Recreation Management Zone prior to timber harvest. The Zone preserves the Willamalane ERMA's recreation objectives of open space and non-motorized trail experiences. Contrary to Plaintiffs' argument, there is no order from this Court – nor any management directives from BLM's 2016 RMP – that requires a specific forest canopy or a level of "naturalness" in the Recreation Management Zone. As for fire hazard, BLM conducted substantial additional analysis and provided that analysis to the public. The analysis forthrightly discloses that the Project results in stand conditions with a high fire hazard in the short and intermediate time frame as forecast by the 2016 RMP Final Environmental Impact Statement ("EIS"). To address concerns about fire hazard, BLM incorporated a number of measures to reduce the fire hazard, such as whole tree yarding, additional treatments for slash, and reduced

replanting density.  The public was fully aware of the effects of the Project on fire hazard in the area.

The second category of claims are not properly before this Court.  Because there is a prior order from this Court that involves the same parties, Plaintiffs cannot relitigate claims they lost, or attempt to bring claims they could have brought in the first action.  Claim preclusion and issue preclusion bar consideration of Plaintiffs' FLPMA claims alleging a failure to amend the RMP and non-compliance with framework standards on setting characteristics.  Those doctrines also bar Plaintiffs' NEPA claims regarding impacts to recreation objectives and range of alternatives.  Finally, Plaintiffs have waived their claim that BLM changed its analysis of stand condition by not raising it in their comments or administrative protest.  Even if the court were to consider these claims in the second category, they lack merit.

Plaintiffs' criticisms of the Project boils down to their disagreement with the selected action and their desire for the trails-only alternative with no regeneration harvest.  But disagreement with an agency's reasoned conclusion does not establish a NEPA violation. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process." (citations omitted)); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983) ("The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements."). The Project satisfies all statutory requirements and enjoys local support, including from the City of Springfield, Willamalane, and the regional tourism promotion association.  BLM satisfied this Court's September 2019 Order on remand.  The Court should deny Plaintiffs' motion for summary judgment, grant summary judgment in favor of BLM on all claims, and allow the Project to proceed.

## II.  BACKGROUND

In May 2020, BLM issued a Decision Record and Finding of No Significant Impact for

the Thurston Hills Non-Motorized Trails and Forest Management Project.  AR04309-24

(Decision Record), 03567-74 (Finding of No Significant Impact).[1]  BLM analyzed the Project in

a February 2020 Environmental Assessment ("EA").  AR03586-3688.  The Project decision

selects Alternative 4 in the EA, as depicted in the following map:



Preferred Alternative 4 -
109 Acre Regeneration Harvest and Trails

AR03691.  Alternative 4 encompasses two separate actions: (1) a timber harvest, named the

Pedal Power Timber Sale, and associated activities, and (2) a new non-motorized trail system for

mountain biking and an associated Recreation Management Zone.  AR04309; *see* AR03618-20

(Alternative 4).

---

[1] BLM lodged the Administrative Record on September 17, 2020 (ECF No. 8).  Concurrently
with this motion, BLM lodges an errata to the Administrative Record.

The timber harvest component of Alternative 4 is a 109-acre regeneration harvest that implements the 2016 Northwestern and Coastal Oregon Resource Management Plan (2016 RMP) management direction for the Harvest Land Base – Moderate Intensity Timber Area. AR04309.  The Project retains 15% of the pre-harvest basal area,[2] the maximum retention allowed under the 2016 RMP.  AR03619, 17051.  The total volume of timber removed would be approximately four million board feet.  AR03619.  BLM awarded the Pedal Power timber sale to the Seneca Sawmill Company in February 2019.  AR04309, 22092.

The trail component of Alternative 4 is the designation and construction of 8.5 miles of non-motorized trails and an associated Recreation Management Zone of that extends 50 feet from the center line of designated trails.  AR04309.  The trails pass through shaded (60%) and open (40%) areas and provide a variety of experiences, difficulties, and trail features.  AR03630, 03634 (Table 8).  The trail component conforms to the 2016 RMP's management direction for the Willamalane ERMA by creating open space and non-motorized trail opportunities in and near the city limits of Springfield.  *Id.*  The new trail system on BLM land will connect to the adjoining Willamalane non-motorized trail system.  *Id.*  BLM plans to begin trail construction once the timber harvest activities are complete.

While Plaintiffs' current and prior lawsuits show that not everyone supports the Project, many do.  Throughout the planning process members of the public expressed support for the balanced alternative BLM ultimately selected.  *See e.g.*, AR00988-95 (summary of comments from Nov. 2017 open house), 00784 (comments from August 2018 public meeting).  The Mayor of Springfield and the Willamalane Board President jointly wrote to BLM in support of the

---

[2] Basal area is cross-sectional area of a single plant stem, of all stems of a species in a stand, or of all plants in a stand that is measured at breast height (about 4.5 feet up from the ground) for larger plants (like trees) or measured at ground level for smaller plants.  AR17278.

selected action stating, "[w]e believe Alternative #4 constitutes an appropriate balance of meeting both the recreation needs of our community, as well as the [BLM's] obligations to achieve timber harvest quotas from its [RMP]." AR00831.  BLM continued to engage heavily with the public on the Project after this Court's September 2019 Order.  *See* AR00001-771 (public involvement since September 2019), 04311-12.  In October 2019, BLM and Willamalane entered into a cooperative agreement to facilitate planning, design, and management of the non-motorized trail system on their adjacent parcels.  AR00671-76.  The Mayor of Springfield remains "fully supportive of this project and the dual purposes of timber harvest and recreational access."  AR00024.  In addition to the mayor, the board of Travel Lane County, the regional tourism promotion association, voted unanimously to support the Project.  AR00630.

### III.  STANDARD OF REVIEW

**A.**     **The Federal Land Policy & Management Act**

FLMPA establishes requirements for land use planning on public lands.  *See* 43 U.S.C. §§ 1701–1785.  Under FLPMA, BLM is required to "develop, maintain, and when appropriate, revise land use plans to ensure that land management be conducted on the basis of multiple use and sustained yield."  *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and internal quotation marks omitted).  Section 701(b) of FLPMA provides an exception for O&C Act lands (such as those at issue in this action) from the principle of multiple use, insofar as it relates to management of timber resources.  43 U.S.C. § 1701 note (1976) (Effect on Existing Rights; Repeal of Existing Laws; Severability Effect on Existing Rights); *Cascadia Wildlands*, 410 F. Supp. 3d at 1153.  Once a land use plan is developed, "[a]ll future resource management authorizations and actions... shall conform to the approved plan." 43 C.F.R. § 1610.5–3(a).  BLM has "a great deal of discretion in deciding how to achieve"

compliance with the applicable land use plan. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66

(2004); *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or.

2013), *aff'd*, F. App'x 648 (9th Cir. 2016).

