UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; and OREGON WILD, an Oregon non-profit corporation; | Case No. 6:20-cv-01395-MK |
| Plaintiffs, | **INTERIM FINDINGS AND RECOMMENDATION** |
| v. | |
| UNITED STATE BUREAU OF LAND MANAGEMENT, an administrative agency of the United States Department of Interior, | |
| Defendant; | |
| SENECA SAWMILL COMPANY, an Oregon corporation; | |
| Intervenor-Defendant. | |

_____

**KASUBHAI,** United States Magistrate Judge:

Cascadia Wildlands and Oregon Wild ("Plaintiffs") filed this lawsuit pursuant to the

Federal Land Management Policy Act ("FLMPA") 43 U.S.C. §§ 302 *et seq.*, the National

Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321 *et seq.*, and the Administrative

Procedure Act ("APA") 5 U.S.C. §§ 701 *et seq.*, challenging Defendant Bureau of Land

Management's ("BLM" or the "Agency") May 2020 decision to authorize the Thurston Hills Non-Motorized Trails and Forest Management Project (the "Project"). This lawsuit comes on the heels of a previous suit involving the same parties and an earlier iteration of the Project in which United States District Judge Michael McShane granted Plaintiffs' motion for summary judgment under FLMPA and NEPA and, rather than vacate the Agency's decision altogether, remanded the matter to BLM on two narrow grounds. *Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d. 1146 (D. Or. 2019) ("*Cascadia I*"). Upon remand, BLM attempted to cure the deficiencies identified in Judge McShane's Opinion and Order, and after following the relevant notice and comment framework, ultimately approved the current version of the Project to go forward. Plaintiffs, BLM, and Intervenor-Defendant Seneca Sawmill Company ("Seneca")[1] have filed cross-motions for summary judgment. *See* ECF Nos. 10, 26, 28. The Court heard oral argument in late January 2021, at which BLM and Seneca requested leave to file supplemental briefing on the issue of the scope of the appropriate remedy—*i.e.*, whether to vacate BLM's decision to authorize the Project entirely or whether to remand this matter back to BLM on a more limited basis. ECF No. 34. As explained in more detail below, Plaintiffs' motion should be GRANTED in part and DENIED in part; BLM's motion should be GRANTED in part and DENIED in part; Seneca's motion should be GRANTED in part and DENIED in part. The Court GRANTS the parties' request to file supplemental briefing.

---

[1] Seneca has contracted with BLM to remove approximately four million board feet of lumber as a result of the proposed timber harvest. Administrative Record ("AR") 03619. References to the AR refer to the administrative record submitted to the Court by BLM at ECF No. 8. Because Seneca's arguments in favor of summary judgment as to Plaintiffs' claims are largely analogous to those asserted by BLM, unless otherwise indicated, the Court addresses Seneca's and BLM's motions together.

# BACKGROUND

The parties are familiar with the statutory and regulatory frameworks that govern the claims at issue as well as the prior lawsuit concerning the Project. However, the Court recounts the following summary for purposes of providing context.

### Statutory and Regulatory Framework

The land at issue in this lawsuit is located on land subject to the Oregon and California Lands Act of 1937 ("O&C Act"). 43 U.S.C. § 2601 (transferred from 43 U.S.C. § 1181a); Pub. L. No. 75-405, 75th Cong., ch. 876, 50 Stat. 874 (Aug. 28, 1937). In enacting the O&C Act, Congress instructed agencies, such as BLM, to manage land subject to the Act:

> for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational [facilities].

43 U.S.C. § 2601; *see also Rivers v. Bureau of Land Mgmt.*, No. 6:16-cv-01598-JR, 2018 WL 6735090, at *17 (D. Or. Oct. 12, 2018), *adopted* 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd sub nom.* 815 F. App'x 107 (9th Cir. 2020). In most contexts, courts have "held the O&C Act is a 'primary' or 'dominant' use statute for sustained-yield timber production." *Rivers*, 2018 WL 6735090, at *17. However, O&C Act lands remain "subject to duties imposed by other, later-enacted statutes, such as NEPA." *Id*. at *17 n.20.

