UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

CASCADIA WILDLANDS, an Oregon
non-profit corporation; and OREGON
WILD, an Oregon non-profit corporation,

          Plaintiffs,

   v.

UNITED STATE BUREAU OF LAND
MANAGEMENT, an administrative agency
of the United States Department of Interior,

          Defendant;

SENECA SAWMILL COMPANY, an
Oregon corporation;

          Intervenor-Defendant.

Case No. 6:20-cv-01395-MK

**FINDINGS AND
RECOMMENDATION**

_____

**KASUBHAI,** United States Magistrate Judge:

      Cascadia Wildlands and Oregon Wild ("Plaintiffs") filed this lawsuit pursuant to the

Federal Land Management Policy Act ("FLMPA") 43 U.S.C. §§ 302 *et seq.*, the National

Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321 *et seq.*, and the Administrative

Procedure Act ("APA") 5 U.S.C. §§ 701 *et seq.*, challenging Defendant Bureau of Land

Management's ("BLM" or the "Agency") May 2020 decision to authorize the Thurston Hills

Non-Motorized Trails and Forest Management Project (the "Project"). This lawsuit comes on the

1 — FINDINGS AND RECOMMENDATION

heels of a previous suit involving the same parties and an earlier iteration of the Project in which

United States District Judge Michael McShane granted Plaintiffs' motion for summary judgment

for violating both FLMPA and NEPA and, rather than vacate the Agency's decision altogether,

remanded the matter to BLM on two narrow grounds. *Cascadia Wildlands v. Bureau of Land

Mgmt.*, 410 F. Supp. 3d. 1146 (D. Or. 2019) ("*Cascadia I*"). On remand, BLM purported to cure

the deficiencies identified in Judge McShane's Opinion and Order, and after following the

relevant notice and comment framework, ultimately approved the current iteration of the Project.

Plaintiffs, BLM, and Intervenor-Defendant Seneca Sawmill Company ("Seneca"[1]) filed cross-

motions for summary judgment. *See* ECF Nos. 10, 26, 28. The Court heard oral argument in late

January 2021, at which BLM and Seneca requested leave to file supplemental briefing on the

issue of the scope of the appropriate remedy—*i.e.*, whether to vacate BLM's decision to

authorize the Project entirely or whether to remand this matter back to BLM on a more limited

basis. ECF No. 34. The parties submitted supplemental briefing on the issue and the Court now

issues this final Findings and Recommendation ("F&R"), which contains the Court's

recommended disposition as to the merits as we well as the appropriate remedy. As explained in

more detail below, Plaintiffs' motion should be GRANTED in part and DENIED in part; BLM's

motion should be GRANTED in part and DENIED in part; Seneca's motion should be

GRANTED in part and DENIED in part. The underlying Project should be REMANDED to

BLM and the Project should be VACATED.

---

[1] Seneca has contracted with BLM to remove approximately four million board feet of lumber as a result of the proposed timber harvest. Administrative Record ("AR") 03619. References to the AR refer to the administrative record submitted to the Court by BLM at ECF No. 8. Because Seneca's arguments in favor of summary judgment as to Plaintiffs' claims largely mirror those asserted by BLM, unless otherwise indicated, the Court addresses Seneca's and BLM's motions together.

## BACKGROUND

The parties are familiar with the statutory and regulatory frameworks that govern the claims at issue as well as the prior lawsuit concerning the Project. However, the Court recounts the following summary for purposes of providing context.

### *Statutory and Regulatory Framework*

The land at issue in this lawsuit is located on land subject to the Oregon and California Lands Act of 1937 ("O&C Act"). 43 U.S.C. § 2601 (transferred from 43 U.S.C. § 1181a); Pub. L. No. 75-405, 75th Cong., ch. 876, 50 Stat. 874 (Aug. 28, 1937). In enacting the O&C Act, Congress instructed agencies, such as BLM, to manage land subject to the Act:

> for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational [facilities].

43 U.S.C. § 2601; *see also Rivers v. Bureau of Land Mgmt.*, No. 6:16-cv-01598-JR, 2018 WL 6735090, at *17 (D. Or. Oct. 12, 2018), *adopted* 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd sub nom.* 815 F. App'x 107 (9th Cir. 2020). In most contexts, courts have "held the O&C Act is a 'primary' or 'dominant' use statute for sustained-yield timber production." *Rivers*, 2018 WL 6735090, at *17. However, O&C Act lands remain "subject to duties imposed by other, later-enacted statutes, such as NEPA." *Id*. at *17 n.20.

The Project encompasses a timber harvest, the Pedal Power Timber Sale, and a new non-motorized trail system for mountain biking and hiking. AR 03591. Under the 2016 Northwestern and Coastal Oregon Record of Decisions and Resource Management Plan ("RMP"), AR 004572, BLM identified and designated numerous recreation areas, including various Recreation

Management Areas ("RMAs"), including Extensive Recreation Management Areas ("ERMAs"),
*see* AR 16390.