**B.      The National Environmental Policy Act**

NEPA requires agencies to prepare an EIS for all "major Federal actions significantly

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  NEPA's

implementing regulations promulgated in 1978 provide that an agency shall prepare an EA to

determine whether a proposed federal action will have a significant impact and to determine

whether preparation of an EIS will be necessary.  40 C.F.R. § 1508.9 (2018).[3]  An EA is a

"concise public document" that "include[s] brief discussions of the need for the proposal, of

alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the

proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§

1508.9(a), (b) (2018).  If the agency concludes in the EA that there is no significant effect from

the proposed project, the federal agency may issue a finding of no significant impact in lieu of

preparing an EIS.  40 C.F.R. § 1508.9(a)(1) (2018); *id.* § 1508.13.

NEPA is procedural, not substantive. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371

(1989); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996)

("NEPA's goal is satisfied once [] information is properly disclosed; thus NEPA exists to ensure

a *process*, not to ensure any result.").  So long as "the adverse environmental effects of the

[3] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978,
43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in
1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986).  More recently, the Council published a new rule,
effective September 14, 2020, further revising the 1978 regulations.  The claims in this case arise
under the 1978 regulations, as amended in 1986.  All citations to the Council's regulations in this
brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 351.

## IV.  ARGUMENT

### A.    The Project complies with the Court's order because it designates trails and establishes a Recreation Management Zone prior to timber harvest

In its September 2019 Order, the Court held that the BLM violated FLPMA because the 2019 Project proposed to designate the Recreation Management Zone after completion of timber harvest. *Cascadia Wildlands*, 410 F. Supp. 3d at 1156.  The Court instructed BLM "to designate trails and establish a Recreation Management Zone before logging begins to ensure adequate protection in the buffer area." *Id.*; *id.* at 1161 (instructing BLM to "designate and preserve a Recreation Management Zone prior to harvest" if the Project proceeds).  The Court ruled in favor of the BLM and Seneca on the rest of Plaintiffs' FLPMA claims. *Id.* at 1153-55.

Consistent with the Court's order on remand, the 2020 Project designates 8.5 miles of non-motorized trails and establishes an associated Recreation Management Zone of 50 feet in both directions from the center line of the trails.  AR04309, 04315-16 (decision record); AR03618-19, 03629-30 (EA); AR01694-95 (recreation specialist report); AR03691 (map). BLM selected 50 feet from the centerline to maintain consistency with other, similar trail systems.  AR16384.  To designate the trails, BLM used GPS to select the location of the center line, flagged the trails, and then created a digital record of the trails' approximate locations for inclusion in BLM's transportation system.  AR03618, 01694.  The red lines in the map at AR03691 show the location of the designated trails.  The associated Recreation Management Zone is the 100-foot wide yellow buffer around the designated trails.  AR03691.  The Project retains 15% of pre-harvest stand basal area – the maximum allowed in the Harvest Land Base under the RMP – and includes aggregate green tree retention within portions of the Recreation

Management Zone.  AR01700, 03630; AR16460 (2016 RMP allowing up to 15% retention in the Harvest Land Base).[4]  Together, the retention acres total approximately 11 acres along the trails in the harvested areas.  AR03619.  The green tree retention in the Recreation Management Zone, combined with the unharvested riparian areas within the Project, creates trails that flow through both shaded and open areas, with approximately 60% in shaded areas and 40% in open areas.  AR01700, 03630.  BLM explained that trail users have a variety of preferences for trail settings and experiences, and that the forested corridors would preserve some of the characteristics that provide high quality tread and enhance the play and challenge experiences for non-motorized bikers.  AR01700, 03630; *see also* AR03634 (EA Table 8).

BLM invited the public to comment on the trail designation and establishment of the associated Recreation Management Zone.  AR00664, *see* AR04315-16 (decision notice responding to Plaintiffs' comment about designation of trails and establishment of Recreation Management Zone).  BLM coordinated with Willamalane when it designated the trails and established the associated Recreation Management Zone, and the two entities have a cooperative management agreement to facilitate planning, design, and management of the non-motorized trail system on their adjacent parcels.  AR00671-76 (agreement); *see* AR00677-78 (October 29, 2019 meeting notes); AR22259-61 (November 22, 2019 project update meeting).  At the October 2019 meeting, BLM and Willamalane discussed how the green tree retention "has been thoughtfully placed based on specific recreation experience of certain trail segments.  Everyone present felt that this is still the correct retention design for the project."  AR00677.  At the

---

[4] Specifically, the Project retains all trees that are (1) both greater than or equal to 40 inches diameter-at-breast height and (2) identified as being established prior to 1850, as required by the 2016 RMP.  The Project allocates the remaining green tree retention (about 75%) into groups of trees within portions of the Recreation Management Zone.  AR03619.

November 22, 2019 meeting hosted by Seneca, a representative from Disciples of Dirt (a local

mountain biking organization) agreed that mountain bikers like a variety of trail experiences,

said the organization was in full support of the trails, and stated the organization was excited to

work with BLM on trail development.  AR22260.

      Plaintiffs concede, as they must, that BLM designated trails and established a Recreation

Management Zone prior to timber harvest.  This fact alone should end the Court's inquiry into

whether BLM complied with the Court's September 2019 Order.  Plaintiffs object that the

Project authorizes timber harvest within some parts of the Recreation Management Zone, but this

argument is founded on the mistaken premise that BLM cannot conduct timber harvest within the

Zone.  *See* Pls.' Mot. & Mem. in Supp. of Summ. J. 12-13, ECF No. 10 ("Pls.' Mem.").  The

Court faulted BLM's prior decision because BLM would have designated trails and established

the Recreation Management Zone *after* completion of timber harvest; the Court did not dictate

what activities could or could not occur within the Recreation Management Zone once

established.  Indeed, the Court held,

> BLM does not have a clear directive to preserve the area's natural setting
> characteristics, and there is no evidence that visitors will be deprived of "quality"
> experiences because portions of the trails pass through regeneration harvest areas.
> In fact, the Willamalane ERMA framework cites "open space and non-motorized
> trail opportunities" as recreational values.  The framework does not prioritize forest
> canopy or naturalness, and there is no evidence in the record that such values are
> universal.  In fact, many comments from mountain bikers, for example, did not
> discuss scenery or naturalness at all.

*Cascadia Wildlands*, 410 F. Supp. 3d at 1155.  Plaintiffs fail to acknowledge this passage of the

Court's opinion, perhaps because it completely undercuts their FLMPA argument.

      What BLM must do in the ERMA – and has done so here – is achieve the recreation

objectives of the area, not preserve Plaintiffs' preference for forest canopy.  BLM explained in

the EA that timber harvest has no impact on realizing recreation objectives because the

recreation values of open space and non-motorized trail opportunities would still be met by the Project.  AR01700, 03630; *see* AR16387 (Willamalane ERMA).  BLM noted that trail users have a variety of preferences for trail settings.  AR03630.  BLM explained that 60% of the trail mileage would have a forested canopy with a natural variation in vegetation type and terrain. For the 40% in open areas, BLM would enhance the trail tread (by manipulating the soil and adding crushed rock) and provide a variety of challenges through technical features (such as rollers, jumps, rock gardens, and steeper grades).  AR01698 (discussing trails in open areas under Alternative 3), 01699 (Alternative 4, implementing layout for Alternative 3 in open areas). Together, the shaded and open trails provide for a range of recreation experiences and difficulties.  Contrary to Plaintiffs' suggestion, nothing in the Court's September 2019 Order required BLM to construct the trails within the now-designated Recreation Management Zone prior to harvest.  The establishment of the Recreation Management Zone protects the recreation objectives of open space and non-motorized trail opportunities because a trail could be realigned within the Zone should resource concerns arise during trail construction or maintenance.[5] AR01700, 03630.