The Project encompasses a timber harvest, the Pedal Power Timber Sale, and a new non-motorized trail system for mountain biking and hiking. AR 03591. Under the 2016 Northwestern and Coastal Oregon Record of Decisions and Resource Management Plan ("RMP"), AR 004572, BLM identified and designated numerous recreation areas, including various Recreation

Management Areas ("RMAs"), including Extensive Recreation Management Areas ("ERMAs"), *see* AR 16390.

As relevant here, BLM designated the land adjacent to the Willamalane Parks and Recreation District ("WPRD") Thurston Hills Natural Area as the 1,058-acre Willamalane Non-Motorized Trails Extensive Recreation Management Area ("Willamalane ERMA" or "ERMA"). AR 03595–96, 16387-89 (Willamalane ERMA Planning Framework); 17076 (RMP directing BLM to develop and maintain partnerships with recreation-based organizations to leverage resources for planning, implementing, and monitoring RMAs).

"As part of this RMP, the BLM has designated portions of the landscape as either SRMAs or ERMAs. Within each of these designated areas, the BLM has established recreation and visitor service objectives and identified supporting management actions and allowable uses." AR 17239. Each Recreation Management Area has individualized planning frameworks, AR 16846–980, and the RMP requires that the BLM manage each "in accordance with their planning frameworks." AR 17076. As Judge McShane previously observed. "The Willamalane ERMA was intended for recreational development consistent with the Willamalane Parks and Recreation District's goals to preserve views, enhance wildlife habitat and sensitive areas, and provide recreation opportunities." *Cascadia I*, 410 F. Supp. 3d at 1151.

Pursuant to the Willamalane ERMA, the BLM is also required to establish a Recreation Management Zone ("RMZ") for all designated trails in the ERMA. AR 16389. RMZs are subdivisions of the broader Recreation Management Areas which "further delineate specific recreation opportunities or [] ensure recreation and visitor services are managed commensurate with the management of other resources and resource uses." AR 17239.

Under the Willamalane ERMA, timber harvest within the RMZ is only allowed to "protect/maintain recreation setting characteristics and/or achieve recreation objectives." AR 16389. Within the broader Willamalane ERMA, BLM is to allow fuel treatments or other vegetation modifications only "if compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics." *Id.*

**Plaintiffs' First Lawsuit**

In March 2017, BLM issued its public "scoping" notice for the Thurston Hills Project. AR 01539–41; 01338–41 (maps and description of types of potential fuels reduction treatments). Plaintiffs submitted comments urging the agency not to employ aggressive commercial logging for fuels reduction and to avoid regeneration logging. AR 01244–46. In April 2018, BLM issued its first Thurston Hills Non-Motorized Trails and Forest Management Project Environmental Assessment ("EA") and subsequently issued a revised EA in May 2018. AR 04311.

After BLM denied Plaintiffs' protest, Plaintiffs filed suit. AR 15681–707; *see also Cascadia I*, 410 F. Supp. 3d. at 1150. Specifically, Plaintiffs alleged that BLM violated: (1) FLMPA by arbitrarily and capriciously authorizing regeneration harvesting in the Willamalane Non-Motorized Trails Extensive Recreation Management Area, failing to evaluate the proposed logging's effects on visitor experience, and failing to designate an RMZ; and (2) NEPA by failing to take the requisite "hard look" at the proposed action's potential environmental impacts, stating an unreasonably narrow purpose and need, and failing to consider reasonable and feasible alternatives. *Cascadia I*, 410 F. Supp. 3d. at 1150.