As relevant here, BLM designated the land adjacent to the Willamalane Parks and
Recreation District ("WPRD") Thurston Hills Natural Area as the 1,058-acre Willamalane Non-
Motorized Trails Extensive Recreation Management Area ("Willamalane ERMA" or "ERMA").
AR 03595–96, 16387-89 (Willamalane ERMA Planning Framework); 17076 (RMP directing
BLM to develop and maintain partnerships with recreation-based organizations to leverage
resources for planning, implementing, and monitoring RMAs).

"As part of this RMP, the BLM has designated portions of the landscape as either
SRMAs or ERMAs. Within each of these designated areas, the BLM has established recreation
and visitor service objectives and identified supporting management actions and allowable uses."
AR 17239. Each Recreation Management Area has individualized planning frameworks, AR
16846–980, and the RMP requires that the BLM manage each "in accordance with their planning
frameworks." AR 17076. As Judge McShane previously observed. "The Willamalane ERMA
was intended for recreational development consistent with the Willamalane Parks and Recreation
District's goals to preserve views, enhance wildlife habitat and sensitive areas, and provide
recreation opportunities." *Cascadia I*, 410 F. Supp. 3d at 1151.

Pursuant to the Willamalane ERMA, the BLM is also required to establish a Recreation
Management Zone ("RMZ") for all designated trails in the ERMA. AR 16389. RMZs are
subdivisions of the broader Recreation Management Areas which "further delineate specific
recreation opportunities or [] ensure recreation and visitor services are managed commensurate
with the management of other resources and resource uses." AR 17239.

Under the Willamalane ERMA, timber harvest within the RMZ is only allowed to "protect/maintain recreation setting characteristics and/or achieve recreation objectives." AR 16389. Within the broader Willamalane ERMA, BLM is to allow fuel treatments or other vegetation modifications only "if compatible with meeting recreation objectives, not interfering with recreation opportunities, and maintaining setting characteristics." *Id.*

***Plaintiffs' First Lawsuit***

In March 2017, BLM issued its public "scoping" notice for the Thurston Hills Project. AR 01539–41; 01338–41 (maps and description of types of potential fuels reduction treatments). Plaintiffs submitted comments urging the Agency not to employ aggressive commercial logging for fuels reduction and to avoid regeneration logging. AR 01244–46. In April 2018, BLM issued its first Thurston Hills Non-Motorized Trails and Forest Management Project Environmental Assessment ("EA") and subsequently issued a revised EA in May 2018. AR 04311.

After BLM denied Plaintiffs' protest, Plaintiffs filed suit. AR 15681–707; *see also Cascadia I*, 410 F. Supp. 3d. at 1150. Specifically, Plaintiffs alleged that BLM violated: (1) FLMPA by arbitrarily and capriciously authorizing regeneration harvesting in the Willamalane Non-Motorized Trails Extensive Recreation Management Area, failing to evaluate the proposed logging's effects on visitor experience, and failing to designate an RMZ; and (2) NEPA by failing to take the requisite "hard look" at the proposed action's potential environmental impacts, stating an unreasonably narrow purpose and need, and failing to consider reasonable and feasible alternatives. *Cascadia I*, 410 F. Supp. 3d. at 1150.

United States District Judge Michael McShane granted Plaintiffs' motion for summary judgement regarding BLM's failure to designate a Recreation Management Zone because "allowing logging and then establishing [an RMZ] at some unspecified later date . . . seems to

defeat the Zone's very purpose." *Id.* at 1156. Judge McShane explained that he would therefore

"require[] BLM to designate trails and establish a Recreation Management Zone before logging

begins to ensure adequate protection in the buffer area." *Id.* Ultimately, Judge McShane's

specific instructions to BLM on remand were to "designate and preserve a Recreation

Management Zone prior to harvest." *Id*. at 1161.

As to Plaintiffs' NEPA claim, Judge McShane also found for Plaintiffs regarding BLM's

failure to take the requisite "hard look" at the Thurston Hills Project's fire risk, and thereby

deprived the public of meaningful participation, instructing BLM:

> to issue a new environmental assessment that adequately discloses
> and analyzes the likely increase of fire hazard to adjacent
> communities, make it available for public review and comment[.]

*Id.* at 1161. The court found that BLM's failure to include "crucial information" from its Fuels

Specialist Report in its EA deprived the public of a meaningful opportunity to participate. *Id.* at

1158.

Finally, Judge McShane granted BLM's and Seneca's cross-motion on all other matters,

including Plaintiffs' remaining NEPA claims finding: (1) "BLM took a hard look at regeneration

logging's potential impact on recreational experiences in the Willamalane ERMA," *id.* at 1159;

and (2) that "BLM adequately analyzed reasonable alternatives and explained why Plaintiffs'

preferred thinning alternative would not achieve the Project's purpose and need," *id*. at 1160.

***Plaintiffs' Present Lawsuit***

In February 2020, BLM published a new EA:

> to disclose the potential increase of fire hazard and risk to adjacent
> communities, designate trails, and designate and preserve a
> [Recreation Management Zone] prior to timber harvest.

AR 03586. After the required public comment period, BLM issued a Finding of No Significant

Impact and in May 2020 BLM issued a Decision Record to implement the Pedal Power Timber

Sale and associated activities. AR 03567, 04309. Plaintiffs submitted their protest letters, which

BLM denied in July 2020. AR 03586, 04309. Plaintiffs filed this lawsuit shortly thereafter.