BLM complied with the Court's September 2019 Order to designate trails and establish a Recreation Management Zone before timber harvest.  Plaintiffs' subjective preference for a forested canopy along the entire trail network fails to show BLM's decision is arbitrary and capricious.  The Court should grant summary judgment in favor of BLM on the FLMPA claim.

---

[5] To the extent Plaintiffs may argue that BLM must construct the trails before conducting timber harvest, that claim has no merit.  BLM explained trail construction would follow timber harvest "in order to avoid trail investments that could be damaged by harvesting activities, and to prevent the need for recreational trail closures during the harvest."  AR03619.  Additionally, some of the trails incorporate portions of spur roads constructed for harvest.  *Id.*

**B.**    **The Project complies with the Court's prior order because it provides additional analysis and disclosure of fire hazard to adjacent communities**

In its September 2019 Order, the Court held that the BLM violated NEPA because the Agency "did not fully analyze and publicly disclose the degree of fire hazard to adjacent communities that the Project is likely to increase." *Cascadia Wildlands*, 410 F. Supp. 3d at 1157. The Court remanded the matter with instructions "to issue a new environmental assessment that adequately discloses and analyzes the likely increase of fire hazard to adjacent communities [and] make it available for public review and comment[.]" *Id.* at 1161.[6] The Court ruled in favor of the BLM and Seneca on the rest of Plaintiffs' NEPA challenges. *Id.* at 1159-61.

1.    The revised fuels specialist report and EA disclose the effects of fire hazard.

In compliance with the Court's order on remand, BLM provided a substantial amount of additional analysis of the fire hazard to adjacent communities and disclosed this information to the public. AR04315 (decision record); AR03653-61 (EA); AR02328-56 (fuels specialist report). The fuels specialist report and EA recount that implementation of the timber harvest program under the 2016 RMP Final EIS would result in a 7% net acreage increase in the high or moderate fire hazard category within the Harvest Land Base over 50 years. AR02344, 03654, 07698. Per the analysis in the 2016 RMP Final EIS, this equates to approximately 3,706 acres with an increased fire hazard from timber harvest in the region managed by the Upper

---

[6] The Court's September 2019 Order only identifies a NEPA violation with respect to fire hazard, not fire risk. *See Cascadia Wildlands*, 410 F. Supp. 3d at 1157-59; *id.* at 1161 (remanding for additional analysis on fire hazard). Fire hazard and fire risk are distinct concepts. Fire hazard refers to the ease of ignition, potential fire behavior, and resistance to control of the fuel complex. AR03653, 07377. Fire risk is the chance of fire starting as a result of natural and human-caused sources. AR03643, 007700. Nevertheless, BLM provided additional analysis on fire risk and made this analysis available to the public. AR03643-53 (EA discussing Project's effects on fire risk). Plaintiffs do not challenge the sufficiency of BLM's additional analysis of fire risk. Any claim about fire risk therefore is waived. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived.").

Willamette Field Office by 2063.  AR03654.  The RMP Final EIS disclosed the level of fire

hazard increase expected from implementing the O&C Act and did not impose additional

management direction in the Harvest Land Base land use allocation to avoid this increased fire

hazard from timber harvest.  AR19106.  In fact, the RMP increases stand-level fire resistance and

decreases stand-level fire hazard on BLM land when compared to current conditions.  AR07659,

17014.  BLM alone, however, has limited ability to shift the overall landscape fire resiliency in

the region, due to ownership patterns and actions by other land owners.  AR07659, 17014.

The Upper Willamette Field Office manages land that contains 22.4% of timber harvest

authorized in the RMP.  *See* Decl. of Rebecca Brooke, Field Manager ¶ 2 (stating that BLM

Oregon's Annual Sale Quantity is 205 million board feet ("MMbf") and the Upper Willamette's

is 46 MMbf).  BLM assumed in the EA that the Pedal Power timber harvest would affect fire

hazard at the Project level (AR02345, 03655), and then conducted a site-specific analysis of each

of the Project's five alternatives at appropriate spatial and temporal scales.  AR02346-47, 03656-

57 (explaining scale parameters); AR02347-51, 03657-61 (effects of each alternative on fire

hazard).  For Alternative 4, the selected alternative, BLM explained that "regeneration harvest

and subsequent reforestation would change the structural stage, fuel model, and fuel loadings

within harvested areas."  AR02350.  In the short term (0-10 years post-harvest), fire hazard

would decrease on 36 acres (shifting from high to moderate) and increase on 73 acres (shifting

from mixed to moderate).  AR02350, 03660.  By the end of the short term timeframe, all 109

harvested acres would have a high fire hazard relative to the no action alternative, which

assumed no timber harvest in the short term.  *Id.*  In the intermediate timeframe (10-30 years),

the structural composition of stands in the 109 harvested acres would shift from stand

establishment into young-high density, but since both compositions have a high fire hazard, the

fire hazard would not change between the short and intermediate time frames.  AR02350, 03660.
For the 56 acres of Harvest Land Base in the Project area that are not harvested as part of the
Project but reasonably would be in the future, these acres would change from early successional
to stand establishment stands in the intermediate timeframe, which results in an increase to a
high fire hazard for these 56 acres.  AR02350-51, 03660.  In the long term (30-50 years), the 109
acres harvested by the Project would develop into the mature multi-level canopy structural stage
with a mixed (and thus lower) fire hazard and the 56 acres harvested in a subsequent action
would develop into young-high density stands with a high fire hazard for these acres.  AR02351,
03660.  When compared to the other alternatives analyzed in detail over the span of 50 years,
BLM concluded that "the effects on fire hazard would be the same under all alternatives,
although the timing of these effects would differ."  AR02351, 03661.

       In accord with the analysis in the RMP Final EIS, the Project increases fire hazard in the
Project area in the short and intermediate term, but also includes measures to reduce the Project's
effects on fire hazard.  The Project requires whole tree yarding (trunk, limbs, and top) on 100%
of the harvested acres, which reduces the amount of residual slash in the Project area and is the
most effective silvicultural method to limit the increase in surface fuels.  AR02346, 03617,
03656.  Harvested areas where heavy concentrations of slash remain after whole tree yarding
would receive additional treatments, such as additional piling and burning so that all acres are
treated.  AR00049.  The Project also reduces the density of trees replanted after harvest from 400
to 200 trees per acre, which reduces the overall amount of fuels present on the landscape.
AR00644.  Reharvesting at a lower density runs the risk of BLM having to do a second planting
in the near future if there is high sapling mortality, but BLM determined the tradeoff was
worthwhile.  AR00677.

BLM disseminated these findings on fire hazard widely and provided ample opportunity for public comment.  AR03600, 04311 (summarizing opportunities to comment on the February 2020 EA); *see also* AR00647-50, 00664-65 (letters to neighbors), 4321-24 (response to comments on fire hazard), 00340-72 (providing final fuels specialist report to member of the public).  BLM also extended the 30-day comment period to 45 days to account for the winter holidays and to ensure that anyone interested in the Project could provide input.  AR00644.