United States District Judge Michael McShane granted Plaintiffs' motion for summary judgement regarding BLM's failure to designate a Recreation Management Zone because "allowing logging and then establishing [an RMZ] at some unspecified later date . . . seems to

defeat the Zone's very purpose." *Id.* at 1156. Judge McShane explained that he would therefore "require[] BLM to designate trails and establish a Recreation Management Zone before logging begins to ensure adequate protection in the buffer area." *Id.* Ultimately, Judge McShane's specific instructions to BLM on remand were to "designate and preserve a Recreation Management Zone prior to harvest." *Id.* at 1161.

As to Plaintiffs' NEPA claim, Judge McShane also found for Plaintiffs regarding BLM's failure to take the requisite "hard look" at the Thurston Hills Project's fire risk, and thereby deprived the public of meaningful participation, instructing BLM:

> to issue a new environmental assessment that adequately discloses and analyzes the likely increase of fire hazard to adjacent communities, make it available for public review and comment[.]

*Id.* at 1161. The court found that BLM's failure to include "crucial information" from its Fuels Specialist Report in its EA deprived the public of a meaningful opportunity to participate. *Id.* at 1158.

Finally, Judge McShane granted BLM's and Seneca's cross-motion on all other matters, including Plaintiffs' remaining NEPA claims finding: (1) "BLM took a hard look at regeneration logging's potential impact on recreational experiences in the Willamalane ERMA," *id.* at 1159; and (2) that "BLM adequately analyzed reasonable alternatives and explained why Plaintiffs' preferred thinning alternative would not achieve the Project's purpose and need," *id.* at 1160.

***Plaintiffs' Present Lawsuit***

In February 2020, BLM published a new EA:

> to disclose the potential increase of fire hazard and risk to adjacent communities, designate trails, and designate and preserve a [Recreation Management Zone] prior to timber harvest.

AR 03586. After the required public comment period, BLM issued a Finding of No Significant

Impact and in May 2020 BLM issued a Decision Record to implement the Pedal Power Timber

Sale and associated activities. AR 03567, 04309. Plaintiffs submitted their protest letters, which

BLM denied in July 2020. AR 03586, 04309. Plaintiffs filed this lawsuit shortly thereafter.

Compl., ECF No. 1.

## STANDARD OF REVIEW

Judicial review of agency action is governed by the Administrative Procedure Act. 5

U.S.C. § 706. The reviewing court:

> must consider whether the decision was based on a consideration
> of the relevant factors and whether there has been a clear error of
> judgment. Although this inquiry into the facts is to be searching
> and careful, the ultimate standard of review is a narrow one. The
> court is not empowered to substitute its judgment for that of the
> agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977).

Agency decisions are "entitled to a presumption of regularity." *Id.* at 415. While such

review is deferential to the agency action taken, the court must not "rubber-stamp" the agency

action as correct. *Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir. 2008); *N. Spotted Owl*

*v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," or "without observance of procedure

required by law." 5 U.S.C. § 706(2)(A), (D). "[I]f an agency 'fails to consider an important

aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the

evidence,' its action is arbitrary and capricious." *Or. Nat. Res. Council Fund v. Goodman*, 505

F.3d 884, 888–89 (9th Cir. 2007) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th

Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."' *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Because this Court's review under the APA is generally limited to the administrative record, *see infra*, no facts are in dispute. However, the parties have filed a Motion and Cross-Motions for Summary Judgment, which may be used as vehicles for the Court to conduct its review of the record. Therefore, the Court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

### I.    Preliminary Matters

In the interest of judicial economy, the Court notes two preliminary matters. First, this F&R's analytical framework largely mirrors Judge McShane's well-reasoned opinion in *Cascadia I*. Second, to the extent Plaintiffs rely on extra-record evidence to support their claims, the Court notes that it is "capable of independently resolving conflicts in the record and questions of admissibility," and therefore declines to strike the evidence at issue, especially because it does not alter the outcome of this case. *Cascadia Wildlands v. Bureau of Land Mgmt.*, No. 6:12-cv-00095-AA, 2012 WL 6738275, *3 n.6 (D. Or. Dec. 21, 2012) (citing *Or. Natural Desert Ass'n v. Sabo,* 854 F.Supp.2d 889, 925 (D. Or. 2012) (denying as moot defendants' motion to strike where the "court has not considered the extra-record evidence offered by plaintiffs")).