Compl., ECF No. 1.

**STANDARD OF REVIEW**

Judicial review of agency action is governed by the Administrative Procedure Act. 5

U.S.C. § 706. The reviewing court:

> must consider whether the decision was based on a consideration
> of the relevant factors and whether there has been a clear error of
> judgment. Although this inquiry into the facts is to be searching
> and careful, the ultimate standard of review is a narrow one. The
> court is not empowered to substitute its judgment for that of the
> agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977).

Agency decisions are "entitled to a presumption of regularity." *Id.* at 415. While such

review is deferential to the agency action taken, the court must not "rubber-stamp" the agency

action as correct. *Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir. 2008); *N. Spotted Owl

v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," or "without observance of procedure

required by law." 5 U.S.C. § 706(2)(A), (D). "[I]f an agency 'fails to consider an important

aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the

evidence,' its action is arbitrary and capricious." *Or. Nat. Res. Council Fund v. Goodman*, 505

F.3d 884, 888–89 (9th Cir. 2007) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th

Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a

satisfactory explanation for its action including a "rational connection between the facts found

and the choice made.'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d

1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Because this Court's review under the APA is generally limited to the administrative

record, *see infra*, no facts are in dispute. However, the parties have filed a Motion and Cross-

Motions for Summary Judgment, which may be used as vehicles for the Court to conduct its

review of the record. Therefore, the Court's role is "to determine whether or not as a matter of

law the evidence in the administrative record permitted the agency to make the decision it did."

*Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

### I.    Preliminary Matters

In the interest of judicial economy, the Court notes two preliminary matters. First, this

F&R's analytical framework largely mirrors Judge McShane's well-reasoned opinion in

*Cascadia I*. Second, to the extent Plaintiffs rely on extra-record evidence to support their claims,

the Court notes that it is "capable of independently resolving conflicts in the record and

questions of admissibility," and therefore declines to strike the evidence at issue, especially

because it does not alter the outcome of this case. *Cascadia Wildlands v. Bureau of Land Mgmt.*,

No. 6:12-cv-00095-AA, 2012 WL 6738275, *3 n.6 (D. Or. Dec. 21, 2012) (citing *Or. Natural

Desert Ass'n v. Sabo,* 854 F.Supp.2d 889, 925 (D. Or. 2012) (denying as moot defendants'

motion to strike where the "court has not considered the extra-record evidence offered by

plaintiffs")).

II.    **FLMPA**

As noted, under FLMPA, BLM must prepare Resource Management Plans for its

districts. 43 U.S.C. § 1712. BLM must ensure that site-specific actions conform to the governing

Resource Management Plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1601.0-5(b) (defining

"conformance" as "specifically provided for in the plan" or "clearly consistent with the terms,

conditions, and decisions of the approved plan or plan amendment."); 43 C.F.R. § 1610.5-3(a);

*Or. Nat. Res. Council v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). The Resource Management

Plan governing the Project at issue is the 2016 RMP. AR 05476–535.

FLMPA generally requires BLM to manage lands "on the basis of multiple use and

sustained yield unless otherwise specified by law" and to protect a wide range of natural resource

values. *See, e.g.*, 43 U.S.C. § 1701(a)(7); *see generally id.* §§ 1701–1782. However, given

Congress' statutory mandate for O&C Lands, FLMPA contains an exception:

> Notwithstanding any provision of this Act, in the event of conflict
> with or inconsistency between this Act and the Acts of August 28,
> 1937 (50 Stat. 874; 43 U.S.C. § 1181a-1181j), and May 24, 1939
> (53 Stat. 753), insofar as they relate to management of timber
> resources, and disposition of revenues from lands and resources,
> the latter Acts shall prevail.

43 U.S.C. § 1701, note (b) (1976); PL 94–579 (S 507), PL 94–579, October 21, 1976, 90 Stat.

2743.

The O&C Act provides that certain revested timberlands in western Oregon shall be

managed for permanent forest production in accordance with the "sustained yield" principle to

provide a "permanent source of timber supply" and recreational facilities, protect watersheds,

regulate stream flow, and contribute to local communities' and industries' economic stability. 43

U.S.C. § 2601. It also requires BLM to set an "annual productive capacity" from O&C lands. *Id.*

BLM uses FLMPA planning procedures to adopt Resource Management Plans for western Oregon O&C lands.

Plaintiffs contend that BLM violated Judge McShane's prior Order. Pl.'s Mot. Summ. J. ("Pl.'s Mot.") 10, ECF No. 10. Specifically, Plaintiffs argue that BLM's decision to log in the RMZ violates Judge McShane's prior Order to "designate and preserve a Recreation Management Zone prior to harvest." Pl.'s Mot. 13 (quoting *Cascadia I*, 410 F. Supp. 3d at 1161).