        2.    <u>BLM evaluated a valid no action alternative</u>.

Plaintiffs argue that BLM did not analyze a "true" no action alternative because the no action alternative analyzed in the EA (and thus fuels report) assumes, consistent with the 2016 RMP, that all 165 acres of the Harvest Land Base in the Project area will eventually be harvested, either as part of this or a future project.  Pls.' Mem. 20-24.[7]  Plaintiffs' argument that BLM "manipulated" the baseline is unfounded because it completely ignores the first of two interpretations of "no action" and misinterprets the second.

Under the 1978 NEPA regulations, which BLM used for this Project, the no action alternative "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action."  *Ctr. for Biological Diversity v. U.S.*

---

[7] Plaintiffs' brief cites an incorrect and version of the fuels specialist report. *See, e.g.*, Pls.' Mem. 21, 25 (citing pages located in AR02288-307); *but see id.* at 25 (citing AR02328-56).  The correct and final version of the report is located at AR02328-56 and the EA incorporates these findings, almost verbatim.  AR03653-61 (EA discussing issue six, the Project's effects on fire hazard); *see* Second Decl. of Maria Vazquez, Planning and Environmental Specialist ¶ 7 (stating that the final fuels report is located at AR02328-56).  The final version of the fuels specialist report (1) identifies the correct no action alternative that assumes no timber harvest in the short term but that harvest will eventually occur in the Harvest Land Base and (2) splits fire hazard and risk into two separate analytical questions and includes additional background and analysis for each.  *Compare* AR02333-51 (final version with two questions and identifying the no action alternative as no timber harvest in the short term) *with* AR-02293-302 (earlier version with one question and identifying the no action alternative as no timber harvest).  The arguments in this section cite to the final version of the fuels specialist report and the EA.

*Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010); *see* 40 C.F.R. § 1502.14(d) (1978).  "The no

action alternative is meant to provide a baseline against which the action alternative" may be

compared.  *Id.* (internal citation and quotation marks omitted).  The term "no action" is not

defined in the statute or NEPA regulations, but the Council on Environmental Quality ("CEQ"),

the agency charged with designing NEPA's implementing regulations (*see* 40 C.F.R. § 1500.3

(1978)), issued an informatory memorandum that guides agencies on what to include in the no

action alternative.  Forty Most Asked Questions Concerning CEQ's National Environmental

Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).  CEQ's guidelines are

"'entitled to substantial deference' as an interpretation of NEPA."  *California v. Block*, 690 F.2d

753, 769 (9th Cir. 1982) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 357 (1979)).

      CEQ's memorandum provides "[t]here are *two* distinct interpretations of 'no action' that

must be considered, depending on the nature of the proposal being evaluated."  Forty Most

Asked Questions, 46 Fed. Reg. at 18,027 (emphasis added).  The first involves situations "where

ongoing programs initiated under existing legislation and regulations will continue, even as new

plans are developed.  In these cases, 'no action' is 'no change' from current management

direction or level of management intensity."  *Id.*  Under the first interpretation, the "no action"

alternative "may be thought of in terms of continuing with the present course of action until that

action is changed."  *Id.*  The second interpretation of a no action alternative involves situations

where "the proposed activity would not take place, and the resulting environmental effects from

taking no action would be compared with the effects of permitting the proposed activity or an

alternate activity to go forward."  *Id.*  An agency is not required to consider "alternatives which

are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of

the area."  *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990) (citations omitted).

The Project's no action alternative "provides a baseline to compare environmental effects by describing the existing condition and the continuing trends anticipated in the absence of action alternatives, but with the implementation of other reasonably foreseeable Federal, State, and private projects." AR03610. The baseline scenario maintains the RMP management direction and would propose future management actions as needed, consistent with the RMP and O&C Act. *Id.* In the short term (0-10 years), the no action alternative assumes no timber harvest. AR03657. For the 165 acres of Harvest Land Base in the Project area, the fire hazard remains high in the 89 acres of young – high density stands and mixed in the 76 acres of mature stands. AR03658. The no action alternative assumes timber harvest will occur in the intermediate timeframe (10-30 years). AR03658. This is because the Project area consists of lands designated as Harvest Land Base by the RMP, which "does not preclude future timber harvest. If the no action was selected at this time, it is reasonably foreseeable that the [field office] would return to the area to implement a timber harvest in the future…." AR03610.

While a no action alternative need only satisfy one interpretation detailed in CEQ's memorandum, the Project's no action alternative satisfies both. It satisfies CEQ's first interpretation because BLM assumed that the current management direction (to harvest the timber) and level of management intensity (to include regeneration harvest) must eventually apply to all of the Harvest Land Base acreage in the Project area. Indeed, the O&C Act *requires* certain revested timberlands to be managed for permanent forest production in accordance with the sustained yield principle to provide a permanent supply of timber, 43 U.S.C. § 2601, and the 2016 RMP identifies the Harvest Land Base as the source for this timber. AR16403. This Court has already found that regeneration harvest "is not 'plainly inconsistent' with the Harvest Land Base management directives or Willamalane ERMA planning framework." *Cascadia Wildlands*,

410 F. Supp. 3d at 1155; *Pac. Rivers v. BLM*, No. 6:16-cv-1598-JR, 2018 WL 6735090, at *17

(D. Or. Oct. 12, 2018) ("[t]he O&C Act is a 'primary' or 'dominant' use statute for sustained-

yield timber production." (citations omitted)), *findings and recommendations adopted*, 2019 WL

1232835 (Mar. 15, 2019), *aff'd*, 815 F. App'x 107 (9th Cir. 2020); *Headwaters*, 914 F.2d at 1183

("the primary use of the [O&C Act] lands is for timber production to be managed in conformity

with the provision of sustained yield." (citation omitted)).  By assuming timber harvest in the

intermediate timeframe, the no action alternative simply reflects the statutory reality of the O&C

Act and the governing RMP: the Harvest Land Base must be subject to regeneration harvest in

order to achieve the RMP's sustained yield framework and achieve the declared Annual Sale

Quantity.  *See Am. Rivers v. FERC*, 201 F.3d 1186, 1200 (9th Cir. 1999) ("[T]he Commission

logically concluded that the 'definition of the no action alternative as continued operation of the

project under the same terms and conditions as the existing license simply reflects this statutory

reality.'" (citation omitted)).  The no action alternative also satisfies CEQ's second interpretation

because there is no timber harvest at the time the analysis was presented to the public and within

the next ten years.  Under either of CEQ's interpretations, BLM's no action alternative is valid.

Plaintiffs never acknowledge that there are two distinct interpretations of the no action

alternative.  They assume the baseline condition for the Project area is no timber harvest *ever*,

but this assumption is contrary to the basic policy objectives for the management of the area and

is not a viable no action alternative.  *Headwaters*, 914 F.2d at 1180 (citations omitted).

Consistent with the 2016 RMP, the status quo of all of the Harvest Land Base is eventual timber

harvest.  *See Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of the Interior*, 929 F. Supp.