II.   **FLPMA**

As noted, under FLPMA, BLM must prepare Resource Management Plans for its

districts. 43 U.S.C. § 1712. BLM must ensure that site-specific actions conform to the governing

Resource Management Plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1601.0-5(b) (defining

"conformance" as "specifically provided for in the plan" or "clearly consistent with the terms,

conditions, and decisions of the approved plan or plan amendment."); 43 C.F.R. § 1610.5-3(a);

*Or. Nat. Res. Council v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). The Resource Management

Plan governing the Project at issue is the 2016 RMP. AR 05476–535.

FLPMA generally requires BLM to manage lands "on the basis of multiple use and

sustained yield unless otherwise specified by law" and to protect a wide range of natural resource

values. *See, e.g.*, 43 U.S.C. § 1701(a)(7); *see generally id.* §§ 1701–1782. However, given

Congress' statutory mandate for O&C Lands, FLPMA contains an exception:

> Notwithstanding any provision of this Act, in the event of conflict
> with or inconsistency between this Act and the Acts of August 28,
> 1937 (50 Stat. 874; 43 U.S.C. § 1181a-1181j), and May 24, 1939
> (53 Stat. 753), insofar as they relate to management of timber
> resources, and disposition of revenues from lands and resources,
> the latter Acts shall prevail.

43 U.S.C. § 1701, note (b) (1976); PL 94–579 (S 507), PL 94–579, October 21, 1976, 90 Stat.

2743.

The O&C Act provides that certain revested timberlands in western Oregon shall be

managed for permanent forest production in accordance with the "sustained yield" principle to

provide a "permanent source of timber supply" and recreational facilities, protect watersheds,

regulate stream flow, and contribute to local communities' and industries' economic stability. 43

U.S.C. § 2601. It also requires BLM to set an "annual productive capacity" from O&C lands. *Id.*

BLM uses FLPMA planning procedures to adopt Resource Management Plans for western Oregon O&C lands.

Plaintiffs contend that BLM violated Judge McShane's prior order. Pl.'s Mot. Summ. J. ("Pl.'s Mot.") 10, ECF No. 10. Specifically, Plaintiffs argue that BLM's decision to log in the RMZ violates Judge McShane's prior order to "designate and preserve a Recreation Management Zone prior to harvest." Pl.'s Mot. 13 (quoting *Cascadia I*, 410 F. Supp. 3d at 1161).

The 2016 RMP mandates that ERMAs must be managed "in accordance with their planning frameworks." AR 17076; *see also* AR 17243 (designating the Willamalane ERMA as such). The Willamalane ERMA, in turn, requires the "[e]stablish[ment of] a Recreation Management Zone (RMZ) distance (off of center line) for all designated trails." AR 16389. Judge McShane's order specifically required BLM to "designate trails and establish a Recreation Management Zone *before* logging begins to ensure adequate protection in the buffer area." *Cascadia I*, 410 F. Supp. 3d at 1156 (emphasis added). Judge McShane further ordered that, should the project proceed, BLM was required to "preserve a Recreation Management Zone *prior to harvest*." *Id.* at 1161 (emphasis added).

In May 2020, BLM formally implemented "the trail and associated [RMZ] designation and development action as described and analyzed under Alternative 4 in the EA. [The] trails and RMZ are shown on the attached project map," shown below:



AR 03691.