The 2016 RMP mandates that ERMAs be managed "in accordance with their planning frameworks." AR 17076; *see also* AR 17243 (designating the Willamalane ERMA as such). The Willamalane ERMA, in turn, requires the "[e]stablish[ment of] a Recreation Management Zone (RMZ) distance (off of center line) for all designated trails." AR 16389. Judge McShane's Order specifically required BLM to "designate trails and establish a Recreation Management Zone *before* logging begins to ensure adequate protection in the buffer area." *Cascadia I*, 410 F. Supp. 3d at 1156 (emphasis added). Judge McShane further ordered that, should the project proceed, BLM was required to "preserve a Recreation Management Zone *prior to harvest*." *Id.* at 1161 (emphasis added).

In May 2020, BLM formally implemented "the trail and associated [RMZ] designation and development action as described and analyzed under Alternative 4 in the EA. [The] trails and RMZ are shown on the attached project map," below:



Preferred Alternative 4 -
109 Acre Regeneration Harvest and Trails

THURSTON HILLS NON-MOTORIZED TRAILS AND FOREST MANAGEMENT PROJECT

AR 04309, 03691.

BLM's actions on remand, however, failed to follow Judge McShane's Order. Although BLM "designated" trails and "established" an RMZ for the proposed roads, it has failed to direct the Court to evidence in the record that it took steps to affirmatively "preserve" the RMZ "prior to harvest," as required by the Court's remand instructions. *Cascadia I*, 410 F. Supp. 3d at 1161. In fact, the current iteration of the Project proposes to log the identical area proposed in 2018. AR 003620. In other words, other than simply adding the trail designations and an RMZ to a map, BLM has not taken *affirmative* steps to *preserve* the RMZ in any meaningful manner prior to the harvest as ordered by Judge McShane. Because BLM's current plan fails to take affirmative steps to preserve the RMZ prior to timber harvesting, it violates Judge McShane's

prior Order as a matter of law. As such, Plaintiff's motion for summary judgment as to this claim

should be GRANTED; BLM's and Seneca's motion should be DENIED.[2]

## III.    NEPA

NEPA requires an analysis of "major Federal actions significantly affecting the quality of

the human environment." 42 U.S.C. § 4332(C). NEPA exists to ensure that agencies take careful

consideration of information related to significant environmental impacts of their proposed

actions and to give "the public the assurance that the agency 'has indeed considered

environmental concerns in its decision-making process.'" *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 349 (1989) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def.*

*Council, Inc.*, 462 U.S. 87, 97 (1983)). NEPA imposes procedural requirements on agencies but

"does not contain substantive environmental standards, nor does the Act mandate that agencies

achieve particular substantive environmental results." *Bering Strait for Responsible Res. Dev. v.*

*U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).

Judicial review of agency actions under NEPA is limited to determining whether the

agency took the requisite "hard look" at the proposed action. *Id.* An agency's "hard look" at an

action and its environmental impacts includes an environmental assessment. *Conner v. Burford*,

848 F.2d 1441, 1446 (9th Cir. 1988). Based on the EA, the agency determines whether to prepare

an Environmental Impact Statement ("EIS"). 40 C.F.R. § 1501.4(c). If the agency finds that the

action will not have a significant impact, it may issue a Finding of No Significant Impact in lieu

---

[2] Plaintiffs additionally argue they are entitled to summary judgment because BLM failed to lawfully amend the Resource Management Plan and because BLM failed to analyze or otherwise demonstrate compliance with the planning framework standards. Pl.'s Mot. 10–18. As explained above, because the Court concludes BLM violated Judge McShane's prior Order, the Court need not reach Plaintiffs additional arguments.

of an Environmental Impact Statement. 40 C.F.R. § 1501.4(e); 40 C.F.R. § 1508.9(a)(1); 40 C.F.R. § 1508.13.

A "hard look" requires a consideration of "all foreseeable direct and indirect impacts" and a full assessment of the cumulative impacts of the proposed action. *Ctr. For Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012). It is not sufficient to make speculative, conclusory statements about the impact of an action. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992); *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). To prevail, a plaintiff must raise "substantial questions whether a project may have a significant effect on the environment." *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citation and quotation marks omitted).

Judge McShane found BLM violated NEPA's "hard look" requirement regarding fire hazard and risk in two ways. First, he concluded that the "Environmental Impact Statement did not analyze site-specific geographic conditions or effects on the immediate area, nor did the Project Environmental Assessment," and "simply acknowledged that there would be a significant increase in stand-level fire hazard in the Project area for the next 40 years without explaining what that means or analyzing the degree or severity of fire hazard to the community and neighboring landowners." *Cascadia I*, 410 F. Supp. 3d at 1158.

Second, he found that "BLM also failed to include crucial information from its fuels specialist in the Environmental Assessment and deprived the public of meaningful participation." *Id.* BLM also failed to respond to questions from the public despite the fuel specialist stating that "BLM would analyze the issue more in the Environmental Assessment," and reduced "the fuels report to a single sentence, explaining that 'regeneration/reforestation actions would create an

increase in fire hazard at the stand level for the next 40 years as stands regrow and transition through progressive structural stages.'" *Id.* (citing *Cascadia I's* AR).

Ultimately, Judge McShane faulted BLM for failing "to incorporate the report into the April 2018 Environmental Assessment," which ultimately "deprived the public of its only opportunity to comment." *Id.* at 1159.