2d 1039, 1055 (E.D. Cal. 2013) ("[D]efining the baseline to be the status quo, which is clearly

permissible under Ninth Circuit authority, is not the same thing as assuming the baseline

includes aspects of the proposed project, which is not permissible.").  There is a long line of
cases that supports BLM's interpretation that the no action alternative includes existing
management direction for consumptive use.  *See, e.g.*, *id*. (finding that the Bureau of
Reclamation "appropriately defined the status quo as the 'continued delivery of [Central Valley
Project] water under the interim renewal of existing contracts which includes terms and
conditions required by non-discretionary [Central Valley Project Improvement Act]
provisions."); *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 868-69 (9th Cir.
2004) (noting that the no action alternative "maintains the status quo, leaving instream flow to
the Trinity River at the 340,000 [acre-feet]/year level prescribed by [Central Valley Project
Improvement Act] § 3406(b)(23).").

    Plaintiffs' oversight about the two interpretations of a no action alternative fatally
undercuts their specific objections to the BLM's analysis of fire hazard. They first complain that
BLM "predetermined" that fire impacts would be the same under all alternatives, Pls.' Mem. 22,
but this mischaracterizes the EA and ignores that the action alternatives compare effects to
current conditions in a given time period.  BLM explained that in the short-term (0-10 years)
there would be no timber harvest in the no action alternative and that the fire hazard remains
high on 89 acres and mixed on 76 acres.  AR03657-58.  The effects analyses for the four action
alternatives then compare to this baseline of no timber harvest in the short term and at the time
the analysis was presented to the public.  *See* AR03658-60.  BLM disclosed that "by the end of
the short-term timeframe, all 109 acres of harvested stands would have a fire hazard of High."
AR03659.  In the intermediate time frame (10-30 years), BLM reasonably foresaw
implementation of regeneration harvest under the no action alternative and that the fire hazard in
the area would be high.  AR03657.  BLM then compared each of the action alternatives in the

intermediate time frame to the intermediate time frame baseline for the no action alternative. *See* AR03658-60. BLM did the same for the long term. AR03658-60. In other words, as time advances, so too does the concept of what the "current conditions" are; current conditions in all time frames are not those in 2020. *See Assoc. of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997) (affirming no action alternative that continued present power sales contracts); *Protecting Arizona's Res. and Children v. Fed. Highway Admin.*, 718 F. App'x 495, 500 (9th Cir. 2017) (affirming no action alternative that assumed existing residential land use patterns and trends would be maintained). BLM clearly disclosed to the public the effects of the Project when compared to the no action alternative for three different time periods.

Plaintiff then complains that BLM marginalizes the fire hazard and misleads the public. Pls.' Mem. 22-23. Not so. BLM clearly stated in the 2016 RMP Final EIS that there would be a 7% net acreage increase in the high or moderate fire hazard category within the Harvest Land Base from timber harvest over 50 years in the region. AR02344, 03654. In the Project area, BLM clearly disclosed the Project's effects on fire hazard to the adjacent community, noting that in the short term there would be an immediate and initial change in fire hazard to high on the 109 harvested acres and remain at high or mixed on the other 56 acres. AR03660. By the end of the intermediate time frame, all Harvest Land Base acres would have a fire hazard of high, and by the end of the long term time frame fire hazard reduces to mixed on 109 acres and remains at high on 56 acres. *Id.* Members of the public were fully aware of the increased fire hazard to the adjacent community; indeed, BLM received more than three hundred form letters that state, "I am very concerned about the fire risks and increased fire hazards this sale poses to Springfield and the adjoining residences." AR00563. But NEPA is procedural; the statute "merely prohibits

uninformed – rather than unwise – agency action." *Robertson*, 490 U.S. at 351.

Finally, Plaintiffs complain that the baseline assumes similar effects as the proposed Project. Pls.' Mem. 23-24. Plaintiffs ignore that the no action alternative has no timber harvest at the time the analysis is presented to the public and in the next ten years. AR03610. For the intermediate and long term, Plaintiffs err by failing to recognize that one interpretation of a no action alternative assumes continued management direction, particularly when there is a statutory mandate like the O&C Act and management directives in the 2016 RMP that direct regeneration harvest for several reasons, "including contribution to the attainment of the Allowable Sale Quantity and adjustment of a sustained yield unit's age class distribution." *Cascadia Wildlands*, 410 F. Supp. 3d at 1155; *see* 43 U.S.C. § 2601. Two of the cases Plaintiffs rely on actually support BLM's interpretation of the no action alternative here. In *Friends of Yosemite Valley v. Kempthorne*, the Ninth Circuit found a no action alternative arbitrary and capricious because the baseline assumed the existence of a comprehensive management plan for a designated wild and scenic river that the Ninth Circuit previously held to be invalid.[8] 520 F.3d 1024, 1038 (9th Cir. 2008). The Ninth Circuit held that the baseline should have included elements of the prior management plan in the status quo. *Id.* Here, the baseline for the Project includes the management direction from the 2016 RMP and directs timber production from the Harvest Land Base. AR03610. *Center for Biological Diversity v. U.S. Bureau of Land Management* concerned the designation of off-highway vehicle routes that, under the relevant management

---

[8] The Wild and Scenic Rivers Act's comprehensive management plan (codified at 16 U.S.C. § 1274(d)) is a resource management plan for a specific wild and scenic river and is analogous to the BLM's 2016 RMP. This Court has rejected challenges by different groups to the 2016 RMP on multiple occasions. *Cascadia Wildlands*, 410 F. Supp. 3d at 1155; *Pac. Rivers*, 815 F. App'x at 107.

plan, limited the network to routes in existence in 1980. 746 F. Supp. 2d 1055, 1090 (N.D. Cal. 2009). The district court agreed with BLM's determination that the no action alternative included in the baseline all routes present in 2003, but ultimately found the no action to be arbitrary and capricious because it did not include a full description that identified routes that were not part of the 1980 network. *Id.* at 1091. Here, BLM identifies all of the Harvest Land Base acres in the Project area and clearly informs the public that under the 2016 RMP, all of these acres are available for timber harvest (including regeneration harvest), either now or in the future. AR03600, 03610. The third case Plaintiffs rely on is readily distinguishable. *Ctr. for Biological Diversity*, 623 F.3d at 642-43, involved a discretionary land exchange to a private mining company, not a statutory mandate for how to manage a resource.

In sum, BLM's additional analysis on remand satisfies this Court's order to fully analyze and publicly disclose the degree of fire hazard to adjacent communities. *Cascadia Wildlands*, 410 F. Supp. 3d at 1157. BLM considered a valid no action alternative because it has no timber harvest at the time of the analysis, but includes regeneration harvest in the foreseeable future consistent with BLM's statutory mandate under the O&C Act and the management direction in the 2016 RMP. Plaintiffs have not shown that this decision is arbitrary and capricious, and the Court should grant summary judgment in favor of BLM on Plaintiffs' NEPA claim.

**C.**    **Plaintiffs' remaining claims are precluded or waived**.

Plaintiffs' remaining claims are either barred by the preclusive effect of the Court's prior judgment or waived. Specifically, Plaintiffs' FLPMA claims alleging a failure to amend the RMP and non-compliance with framework standards on setting characteristics are precluded. Pls.' Mem. 13-18. Plaintiffs' NEPA claims regarding impacts to recreation objectives and range of alternatives also are precluded. *Id.* at 27-31. Plaintiffs' NEPA claim on stand condition is

waived because they failed to raise it in their comments or protest.  *Id.* 24-26.  Even if the Court

were to consider these claims, they are without merit.