BLM's actions on remand, however, failed to follow Judge McShane's instructions. Although BLM "designated" trails and "established" an RMZ for the proposed roads, it has failed to direct the Court to evidence in the record it took steps to affirmatively "preserve" the RMZ "prior to harvest," as required by the Court's remand instructions. *Cascadia I*, 410 F. Supp. 3d at 1161. In fact, the current iteration of the Project proposes to log the identical area proposed in 2018. AR 003620. In other words, other than simply adding the trail designations and an RMZ to a map, BLM has not taken *affirmative* steps to *preserve* the RMZ in any meaningful manner prior to the harvest as ordered by Judge McShane. Because BLM's current plan fails to take affirmative steps to preserve the RMZ prior to timber harvesting, it violates Judge McShane's prior order as a matter of law. As such, Plaintiff's motion for summary judgment as to this claim should be GRANTED; BLM's and Seneca's motion should be DENIED.[2]

---

[2] Plaintiffs additionally argue they are entitled to summary judgment because BLM failed to lawfully amend the Resource Management Plan and because BLM failed to analyze or otherwise demonstrate compliance with the planning framework standards. Pl.'s Mot. 10–18. As explained

### III.    NEPA

NEPA requires an analysis of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA exists to ensure that agencies take careful consideration of information related to significant environmental impacts of their proposed actions and to give "the public the assurance that the agency 'has indeed considered environmental concerns in its decision-making process.'" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). NEPA imposes procedural requirements on agencies but "does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results." *Bering Strait for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).

Judicial review of agency actions under NEPA is limited to determining whether the agency took the requisite "hard look" at the proposed action. *Id.* An agency's "hard look" at an action and its environmental impacts includes an environmental assessment. *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988). Based on the EA, the agency determines whether to prepare an Environmental Impact Statement ("EIS"). 40 C.F.R. § 1501.4(c). If the agency finds that the action will not have a significant impact, it may issue a Finding of No Significant Impact in lieu of an Environmental Impact Statement. 40 C.F.R. § 1501.4(e); 40 C.F.R. § 1508.9(a)(1); 40 C.F.R. § 1508.13.

A "hard look" requires a consideration of "all foreseeable direct and indirect impacts" and a full assessment of the cumulative impacts of the proposed action. *Ctr. For Biological*

---

above, because the Court concludes BLM violated Judge McShane's prior Order, the Court need not reach Plaintiffs additional arguments.

*Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012). It is not sufficient to make speculative, conclusory statements about the impact of an action. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992); *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139. To prevail, a plaintiff must raise "substantial questions whether a project may have a significant effect on the environment." *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citation and quotation marks omitted).

Judge McShane found BLM violated NEPA's "hard look" requirement regarding fire hazard and risk in two ways. First, he concluded that the "Environmental Impact Statement did not analyze site-specific geographic conditions or effects on the immediate area, nor did the Project Environmental Assessment," and "simply acknowledged that there would be a significant increase in stand-level fire hazard in the Project area for the next 40 years without explaining what that means or analyzing the degree or severity of fire hazard to the community and neighboring landowners." *Cascadia I*, 410 F. Supp. 3d at 1158.

Second, he found that "BLM also failed to include crucial information from its fuels specialist in the Environmental Assessment and deprived the public of meaningful participation." *Id.* BLM also failed to respond to questions from the public despite the fuel specialist stating that "BLM would analyze the issue more in the Environmental Assessment," and reduced "the fuels report to a single sentence, explaining that 'regeneration/reforestation actions would create an increase in fire hazard at the stand level for the next 40 years as stands regrow and transition through progressive structural stages.'" *Id.* (citing *Cascadia I's* AR).

Ultimately, Judge McShane faulted BLM for failing "to incorporate the report into the April 2018 Environmental Assessment," which ultimately "deprived the public of its only opportunity to comment." *Id.* at 1159.

On remand, BLM responded to the Court's order by responding to "Issue 6: How would trail development, timber harvest, and reforestation affect fire hazard?" AR 03653. Over the course of nine pages in the EA, BLM analyzed the effect of fire hazard for each of the proposed plans, and provided the following summary:

> Under Alternatives 3, 4, and 5, timber harvest would increase fire hazard in the short-term at the project scale because of the creation of residual activity fuels. The use of whole tree yarding and slash treatments would reduce, but not eliminate, this increase in fire hazard. Subsequent reforestation would create stands that would have a Moderate fire hazard initially, followed by a High fire hazard by the end of the short term and during the intermediate timeframe, followed by a Mixed fire hazard in the long term. Because regeneration harvest is reasonably foreseeable in the intermediate timeframe under the No Action alternative, Alternative 2, and the unharvested portions of the project area under Alternative 4, the same effects on fire hazard would occur under these alternatives, except 10 to 20 years later. Therefore, the effects on fire hazard would be the same under all alternatives, although the timing of these effects would differ.