On remand, BLM responded to the court's Order by responding to "Issue 6: How would trail development, timber harvest, and reforestation affect fire hazard?" AR 03653. Over the course of nine pages in the EA, BLM analyzed the effect of fire hazard for each of the proposed plans, and provided the following summary:

> Under Alternatives 3, 4, and 5, timber harvest would increase fire hazard in the short-term at the project scale because of the creation of residual activity fuels. The use of whole tree yarding and slash treatments would reduce, but not eliminate, this increase in fire hazard. Subsequent reforestation would create stands that would have a Moderate fire hazard initially, followed by a High fire hazard by the end of the short term and during the intermediate timeframe, followed by a Mixed fire hazard in the long term. Because regeneration harvest is reasonably foreseeable in the intermediate timeframe under the No Action alternative, Alternative 2, and the unharvested portions of the project area under Alternative 4, the same effects on fire hazard would occur under these alternatives, except 10 to 20 years later. Therefore, the effects on fire hazard would be the same under all alternatives, although the timing of these effects would differ.

AR 03661; *see also* AR 02328–56 (fuels specialist report). In the EA, BLM assumed that the Pedal Power timber harvest would affect fire hazard at the Project level, AR 02345, 03655, and then conducted a site-specific analysis of each of the Project's five alternatives at appropriate spatial and temporal scales, AR 02346–47, 03656–57 (explaining scale parameters); AR 02347–51, 03657–61 (effects of each alternative on fire hazard).

For Alternative 4, the selected alternative, BLM explained that "regeneration harvest and subsequent reforestation would change the structural stage, fuel model, and fuel loadings within harvested areas." AR 02350. In the short term (0–10 years post-harvest), fire hazard would decrease on 36 acres (shifting from high to moderate) and increase on 73 acres (shifting from mixed to moderate). AR 02350, 03660. By the end of the short-term timeframe, all 109 harvested acres would have a high fire hazard relative to the no action alternative, which assumed no timber harvest in the short term. *Id.*

In the intermediate timeframe (10–30 years), the structural composition of stands in the 109 harvested acres would shift from stand establishment into young-high density stands; however, because both compositions have a high fire hazard, the fire hazard would not change between the short and intermediate time frames. AR 02350, 03660. For the 56 acres of Harvest Land Base in the Project area that would not be harvested as part of the Project, but reasonably would be in the future, these acres would change from early successional to stand establishment stands in the intermediate timeframe, which would result in an increase to a high fire hazard for these 56 acres. AR 02350–51, 03660.

In the long term (30–50 years), the 109 acres harvested by the Project would develop into the mature multi-level canopy structural stage with a mixed (and thus lower) fire hazard and the 56 acres harvested in a subsequent action would develop into young-high density stands with a high fire hazard for these acres. AR 02351, 03660. When compared to the other alternatives analyzed in detail over the span of 50 years, BLM concluded that "the effects on fire hazard would be the same under all alternatives, although the timing of these effects would differ." AR 02351, 03661.

BLM disseminated these findings and provided opportunity for public comment. AR 03600, 04311 (summarizing opportunities to comment on the February 2020 EA); *see also* AR 00647–50, 00664-65 (letters to neighbors), 04321–24 (response to comments on fire hazard), 00340-72 (providing final fuels specialist report to member of the public). BLM also extended the 30-day comment period to 45 days to account for the winter holidays and to ensure that anyone interested in the Project could provide input. AR 00658–59.

### A.    No Action Alternative

The purpose of a "no action alternative" is to allow "policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010). Put differently, the "no action alternative is meant to 'provide a baseline against which the action alternative'—in this case, [the Project]—is evaluated." *Id.* (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998) (citation altered).

Although the term "no action" alternative is not defined in the statute or NEPA regulations, in 1981, the Council on Environmental Quality ("CEQ"), the agency charged with designing NEPA's implementing regulations, *see* 40 C.F.R. § 1500.3, issued an informatory "Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations." 46 Fed. Reg. 18,026–01 (Mar. 23, 1981) ("40 Questions Memorandum"). The third question the Memorandum addresses is: "What does the 'no action' alternative include? If an agency is under a court order or legislative command to act, must the EIS[3] address the 'no action' alternative?" *Id.* at 18,027. The CEQ's answer provides in pertinent part:

---

[3] Although this regulatory provision facially applies only to EISs, "[t]he alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA." *Native Ecosystems,* 428 F.3d at 1245.

[] Section 1502.14(d) requires the alternatives analysis in the EIS to "include the alternative of no action." There are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. *The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed.* In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. *Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed.* Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

* * *

In light of the above, it is difficult to think of a situation where it would not be appropriate to address a "no action" alternative. Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. Section 1502.14(c). [] Inclusion of such an analysis in the EIS is necessary to inform the Congress, the public, and the President as intended by NEPA. Section 1500.1(a).

*Id.* (emphasis added).

Here, the EA defined the no-action alternative as follows:

The No Action Alternative is the only alternative BLM must analyze in detail that does not meet the purpose and need for action. No

action provides a baseline to compare environmental effects by describing the existing condition and the continuing trends anticipated in the absence of the action alternatives, but with the implementation of other reasonably foreseeable Federal, State, and private projects. The baseline scenario maintains the ERMA designation, the LUAs, and the RMP management direction on the lands in the study area, and the BLM would propose management actions in the future as needed, consistent with the RMP.