      1.    <u>The doctrines of claim preclusion and issue preclusion apply here</u>

      "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion,

which are collectively referred to as 'res judicata.'"  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)

(citation omitted).[9]  "To preclude parties from contesting matters that they have had a full and

fair opportunity to litigate protects their adversaries from the expense and vexation attending

multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by

minimizing the possibility of inconsistent decisions."  *Montana v. United States*, 440 U.S. 147,

153-154 (1979); *Segal v. Am. Tel. & Tel. Co., Inc.*, 606 F. 2d 842, 846 (9th Cir. 1979).

      Under claim preclusion, "a final judgment on the merits of an action precludes the parties

or their privies from relitigating issues that were or could have been raised in that action." *Allen

v. McCurry*, 449 U.S. 90, 94 (1980).  Claim preclusion applies "whenever there is (1) an identity

of claims, (2) a final judgment on the merits, and (3) privity between parties."  *Tahoe-Sierra

Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (citations

omitted).  Identity of claims exists "when two suits arise from the same transactional nucleus of

facts.  Newly articulated claims based on the same nucleus of facts may still be subject to a

[claim preclusion] finding if the claims could have been brought in the earlier action."  *Id.* at

1078 (citations and alterations omitted).  "A plaintiff need not bring every possible claim.  But

where claims arise from the same factual circumstances, a plaintiff must bring all related claims

---

[9] Res judicata is sometimes used as a synonym for claim preclusion only and sometimes to
encompass both claim and issue preclusion.  *See United States v. Bhatia*, 545 F.3d 757, 759 n.2
(9th Cir. 2008) (noting the "district court and the parties used the term 'res judicata' to mean
'claim preclusion,' and 'collateral estoppel' to mean 'issue preclusion.'").  For clarity, this brief
will avoid using res judicata and instead will refer to claim preclusion and issue preclusion.

together or forfeit the opportunity to bring any omitted claim in a subsequent proceeding."
*Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012).
Claim preclusion "bars all grounds for recovery which could have been asserted, whether they
were or not, in a prior suit between the same parties on the same cause of action."  *Costantini v.
Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982) (citation and alterations omitted).

    An identity of claims exists between this and the prior action because both concern the
Thurston Hills Non-Motorized Trails and Forest Management Project.  The underlying Project,
and the statutes under which Plaintiffs bring their claims, share the same transactional nucleus of
facts.  *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052 (9th Cir. 2005) (finding
identity of claims because "[a]ll three of [plaintiff's] claims were present in the prior suits.
Further, the [two] timber sales are part of the underlying 'nucleus of facts' that forms the basis
for all three of these suits."); *cf. Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964-65
(9th Cir. 2002) (finding no identity of claims because the two cases challenged different timber
sales).  Plaintiffs themselves state that BLM "approv[ed] what is essentially the same Project that
this Court already rejected."  Pls.' Mem. 1.  Any of Plaintiffs' claims that could have been
brought in the prior litigation are barred by claim preclusion.

    Issue preclusion "generally refers to the effect of a prior judgment in foreclosing
successive litigation of an issue of fact or law actually litigated and resolved in a valid court
determination essential to the prior judgment, whether or not the issue arises on the same or a
different claim."  *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001).  Issue preclusion also has
a three element test that has a final judgment and the same party or parties in privity as the
second and third elements.  *See Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996) (identifying
three elements).  The first element, however, differs with claim preclusion in that "the issue

necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (citation omitted).

The Court previously determined "BLM authorized the Pedal Power timber sale consistent with the applicable management directives, adequately evaluated its effects on targeted visitor activities, quality recreation, and anticipated benefits, took a hard look at its potential impact on recreational experiences, and adequately analyzed reasonable alternatives." *Cascadia Wildlands*, 410 F. Supp. 3d at 1151. These issues cannot be litigated anew.

As discussed in the following sections, Plaintiffs' new claims have either already been decided by this Court or could have been brought in the first action.[10] Either way, they cannot be raised now. *Tahoe-Sierra Pres. Council*, 322 F.3d at 1077 ("Once a sophisticated party has had a full and fair opportunity to be heard…we also recognize the merits of finality[.]").

2.    Plaintiffs' challenge to the plan amendment is precluded.

Plaintiffs challenge the Deputy State Director's plan maintenance document. Pls.' Mem. 13-16. This document clarified that where ERMA designations overlap with the underlying Harvest Land Base land use allocation, BLM implements actions as directed by the Harvest Land Base management direction, with consideration of project design features that would minimize or avoid adverse effects to recreational resources. AR16381-82.[11] Plaintiffs claim the plan maintenance is "an unlawful attempt to amend the RMP without following proper administrative procedures." Pls.' Mem. 13. This claim is precluded and is without merit.

---

[10] There can be no dispute on the second and third elements for either claim preclusion or issue preclusion; the Court entered final judgment in November 2019 (*Cascadia Wildlands*, No. 6:19-cv-00247-MC, ECF No. 33) and the two plaintiffs in the prior and instant action are the same.

[11] The plan maintenance is dated November 20, 2018. AR16382. The EA erroneously states the plan maintenance is dated August 8, 2018. AR03592-93.

First, Plaintiffs are precluded from bringing this claim. In its September 2019 decision, the Court quoted from this very same document when it held that the Project "is not 'plainly inconsistent with the Harvest Land Base management directives or Willamalane ERMA planning framework." *Cascadia Wildlands*, 410 F. Supp. 3d at 1155 (citing *Oregon Nat. Res. Council Fund*, 492 F.3d at 1132). To the extent Plaintiffs argue that BLM's reliance on this document violates FLPMA, that issue has already been decided against them and they are precluded from raising it again. *Hydranautics*, 204 F.3d at 885. To the extent Plaintiffs attempt to put a new spin on their challenge to the plan maintenance document by saying it violates FLPMA because it does not follow the proper administrative procedures, they are precluded from raising the claim now because it could have been brought in the prior litigation. *Turtle Island*, 673 F.3d at 918. The response to comments in the Decision Notice underscores the fact that Plaintiffs are precluded from bringing this claim. AR04319 (noting that Plaintiff Oregon Wild "already litigated the issues it raises regarding the plan maintenance, and BLM was not required to revisit the plan maintenance.").

Even if the Court were to consider this precluded challenge, it fails. As BLM explained in its opening brief in the first lawsuit, the management direction for the Harvest Land Base expressly allows for regeneration harvest and commercial thinning. AR17047-48, 17051. Modeling for timber production in the Harvest Land Base – Moderate Intensity Timber Area (wherein the Project area lies) begins with the assumption that between 8 and 17% of the area will experience regeneration harvest in each decade. AR22279. The environmental impact statement analysis and vegetation modeling for the RMP assumed that there would be *no* restriction of timber harvest where ERMAs overlap with the Harvest Land Base. AR16382 (citing AR19193-94). BLM issued the plan maintenance document to correct any mistaken

interpretation that ERMAs could restrict timber harvest in the Harvest Land Base.  AR16382.