AR 03661; *see also* AR 02328–56 (fuels specialist report). In the EA, BLM assumed that the Pedal Power timber harvest would affect fire hazard at the Project level, AR 02345, 03655, and then conducted a site-specific analysis of each of the Project's five alternatives at appropriate spatial and temporal scales, AR 02346–47, 03656–57 (explaining scale parameters); AR 02347–51, 03657–61 (effects of each alternative on fire hazard).

For Alternative 4, the selected alternative, BLM explained that "regeneration harvest and subsequent reforestation would change the structural stage, fuel model, and fuel loadings within harvested areas." AR 02350. In the short term (0–10 years post-harvest), fire hazard would

decrease on 36 acres (shifting from high to moderate) and increase on 73 acres (shifting from

mixed to moderate). AR 02350, 03660. By the end of the short-term timeframe, all 109 harvested

acres would have a high fire hazard relative to the no action alternative, which assumed no

timber harvest in the short term. *Id.*

In the intermediate timeframe (10–30 years), the structural composition of stands in the

109 harvested acres would shift from stand establishment into young-high density; however,

because both compositions have a high fire hazard, the fire hazard would not change between the

short and intermediate time frames. AR 02350, 03660. For the 56 acres of Harvest Land Base in

the Project area that would not be harvested as part of the Project, but reasonably would be in the

future, these acres would change from early successional to stand establishment stands in the

intermediate timeframe, which would result in an increase to a high fire hazard for these 56

acres. AR 02350-51, 03660.

In the long term (30–50 years), the 109 acres harvested by the Project would develop into

the mature multi-level canopy structural stage with a mixed (and thus lower) fire hazard and the

56 acres harvested in a subsequent action would develop into young-high density stands with a

high fire hazard for these acres. AR 02351, 03660. When compared to the other alternatives

analyzed in detail over the span of 50 years, BLM concluded that "the effects on fire hazard

would be the same under all alternatives, although the timing of these effects would differ." AR

02351, 03661.

BLM disseminated these findings and provided opportunity for public comment. AR

03600, 04311 (summarizing opportunities to comment on the February 2020 EA); *see also* AR

00647–50, 00664-65 (letters to neighbors), 04321–24 (response to comments on fire hazard),

00340-72 (providing final fuels specialist report to member of the public). BLM also extended

the 30-day comment period to 45 days to account for the winter holidays and to ensure that

anyone interested in the Project could provide input. AR 00658–59.

### A.       No Action Alternative

The purpose of a "no action alternative" is to allow "policymakers and the public to

compare the environmental consequences of the status quo to the consequences of the proposed

action." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010).

Put differently, the "no action alternative is meant to 'provide a baseline against which the action

alternative'—in this case, [timber sale]—is evaluated." *Id.* (quoting *Friends of Southeast's*

*Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998) (citation altered).

Although the term "no action" alternative is not defined in the statute or NEPA

regulations, in 1981, the Council on Environmental Quality ("CEQ"), the agency charged with

designing NEPA's implementing regulations, *see* 40 C.F.R. § 1500.3, issued an informatory

"Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA

Regulations." 46 Fed. Reg. 18,026–01 (Mar. 23, 1981) ("40 Questions Memorandum"). The

third question the Memorandum addresses is: "What does the 'no action' alternative include? If

an agency is under a court order or legislative command to act, must the EIS[3] address the 'no

action' alternative?" *Id.* at 18,027. The CEQ's answer provides in pertinent part:

> [ ] Section 1502.14(d) requires the alternatives analysis in the EIS
> to "include the alternative of no action." There are two distinct
> interpretations of "no action" that must be considered, depending on
> the nature of the proposal being evaluated. *The first situation might*
> *involve an action such as updating a land management plan where*
> *ongoing programs initiated under existing legislation and*

---

[3] Although this regulatory provision facially applies only to EISs, "[t]he alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA." *Native Ecosystems,* 428 F.3d at 1245.