Under the No Action Alternative, the BLM would not implement the development of trails nor a timber harvest plan within the project area at this time. *Since the project area consists of lands designated as [Harvest Land Base ("HLB")] by the RMP, this alternative (the No Action Alternative) does not preclude future timber harvest.* If the no action was selected at this time, it is reasonably foreseeable that the FO would return to the area to implement a timber harvest in the future, as stated in a memorandum from the Upper Willamette Field Office supervisory forester and incorporated herein by reference (Bickford, 2020). Given that the stands in the project area are in the 70-year age class, it is reasonably foreseeable that the FO would re-initiate planning for a timber harvest project in the Thurston Hills area 10-20 years from now. It is reasonably foreseeable that the proposed harvest area and harvest treatments would be the same or very similar to the current project. The BLM would prepare an EA for such a project at that future time, prior to making any implementation decisions.

AR 03610–11 (emphasis added).

BLM asserts their actions satisfy either interpretation. Def.'s Mot. 17–18. The Court agrees. Plaintiffs essentially begin with the flawed presumption that the baseline condition for the Project area is never conducting a timber harvest. However, consistent with the 2016 RMP, the status quo of all HLB is eventual timber harvest. *See Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of the Interior*, 929 F. Supp. 2d 1039, 1055 (E.D. Cal. 2013) ("[D]efining the baseline to be the status quo, which is clearly permissible under Ninth Circuit authority, is not the same thing as assuming the baseline includes aspects of the proposed project, which is not permissible.").

Caselaw supports BLM's interpretation that the no action alternative includes existing

management direction for consumptive use. *See, e.g.*, *id.* (finding that the Bureau of Reclamation

"appropriately defined the status quo as the 'continued delivery of [Central Valley Project] water

under the interim renewal of existing contracts which includes terms and conditions required by

non-discretionary [Central Valley Project Improvement Act] provisions")"; *Westlands Water Dist.*

*v. U.S. Dep't of Interior*, 376 F.3d 853, 868-69 (9th Cir. 2004) (noting that the no action

alternative "maintains the status quo, leaving instream flow to the Trinity River at the 340,000

[acre-feet]/year level prescribed by [Central Valley Project Improvement Act] § 3406(b)(23).").

BLM explained that in the short-term (0–10 years) there would be no timber harvest in

the no action alternative and that the fire hazard remains high on 89 acres and mixed on 76 acres.

AR 03657–58. The analyses for the effects of the four action alternatives are then compared to

this baseline of no timber harvest in the short term and at the time the analysis was presented to

the public. *See* AR 03658–61. BLM disclosed that "by the end of the short-term timeframe, all

109 acres of harvested stands would have a fire hazard of High." AR 03660.

In the intermediate time frame (10–30 years), BLM reasonably foresaw implementation

of regeneration harvest under the no action alternative and that the fire hazard in the area would

be high. AR 03658. BLM then compared each of the action alternatives in the intermediate time

frame to the intermediate time frame baseline for the no action alternative. *See* AR03658–61.

BLM did the same for the long term. AR 03658-61. In other words, as time advances, so does the

concept of what the "current conditions" are; current conditions in all time frames are not those

in 2020. *See Assoc. of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158,

1188 (9th Cir. 1997) (affirming no action alternative that continued present power sales

contracts); *Protecting Ariz.'s Res. & Children v. Fed. Highway Admin.*, 718 F. App'x 495, 500

(9th Cir. 2017) (affirming no action alternative that assumed existing residential land use patterns and trends would be maintained).

BLM sufficiently disclosed to the public the effects of the Project when compared to the no action alternative for three different time periods. As such, the Court should find that BLM met the procedural requirements of NEPA. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (explaining that so long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs"); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996) ("NEPA's goal is satisfied once [] information is properly disclosed; thus NEPA exists to ensure a process, not to ensure any result." (citation and quotation omitted)).

## B.    Fuels Report

The Court should find that Plaintiffs waived their argument relating to BLM's purported failure to provide a reasoned explanation for a changed analysis in the fuels report. Pl.'s Mot. 24–26. This claim is subject to waiver because Plaintiffs failed to raise it during the administrative process. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) ("Because respondents did not raise these particular objections. . . [they] have therefore forfeited any objection to the [environmental assessment] on [those] ground[s]."); *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1033 (9th Cir. 2018) ("Absent exceptional circumstances . . . belatedly raised issues may not form a basis for reversal of an agency decision.") (quoting *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991))). As such, the Court should find that BLM could not have responded to the specific issue of the revised stand composition

analysis, because Plaintiffs never raised it with the requisite specificity during the administrative process. *Havasupai Tribe*, 943 F.2d at 34.

###    C.    Range of Reasonable Alternatives

Plaintiffs' argument that the EA did not consider a range of reasonable alternatives is barred by the doctrine of claim preclusion. Claim preclusion applies where "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Claim preclusion applies "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (citations omitted).