As stated in the RMP, and reiterated in the clarification, "BLM will not defer or forgo timber

harvest of stands in the HLB for reasons not described in the management direction or this

appendix." *Id.* (citing AR17093).  The plan maintenance document does not, as Plaintiffs claim,

expand the scope of resource use in the ERMAs or change their terms and conditions because

ERMAs are not land use allocations and do not allow, restrict, or exclude other management

activities.  Unlike in *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 558 (9th Cir.

2006), this plan maintenance document does not change the terms and conditions of the resource

management plan – it merely clarifies that the Harvest Land Base is the dominant management

direction for the area.

  This Court has already held that the Project is consistent with applicable management

directives.  *Cascadia Wildlands*, 410 F. Supp. 3d at 1155.  It should decline to revisit that

holding, but if it does, it should again hold that the Project is consistent with the Harvest Land

Base management directives and the Willamalane ERMA planning framework.

  3.  <u>Plaintiffs' challenge to setting characteristics and recreation objectives is
<br>      precluded</u>.

  Plaintiffs argue BLM has not demonstrated how timber harvest in the Recreation

Management Zone complies with the setting characteristics of the Willamalane ERMA.  Pls.'

Mem. 16-18.  Plaintiffs raise a related claim that the Project did not analyze impacts to recreation

objectives.  *Id.* at 31 and n.5.

  The Court already held that "BLM does not have a clear directive to preserve the area's

natural setting characteristics, and there is no evidence that visitors will be deprived of 'quality'

experiences because portions of the trails pass through regeneration harvest areas."  *Cascadia*

*Wildlands*, 410 F. Supp. 3d at 1155.  The Court noted that the Willamalane ERMA designates

the setting characteristic as front country, which allows for partially modified landscapes with more noticeable modifications, and is designated Visual Resource Management Class IV, which is the lowest quality visual classification and provides for management activities that require major modifications of the landscape, such as regeneration harvest. *Id.*; AR16388 (designating the setting characteristic as front country). As for BLM's finding on recreation objectives, the Court previously held that BLM took a hard look at regeneration harvest's potential impact on recreation experiences. *Cascadia Wildlands*, 410 F. Supp. 3d at 1159.

Plaintiffs already litigated the setting characteristics and recreation objectives claims, and the Court found in favor of BLM. The Court should decline to revisit its earlier holding, but if it does, it should again hold that the Project complies with setting characteristics and recreation objectives.

      4.      <u>Plaintiffs' range of alternatives argument is precluded</u>.

Plaintiffs argue the EA did not consider a reasonable range of alternatives. Pls.' Mem. 27-31. Specifically, they say BLM should have considered an alternative that refrained from conducting timber harvest in the Recreation Management Zone and another that only thinned within the Zone.

Plaintiffs are precluded from raising the range of alternatives argument again. This Court already held that BLM adequately analyzed a reasonable range of alternatives and expressly rejected Plaintiffs' preferred thinning alternative, albeit on a Project-wide scale. *Cascadia Wildlands*, 410 F. Supp. 3d at 1160-61. If Plaintiffs wanted to present additional alternatives about activities in the Recreation Management Zone, such as no timber harvest or just thinning in the Zone, it should have done so in the prior litigation. *Turtle Island*, 673 F.3d at 918.

Even if the Court were to find that Plaintiffs could once again litigate the range of

alternatives, the claim has no merit.  It is well established that an agency's range of alternatives is reviewed under a "rule of reason" standard that "requires an agency to set forth only those alternatives necessary to permit a reasoned choice."  *Headwaters*, 914 F.2d at 1180 (citation omitted); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.").  An agency does not have to consider "mid-range alternatives to comply with NEPA."  *Westlands Water Dist.*, 376 F.3d at 871 (9th Cir. 2004); *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) ("An agency need not…discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives [of the project].") (citation and internal quotation marks omitted)).  Nor does NEPA require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.  *N. Plains Res. Council v. Lujan*, 874 F.2d 661, 666 (9th Cir. 1989).  Thus, an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative.

Plaintiffs' two new alternatives are merely variations of alternatives considered in the EA.  Alternatives 3 and 5 involved 165 acres of harvest (155 acres regeneration) and Alternative 4 involved 109 acres of harvest (98 acres regeneration).  AR03621.  Alternatives 1 and 2 did not meet the project's purpose and need to provide Allowable Sale Quantity timber volume in the short term (0-10 years).  AR03639.  BLM already explained why a thinning-only alternative in the Project area did not meet the purpose and need.  AR03623.  Plaintiffs wrongly argue that the Court ordered no timber harvest in the Recreation Management Zone, *see infra* Part IV.A, and

BLM explained how timber harvest (regeneration or otherwise) does not impact recreation objectives. AR04315, 14856-58 (protest response). Plaintiffs make an unsubstantiated claim that their newly spun alternatives "generate commercial timber volume," Pls.' Mem. 28, but cite nothing to show that thinning is commercially viable for the stands in the Project area. Even if they did, economic forecasts are well within BLM's expertise. *See Native Ecosystems Council v. Tidwell*, No. CV 08-121-M-DWM, 2009 WL 10695236, at *4 (D. Mont. June 1, 2009) ("The Forest Service's expertise includes conducting feasibility and economic analyses on timber projects."), *aff'd*, 371 F. App'x 718 (9th Cir. 2010); *see In re Big Thorne Project*, 93 F. Supp. 3d 1134, 1143 (D. Alaska 2015) (The Forest Service "has recognized expertise and discretion in predicting timber demand." (citation omitted)), *aff'd*, 691 F. App'x 417 (9th Cir. 2017). Finally, Plaintiffs rely heavily on *Oregon Natural Resources Council Action v. U.S. Forest Service* to argue that BLM had to consider additional alternatives on remand. Pls.' Mem. 29-31 (citing 445 F. Supp. 2d 1211 (D. Or. 2006)). Plaintiffs muddle that decision's findings on NEPA supplementation because of new information (which is not at issue here) and a no action alternative (discussed *supra*). Neither is relevant to whether BLM considered an adequate range of alternatives, which this Court already held that BLM did.

BLM is not required to include or evaluate every conceivable possible alternative, including Plaintiffs' two new mid-range alternatives. *Vt. Yankee*, 435 U.S. at 551. Plaintiffs have not shown that considering additional alternatives was "necessary to permit [the Forest Service to make] a reasoned choice." *See Block*, 690 F.2d at 767 (citations omitted). This Court already held that BLM's range of alternatives was reasonable and, if it considers Plaintiffs' argument again, should grant judgment in favor of BLM on Plaintiffs' NEPA alternatives argument.

5.    <u>Plaintiffs waived their NEPA claim on stand condition</u>.

Plaintiffs allege the Project violates NEPA because the EA does not provide a reasoned explanation for a changed analysis in the fuels report.  Pls.' Mem. 24-26.  Specifically, Plaintiffs claim there is no explanation for why the 2018 fuels specialist report said the Project area is predominantly mature stands with mixed to low fire hazard, whereas the 2019 fuels specialist report says the stands are a combination of young high density and mature multi-canopy stands with high to mixed fire hazard.  *Id.* at 25 (citing AR00345, 002291).  This claim is procedurally defective and fails on the merits.