*regulations will continue, even as new plans are developed.* In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. *Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed.* Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

\* \* \*

In light of the above, it is difficult to think of a situation where it would not be appropriate to address a "no action" alternative. Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. Section 1502.14(c). [ ] Inclusion of such an analysis in the EIS is necessary to inform the Congress, the public, and the President as intended by NEPA. Section 1500.1(a).

*Id.* (emphasis added).

Here, the EA defined the no-action alternative as follows:

The No Action Alternative is the only alternative BLM must analyze in detail that does not meet the purpose and need for action. No action provides a baseline to compare environmental effects by describing the existing condition and the continuing trends anticipated in the absence of the action alternatives, but with the implementation of other reasonably foreseeable Federal, State, and private projects. The baseline scenario maintains the ERMA designation, the LUAs, and the RMP management direction on the

lands in the study area, and the BLM would propose management actions in the future as needed, consistent with the RMP.

Under the No Action Alternative, the BLM would not implement the development of trails nor a timber harvest plan within the project area at this time. *Since the project area consists of lands designated as [Harvest Land Base ("HLB")] by the RMP, this alternative (the No Action Alternative) does not preclude future timber harvest.* If the no action was selected at this time, it is reasonably foreseeable that the FO would return to the area to implement a timber harvest in the future, as stated in a memorandum from the Upper Willamette Field Office supervisory forester and incorporated herein by reference (Bickford, 2020). Given that the stands in the project area are in the 70-year age class, it is reasonably foreseeable that the FO would re-initiate planning for a timber harvest project in the Thurston Hills area 10-20 years from now. It is reasonably foreseeable that the proposed harvest area and harvest treatments would be the same or very similar to the current project. The BLM would prepare an EA for such a project at that future time, prior to making any implementation decisions.

AR 03610–11 (emphasis added).

BLM asserts their actions satisfy either interpretation. Def.'s Mot. 17–18. The Court agrees. Plaintiffs essentially begin with the flawed presumption that the baseline condition for the Project area is never conducting a timber harvest. However, consistent with the 2016 RMP, the status quo of all HLB is eventual timber harvest. *See Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1055 (E.D. Cal. 2013) ("[D]efining the baseline to be the status quo, which is clearly permissible under Ninth Circuit authority, is not the same thing as assuming the baseline includes aspects of the proposed project, which is not permissible.").

Caselaw supports BLM's interpretation that the no action alternative includes existing management direction for consumptive use. *See, e.g., id.* (finding that the Bureau of Reclamation "appropriately defined the status quo as the 'continued delivery of [Central Valley Project] water under the interim renewal of existing contracts which includes terms and conditions required by

non-discretionary [Central Valley Project Improvement Act] provisions"); *Westlands Water Dist.*

*v. U.S. Dep't of Interior*, 376 F.3d 853, 868-69 (9th Cir. 2004) (noting that the no action

alternative "maintains the status quo, leaving instream flow to the Trinity River at the 340,000

[acre-feet]/year level prescribed by [Central Valley Project Improvement Act] § 3406(b)(23).").

BLM explained that in the short-term (0–10 years) there would be no timber harvest in

the no action alternative and that the fire hazard remains high on 89 acres and mixed on 76 acres.

AR 03657–58. The analyses for the effects of the four action alternatives are then compared to

this baseline of no timber harvest in the short term and at the time the analysis was presented to

the public. *See* AR 03658–61. BLM disclosed that "by the end of the short-term timeframe, all

109 acres of harvested stands would have a fire hazard of High." AR 03660.