Judge McShane previously held that BLM adequately analyzed a reasonable range of alternatives, albeit on a Project-wide scale. *Cascadia I*, 410 F. Supp. 3d at 1160–61. Plaintiffs may not now present additional alternatives about activities in the RMZ, such as no timber harvest or just thinning in the Zone, where they could have done so in the prior litigation. *See Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012) ("A plaintiff need not bring every possible claim. But where claims arise from the same factual circumstances, a plaintiff must bring all related claims together or forfeit the opportunity to bring any omitted claim in a subsequent proceeding.").

In sum, because BLM gave the requisite "hard look" at the Project's fire hazard and risk through site specific analysis as ordered by Judge McShane, and provided that information in a manner that allowed for meaningful public participation, the Court should grant BLM and Seneca's motions for summary judgment on Plaintiffs' NEPA claim; Plaintiffs' motion should be denied as to this claim.

## IV.    Remedy

As noted, the parties requested, and the Court permitted, supplemental briefing on the

issue of remedy. *See* ECF Nos. 37–39. The standard remedy for an agency's violation of the

APA is for the reviewing court to "hold unlawful and set aside agency action." 5 U.S.C. §

706(2). Thus, where an agency's "finding is not sustainable on the administrative record made,

then the [] decision must be vacated and the matter remanded [to the agency] for further

consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973).

In the Ninth Circuit, vacatur is the presumed remedy. *See California Communities*

*Against Toxics v. E.P.A.*, 688 F.3d 989, 994 (9th Cir. 2012) ("We have only ordered remand

without vacatur in limited circumstances.") ("*California Communities*"); *Humane Soc'y v.*

*Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In rare circumstances, when we deem it

advisable that the agency action remain in force until the action can be reconsidered or replaced,

we will remand without vacating the agency's action."); *Ctr. for Env't Health v. Vilsack*, 2016

WL 3383954, at \*10 (N.D. Cal. June 20, 2016) ("In the Ninth Circuit, remand without vacatur is

the exception rather than the rule."). Courts "leave an invalid rule in place only when equity

demands that we do so." *Pollinator Stewardship Council v. E.P.A.*, 806 F.3d 520, 532 (9th Cir.

2015). "When determining whether to leave an agency action in place on remand, [courts] weigh

the seriousness of the agency's errors against the disruptive consequences of an interim change

that may itself be changed." *Id.* (internal citation and quotation marks omitted); *Ctr. for Food*

*Safety v. Vilsack*, 734 F.Supp.2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found

remand without vacatur warranted by equity concerns in limited circumstances, namely serious

irreparable environmental injury.").

Courts consider two factors when assessing whether an agency's decision should be vacated: (1) "how serious the agency's errors are" and (2) "the disruptive consequences of an interim change that may itself be changed." *California Communities*, 688 F.3d 989, 992 (9th Cir. 2012) (citation and quotation marks omitted).

## A.      Seriousness of the Agency's Error

The first factor that the Court must assess when evaluating whether vacatur is appropriate is the severity of the error. *See California Communities*, 688 F.3d at 992. "Courts have recognized that substantive flaws in an agency's rule tend to be more serious than those that are entirely procedural because a substantive error may decrease the likelihood that the agency will be able to substantiate the rule on remand." *GOV. C.L. "Butch" Otter v. Salazar*, 2012 WL 12517198, at *5–6 (D. Idaho Dec. 4, 2012) (citation and quotation marks omitted).

The Court finds BLM's error here serious. As noted *supra* in Section II, other than simply adding the trail designations and an RMZ to a map, BLM failed to take affirmative steps to preserve the RMZ prior to the harvest as ordered by Judge McShane nearly three years ago. *See also Cascadia I*, 410 F. Supp. 3d 1156 ("But this 'cut the trees first, zone the buffer later' argument ignores the Willamalane ERMA framework's language . . . .").

BLM's three arguments to the contrary are not persuasive. First, BLM asserts that vacating the Project will harm the human environment based on the loss of non-motorized recreation opportunities. Such a loss, however, is not relevant to the seriousness of BLM's failure to follow the relevant planning framework as mandated by the 2016 RMP. *See* AR 17076; *see also* AR 17243.[4]

---

[4] As noted, the Court has considered Seneca's arguments to the extent they overlap with BLM's. However, the Court briefly addresses Seneca's argument that the Project overall will be beneficial

Second, BLM argues it would be able to reach a similar decision on remand. That argument, however, is undermined by the fact that BLM already had a second chance to cure the Project's defects. The Court finds no persuasive reason that would justify giving BLM a third bite at the apple. Further, the error here is not a mere a procedural misstep on the part of the Agency or a mere "failure to explain" as asserted by Seneca. *See* Seneca Remedy Br. At 8, ECF No. 38. Rather, the error here was the substantive disregard of the Willamalane ERMA framework and the failure to "designate and preserve a Recreation Management Zone prior to harvest" as ordered by Judge McShane. *See Cascadia I*, 410 F. Supp. 3d at 1161.

Finally, BLM argues that "the error should be considered minor because in the overall context of Judge McShane's Order, BLM made significant efforts to remedy the two deficiencies in the Environmental Assessment identified by Judge McShane." Fed. Def.'s Supp. Br. 6, ECF No. 37. In some circumstances, the Ninth Circuit has indicated it may be appropriate to evaluate an agency's overall compliance with regulatory schemes when considering whether an error is "serious." *See e.g.*, *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 929 (9th Cir. 2020) ("EPA's error—failing to consider harm to monarch butterflies caused by killing target milkweed—is not 'serious,' especially in light of EPA's full compliance with the ESA and substantial compliance with FIFRA.") (internal citation omitted). Here, however, such a consideration is not appropriate. The Court finds BLM's failure to comply with Judge McShane's Order on remand particularly significant and that failure distinguishes this case from those relied upon by BLM and Seneca. The Court therefore finds the severity of BLM's error weighs in favor of vacatur.

---

to the environment. *See* Seneca Remedy Brief at 5, ECF No. 38. Such a consideration is also not relevant to the Court's assessment of whether the Agency's error was "serious."

**B.      Disruptive Consequences**

"In considering whether vacatur is warranted, [courts] must balance the [agency's] errors against the consequences of such a remedy." *California Communities*, 688 F.3d at 993. BLM has identified two disruptive consequences that it contends warrant remand without vacatur. First, BLM asserts that vacatur could result in potential lost recreational opportunities by depriving the public of non-motorized trails. Second, BLM maintains that vacatur will cause the local economy to suffer.

The Court finds that any potential disruptive consequences here do not justify departing from the default remedy of vacatur. A review of several decisions in which the Ninth Circuit has left agency action in place despite finding error demonstrates why vacatur is appropriate in this case. For example, in *California Communities*, the EPA conceded that its rulemaking process had been flawed and voluntarily sought remand following an APA challenge. 688 F.3d at 992–93. The Ninth Circuit found the case was among the "limited circumstances" in which vacatur was not appropriate based on the delay it would have caused in constructing a much-needed power plant in southern California. *Id.* at 994. Without the plant, the region was likely to suffer from rolling blackouts, necessitating "the use of diesel generators that pollute the air, the very danger the Clean Air Act aims to prevent." *Id.* Further, the court characterized the economic consequences of vacatur as "disastrous" because it would have disrupted "a billion-dollar venture employing 350 workers." *Id.*

The Ninth Circuit has also left agency action in place because of the potential for environmental harm and irreparable injuries such as the potential extinction of an animal species. *See, e.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (concluding that equity warranted leaving the rule in place during remand because of the potential extinction

of a snail species); *Pollinator Stewardship Council*, 806 F.3d at 532 (concluding that "given the precariousness of the bee population, leaving the EPA's registration of sulfoxaflor in place risks more potential environmental harm than vacating it.").

Here, the potential harms identified—loss of recreational opportunities and economic harm—are easily distinguishable both in kind and in scale than those at issue in *California Communities*. Moreover, vacating the Project does not necessarily foreclose BLM from supplying the public with recreational opportunities in the form of non-motorized trails. Further, the economic disruption highlighted by BLM and Seneca are nowhere near those identified by the Ninth Circuit in *California Communities*. Nor will vacating the Project cause irreparable environmental harm as in *Idaho Farm Bureau* or *Pollinator Steward Council*.[5] As such, the potential for disruption in this case is minimal and the Court finds this factor weighs in favor of vacatur.

In sum, the Court finds BLM's error to be a serious, substantive error and finds that the disruptive consequences do not weigh in favor of departing from the default remedy of vacatur. As such, the Project should be VACATED.

---

[5] The Court finds Seneca's argument that preparing "a new EA would cause unnecessary and widespread disruption by . . . delaying regeneration harvest activities necessary to address the uneven age-class distribution in the project area" unpersuasive. Seneca Remedy Br. 9, ECF No. 38. Given Oregon's historic and devastating 2020 fire season, a new EA will allow BLM to take into account a significant change in circumstances. *See Walker v. Am. Red Cross*, No. 6:20-cv-01755-MK, 2021 WL 1232669, at *1 (D. Or. Apr. 1, 2021) ("The Holiday Farm Fire began on September 7, 2020. Since that time, the wildfire burned over 173,000 acres in and around the McKenzie National Forest, destroying property and displacing thousands of residents."). Further, delay as a result of vacating a decision is true of every case brought under the APA where the Court ultimately decides to vacate an agency action and therefore not an independent reason to justify departing from the ordinary remedy of vacatur.

## RECOMMENDATION

For the reasons explained above, Plaintiffs' motion for summary judgment (ECF No. 10) should be GRANTED in part as to Plaintiff's FLMPA claim insofar as BLM failed to follow Judge McShane's prior Order to take affirmative steps to preserve the RMZ prior to the timber harvest and DENIED in all other respects; BLM and Seneca's motions for summary judgment (ECF Nos. 26, 28) should be GRANTED as to Plaintiff's NEPA claim and DENIED in all other respects. The underlying Thurston Hills Non-Motorized Trails and Forest Management Project should be REMANDED to BLM and the Decision Notice and Finding of No Significant Impact should be VACATED.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the district court's judgment or appealable order. The Findings and Recommendation will be referred to a district judge. Objections to this Findings and Recommendation, if any, are due fourteen (14) days from today's date. *See* Fed. R. Civ. P. 72. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this 13th day of September 2021.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge

27 — FINDINGS AND RECOMMENDATION