Plaintiffs waived this claim because they failed to raise it during the administrative process.  One of the twin aims of NEPA is to "ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).  The corollary is that interested parties must identify their concerns during the public comment period.  A party must follow this process before pursuing litigation, and failure to raise an issue results in waiver of the claim.  *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764-65 (2004) ("Because respondents did not raise these particular objections. . . [they] have therefore forfeited any objection to the [environmental assessment] on [those] ground[s]."); *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1033 (9th Cir. 2018) ("Absent exceptional circumstances...belatedly raised issues may not form a basis for reversal of an agency decision.") (quoting *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991))).

While one of Plaintiffs' protest points and a comment on the EA allege the 2020 EA contradicts BLM's prior analysis, these statements allege BLM inaccurately described the fire hazard associated with mature stands, and did not allege – as Plaintiffs do now – that BLM

changed the characterization of the current structural condition of the stands in the Project area.
AR00166-68 (June 1, 2020 protest), 00395-97 (March 5, 2020 comments on the revised EA).
BLM responded to Plaintiffs' comment on the analysis of fire hazard and risk as Plaintiffs
presented them during the administrative process.  AR04321-23 (responding to Oregon Wild
comments 7, 8, and 9).  But BLM could not have responded to the specific issue of the revised
stand composition analysis, because Plaintiffs never raised it with the requisite specificity during
the administrative process.  This belatedly raised issue cannot form a basis for reversal of the
Project decision. *Havasupai Tribe*, 943 F.2d at 34.

Even if Plaintiffs had raised this claim in their comments on the EA or protest, it fails on
the merits for two reasons.  First, it is well-established that a court must be "at its most
deferential" when reviewing scientific judgments and technical analyses within the agency's
expertise.  *Balt. Gas & Elec.*, 462 U.S. at 103; *Lands Council v. McNair*, 537 F.3d 981, 993 (9th
Cir. 2008).  The 2018 version of the fuels report characterized the project's stands as "mature,
single canopy" stands based on a visual inspection, professional experience, and modeling.
AR3345; Brooke Decl. ¶ 10.[12]  The 2019 report used the structural dataset developed for the
2016 RMP Final EIS and characterized the stands as "young, high density" and "mature, mixed-
canopy."  AR002330; Brooke Decl. ¶ 11.  The characterization of stands in the 2019 report using

---

[12] Though extra-record, the Brooke Declaration falls within the second and third narrow
exceptions to record review because it is necessary to determine whether the agency has
considered all relevant factors and explained its decision and to explain technical terms or
complex subject matter.  *Inland Empire Pub. Lands Council v. Glickma*n, 88 F.3d 697, 703-04
(9th Cir. 1996).  Because Plaintiffs did not raise this issue during the administrative process and
did not plead it in their Complaint, *see* ECF No. 1 ¶¶ 81-89 (NEPA allegations), it is not
addressed in the Administrative Record as fully as it would have been had Plaintiffs provided
adequate notice of their claim.  The testimony of Becca Brooke, Field Manager for BLM's
Upper Willamette Field Office, is thus necessary to assist the Court's determination that BLM
properly conducted the stand composition analysis.

the 2016 RMP Final EIS dataset is an updated approach and is consistent with the approach used in other timber management projects in BLM's Northwest Oregon District.  Brooke Decl. ¶¶ 11-12.  Plaintiffs do not dispute the characterization of the stand condition in 2019 report; they merely note that it is different from the 2018 report.  The Court should defer to the most recent analysis of BLM's experts.  *Lands Council*, 537 F.3d at 993.[13]

Plaintiffs' claim also fails because it flyspecks the environmental analysis on an inconsequential point.  Courts are to apply a "rule of reason" and "need not 'fly-speck' the document and 'hold it insufficient on the basis of inconsequential, technical deficiencies....'" *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996); *All. for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1128 (D. Mont. 2013), *aff'd*, 639 F. App'x 498 (9th Cir. 2016) (applying the fly-specking principle to an environmental assessment).  BLM disclosed the structural condition of the stands in the 2019 fuels specialist report and 2020 EA, and BLM made these analyses available to the public.  The 2019 fuels specialist report and 2020 EA confirm BLM's analysis in the 2016 RMP Final EIS, which publicly disclosed increased fire hazard from implementing the timber harvest required to achieve the RMP's declared Annual Sale Quantity. The Project decision relies on the updated fuels specialist report and 2020 EA.  The fact that the revised analysis contains *more* detailed information about the stand condition that was contained in the 2018 fuels specialist report does not show that BLM's decision is arbitrary and capricious.

Plaintiffs waived their NEPA claim about stand condition and it fails on the merits.  The Court should grant judgment in favor of BLM on this claim.

---

[13] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) is inapposite because that case concerned a change in policy for an administrative rule making, not an updated analysis for a site-specific action.

D.    **BLM objects to Plaintiffs' post-decisional documents**.

Plaintiffs' opening brief relies on extra-record, post-decisional documents, news articles, and declarations about post-decisional events.  *See* Pls.' Mem. 1 (citing Frank Declaration ¶¶ 4-10, ECF No. 13), 8 n.1-2 (citing websites).  BLM objects to the Court's consideration of these materials and raises the following evidentiary objection under LR 56-1(b).[14]  Counsel for Federal Defendant conferred with counsel for Plaintiffs via telephone on November 2, 2020, in accordance with LR 7-1(a), and the parties have not been able to resolve this objection.

A reviewing court may consider extra-record materials only: (1) if necessary to determine whether the agency has considered all relevant factors and explained its decision, (2) when the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.  *Inland Empire*, 88 F.3d at 703-04.  "[E]xceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information."  *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (citation omitted).  Here, the events in the Frank Declaration and news articles cited in the brief all post-date BLM's May 18, 2020 Project decision.  AR04312. The Court should strike Paragraphs 4 through 10 of the Frank Declaration, the news articles cited in footnotes 1 and 2 of Plaintiffs' brief, and all arguments in Plaintiffs' briefs that rely on these extra-record and post-decisional documents.

In the alternative, if the Court considers these documents, it should also consider ¶¶ 4-8 of  the Declaration of Rebecca Brooke, Field Manager for BLM's Upper Willamette Field Office.  Ms. Brooke's declaration places the post-decisional events in context.

---

[14] BLM does not object to Plaintiffs' declarations to the extent they establish standing.

## V. **CONCLUSION**

BLM satisfied this Court's September 2019 Order on remand.  BLM designated trails and an associated Recreation Management Zone prior to timber harvest.  BLM also conducted additional analysis on fire hazard and made that analysis available to the public.  The Court should grant BLM's motion for summary judgment on all claims and deny Plaintiffs' motion for summary judgment in its entirety.

Respectfully submitted on this 3rd day of November, 2020.

BILLY J. WILLIAMS
United States Attorney
District of Oregon

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/  John P. Tustin*
JOHN P. TUSTIN
(he/him/his)
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  (202) 305-3022 / Fax:  (202) 305-0506
john.tustin@usdoj.gov

*Attorneys for Federal Defendant*