In the intermediate time frame (10–30 years), BLM reasonably foresaw implementation

of regeneration harvest under the no action alternative and that the fire hazard in the area would

be high. AR 03658. BLM then compared each of the action alternatives in the intermediate time

frame to the intermediate time frame baseline for the no action alternative. *See* AR03658–61.

BLM did the same for the long term. AR 03658-61. In other words, as time advances, so does the

concept of what the "current conditions" are; current conditions in all time frames are not those

in 2020. *See Assoc. of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158,

1188 (9th Cir. 1997) (affirming no action alternative that continued present power sales

contracts); *Protecting Ariz.'s Res. & Children v. Fed. Highway Admin.*, 718 F. App'x 495, 500

(9th Cir. 2017) (affirming no action alternative that assumed existing residential land use patterns

and trends would be maintained).

BLM sufficiently disclosed to the public the effects of the Project when compared to the

no action alternative for three different time periods. As such, the Court should find that BLM

met the procedural requirements of NEPA as a matter of law. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (explaining that so long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs"); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996) ("NEPA's goal is satisfied once [] information is properly disclosed; thus NEPA exists to ensure a process, not to ensure any result." (citation and quotation omitted)).

### B.    Fuels Report

The Court should find that Plaintiffs waived their argument relating to BLM's purported failure to provide a reasoned explanation for a changed analysis in the fuels report. Pl.'s Mot. 24–26. This claim is subject to waiver because Plaintiffs failed to raise it during the administrative process. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) ("Because respondents did not raise these particular objections. . . [they] have therefore forfeited any objection to the [environmental assessment] on [those] ground[s]."); *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1033 (9th Cir. 2018) ("Absent exceptional circumstances . . . belatedly raised issues may not form a basis for reversal of an agency decision.") (quoting *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991))). As such, the Court should find that BLM could not have responded to the specific issue of the revised stand composition analysis, because Plaintiffs never raised it with the requisite specificity during the administrative process. *Havasupai Tribe*, 943 F.2d at 34.

### C.    Range of Reasonable Alternatives

Plaintiffs' argument that the EA did not consider a range of reasonable alternatives is barred by the doctrine of claim preclusion. Claim preclusion applies where "a final judgment on

the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Claim preclusion applies "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (citations omitted).

Judge McShane previously held that BLM adequately analyzed a reasonable range of alternatives, albeit on a Project-wide scale. *Cascadia I*, 410 F. Supp. 3d at 1160–61. Plaintiffs may not now present additional alternatives about activities in the RMZ, such as no timber harvest or just thinning in the Zone, where they could have done so in the prior litigation. *Turtle Island*, 673 F.3d at 918; *see also Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012) ("A plaintiff need not bring every possible claim. But where claims arise from the same factual circumstances, a plaintiff must bring all related claims together or forfeit the opportunity to bring any omitted claim in a subsequent proceeding.").

In sum, because BLM gave the requisite "hard look" at the Project's fire hazard and risk through site specific analysis as ordered by Judge McShane, and provided that information in a manner that allowed for meaningful public participation, the Court should grant BLM and Seneca's motions for summary judgment on Plaintiffs' NEPA claim; Plaintiffs' motion should be denied as to this claim.

## CONCLUSION

For the reasons explained above, the court will make the following recommendation that Plaintiffs' motion should be GRANTED in part and DENIED in part; BLM's motion should be GRANTED in part and DENIED in part; Seneca's motion should be GRANTED in part and DENIED in part. The Court GRANTS the parties request to file supplemental briefing. The

parties have 30 days from the entry of this Interim Findings and Recommendation to file supplemental briefs as to the appropriate remedy given the Court's expected recommendation. The Court will thereafter refer a final-Findings and Recommendation to a district judge to which the parties may file objections that includes a recommendation on the issue of remedy. *See* Fed. R. Civ. P. 72.

DATED this <u>4th</u> day of June 2021.

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge