Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; and OREGON WILD, an Oregon non-profit corporation, | **Case No. 6:20-cv-01395-MK** |
| Plaintiffs, | PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, an administrative agency of the United States Department of the Interior, | |
| Defendant, | |
| SENECA SAWMILL COMPANY, an Oregon Corporation, | |
| Intervenor-Defendant. | |

PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS

# TABLE OF CONTENTS

Table of Authorities ............................................................................................ ii

List of Acronyms .............................................................................................. vi

**INTRODUCTION**............................................................................................1

**STANDARD OF REVIEW** ...............................................................................1

**ARGUMENT** ...................................................................................................2

    **I.**    **BLM's Decision to Log the RMZ Violates FLPMA** ............................2

    **II.**   **BLM Failed to Fully and Fairly Analyze Fire Impacts** ...........................4

        A.  No Action Alternative ..................................................................4

            *1.*   *BLM Cannot Incorporate Effects from the Proposed
Illegal Project into the No Action Alternative* ...........................5*

            *2.*   *BLM's Future Regeneration Harvest in the Project Area
is Not Reasonably Foreseeable* ....................................................9

            *3.*   *No Action in this Case Requires Analyzing Effects
if the Proposed Timber Sale Would Not Take Place* ...................12

        B.  Changed Stand Baseline Conditions ..........................................17

   **III.**   **BLM Failed to Analyze a Reasonable Range of Alternatives** ...............21

   **IV.**   **BLM Failed to Demonstrate How Timber Harvest in the
RMZ Protects and/or Maintains Setting Characteristics**....................24

  **CONCLUSION** .............................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Savage,*
  897 F.3d 1025 (9th Cir. 2018) ........................................................................20

*Alsea Valley Alliance v. Dept. of Commerce,*
  358 F.3d 1181 (9th Cir. 2004) ........................................................................22

*Anaheim Mem'l Hosp. v. Shalala,*
  130 F.3d 845 (9th Cir. 1997) .......................................................................2, 16

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..........................................................................................1

*Barnes v. U.S. Dep't of Transp.,*
  655 F.3d 1124 (9th Cir. 2011) ........................................................................19

*Blue Mts. Biodiversity Project v. Blackwood,*
  161 F.3d 1208 (9th Cir. 1998) ........................................................................10

*California Communities Against Toxics v. EPA,*
  688 F.3d 989 (9th Cir. 2012) ............................................................................4

*California Energy Comm'n v. Dep't of Energy,*
  585 F.3d 1143 (9th Cir. 2009) ........................................................................16

*Cascadia Wildlands v. BLM,*
  410 F. Supp. 3d 1146 (D. Or. 2019) ...................................................... *passim*

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)..........................................................................................1

*Ctr. for Biological Diversity v. U.S. Dept. of Interior,*
  623 F.3d 633 (9th Cir. 2010) ...........................................................5, 6, 8, 17

*Ctr. for Env't Health v. Vilsack,*
  2016 WL 3383954, at *10 (N.D. Cal. June 20, 2016) .......................................4

*Church of Scientology of California v. Linberg,*
  529 F. Supp. 945 (C.D. Cal. 1981) .................................................................22

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971)..........................................................................................2

*City of Tenakee Springs v. Clough,*
    915 F.2d 1308 (9th Cir. 1990) ......................................................................16

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004)........................................................................................19

*Earth Island Inst. v. Christopher,*
    913 F. Supp. 559 (Ct. Int'l Trade 1995) .........................................................23

*Electrical Fittings Corp. v. Thomas & Betts Corp.,*
    307 U.S. 241 (1939)........................................................................................22

*Envtl. Def. Ctr. v. EPA,*
    319 F.3d 398 (9th Cir. 2003) ...........................................................................2

*Forest Guardians v. U.S. Forest. Serv.,*
    329 F.3d 1089 (9th Cir. 2003) .........................................................................2

*Friends of the Clearwater v. Dombeck,*
    222 F.3d 552 (9th Cir. 2000) .........................................................................19

*Friends of Yosemite Valley v. Kempthorne,*
    520 F.3d 1024 (9th Cir. 2008) ..........................................................6, 7, 8, 17

*Hydranautics v. FilmTec Corp.,*
    204 F.3d 880 (9th Cir. 2000) .........................................................................21

*Jones v. Nat'l Marine Fisheries Serv.,*
    741 F.3d 989 (9th Cir. 2013) .........................................................................10

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976)..................................................................................10, 11

*Lands Council v. McNair,*
    629 F.3d 1070 (9th Cir. 2010) .......................................................................19

*Lindberg v. United States Forest Service,*
    132 F. Supp. 3d 1255 (D. Or. 2015) ..............................................................10

*Marsh v. Or. Natural Res. Council,*
    490 U.S. 360 (1989)..........................................................................................2

*McDonnell Douglas Corp. v. Commodore Bus.,*
    656 F.2d 1309 (9th Cir. 1981) .........................................................................1

*Montana v. United States,*
    440 U.S. 147 (1979)................................................................................22

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
    241 F.3d 722 (9th Cir. 2001) .................................................................5

*Native Ecosystems Council v. United States Forest Service,*
    418 F.3d 953 (9th Cir. 2005) ...............................................................26

*Northern Spotted Owl v. Hodel,*
    716 F. Supp. 479 (W.D. Wash. 1988)....................................................2

*Offshore Sportswear, Inc. v. Vuarnet International, B.V.,*
    114 F.3d 848 (9th Cir. 1997) ...............................................................21

*Oregon Natural Desert Ass'n v. BLM,*
    625 F.3d 1092 (9th Cir. 2010) .............................................................26

*Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of Interior,*
    929 F. Supp. 2d 1039 (E.D. Cal. 2013)................................13, 14, 16

*Pit River Tribe v. BLM,*
    939 F.3d 962 (9th Cir. 2019) .............................................................. 24

*Pit River Tribe v. U.S. Forest Serv.,*
    615 F.3d 1069 (9th Cir. 2010) ........................................................22, 24

*Snoqualmie Indian Tribe v. F.E.R.C.,*
    545 F.3d 1207 (9th Cir. 2008) .............................................................16

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
    322 F.3d 1064 (9th Cir. 2003) .............................................................21

*Turtle Island Restoration Network v. U.S. Dep't of State,*
    673 F.3d 914 (9th Cir. 2012) ........................................................23, 24

*United States v. Good Samaritan Church,*
    29 F.3d 487 (9th Cir. 1994) .................................................................22

*Westlands Water Dist. v. U.S. Dep't of Interior,*
    376 F.3d 853 (9th Cir. 2004) ........................................................13, 14

**Statutes**

5 U.S.C. § 706 ..........................................................................................................1

28 U.S.C. § 636 ........................................................................................................1

43 U.S.C. § 1732 ......................................................................................................2

42 U.S.C. § 4332 ...............................................................................................2, 3, 5

**Regulations**

40 C.F.R. § 1501.5 ..................................................................................................21

40 C.F.R. § 1502.14 .................................................................................................5

40 C.F.R. § 1505.2 ..................................................................................................21

40 C.F.R. § 1508.7 ..................................................................................................11

40 C.F.R. § 1508.8 ..................................................................................................11

43 C.F.R. § 1601.0-5 ................................................................................................2

46 Fed. Reg. 18,026 (Mar. 23, 1981) .....................................................................12

Fed. R. Civ. P. 56 .....................................................................................................1

**LIST OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| ASQ | Allowable Sales Quantity |
| BLM | Bureau of Land Management |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ERMA | Extensive Recreation Management Area |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impacts |
| HLB | Harvest Land Base |
| LSR | Late-Successional Reserve |
| NEPA | National Environmental Policy Act |
| PRMP | Proposed Resource Management Plan |
| RMA | Recreation Management Area |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| THNA | Thurston Hills Natural Area |
| WPRD | Willamalane Parks and Recreation District |
| WUI | Wildland Urban Interface |

## INTRODUCTION

Plaintiffs respectfully submit the following objections to the Findings and Recommendations ("F&R"), Dkt. No. 43, issued in the above-captioned case for Plaintiffs' challenge to the United States Bureau of Land Management's ("BLM") issuance of the Thurston Hills Non-Motorized Trails and Forest Management Project ("Thurston Hills Project") Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR").

## STANDARD OF REVIEW

Courts review *de novo* a Magistrate Judge's Findings and Recommendations. 28 U.S.C. § 636(b); *McDonnell Douglas Corp. v. Commodore Bus.,* 656 F.2d 1309, 1313 (9th Cir. 1981). Federal Rule of Civil Procedure 56 allows entry of summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court encourages district courts to utilize summary judgment in appropriate cases. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-27 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-49 (1986).

Judicial review of agency actions involving the Federal Land Policy and Management Act ("FLPMA") and the National Environmental Policy Act ("NEPA") are governed the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Pursuant to the APA, courts shall hold "unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as those actions taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The "arbitrary and capricious" standard of review does not shield agency action from a "thorough, probing, in-depth review" of challenged actions. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 (1971).

"Courts must not 'rubber stamp the agency decision as correct.' Rather, the reviewing court . . . must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'" *Northern Spotted Owl v. Hodel,* 716 F. Supp. 479, 482 (W.D. Wash. 1988) (internal citations omitted).

On review, agencies must articulate a rational connection between the facts found and the conclusions made. *See Envtl. Def. Ctr. v. EPA,* 319 F.3d 398, 428 n.46 (9th Cir. 2003). In particular, the reviewing court must determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); *Forest Guardians v. U.S. Forest. Serv.,* 329 F.3d 1089, 1097 (9th Cir. 2003). Finally, courts may only uphold an agency's decision on the basis of the reasoning found in the challenged decision itself; courts may not substitute reasons for an agency action that are not found in the record. *Anaheim Mem'l Hosp. v. Shalala,* 130 F.3d 845, 849 (9th Cir. 1997).

## ARGUMENT

The Court should adopt Judge Kasubhai's Findings and Recommendations regarding Plaintiffs' FLPMA claim because BLM abjectly failed to take affirmative steps to preserve the Recreation Management Zone ("RMZ") prior to the timber harvest. Plaintiffs object to Judge Kasubhai's Findings and Recommendations regarding Plaintiffs' NEPA claims.

## I.    BLM's Decision to Log the RMZ Violates FLPMA

BLM must ensure that a site-specific project conforms to the governing Resource Management Plan ("RMP") pursuant to FLPMA. 43 U.S.C. § 1732(a); 43 C.F.R. § 1601.0-5(b); *Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1153 (D. Or. 2019) ("*Cascadia I*"). The applicable plan in this case is the 2016 Northwestern and Coastal Oregon RMP. Dkt. No. 43 at 9.

The RMP established designated recreation areas, including Extensive Recreation Management Areas ("ERMA"), which must be managed in accordance with their specific planning framework. Dkt. No. 43 at 10 (citing the RMP). The relevant ERMA here is the 1,058-acre Willamalane Non-Motorized Trails Extensive Recreation Management Area ("Willamalane ERMA"). *Id.* Pursuant to the Willamalane ERMA's planning framework, the BLM is required to designate a Recreation Management Zone ("RMZ") encompassing designated trails in the ERMA. Under the Willamalane ERMA, timber harvest within the RMZ is only permitted to the extent it is needed to protect/maintain recreation setting characteristics and/or to achieve recreation objectives. *See id*.

In *Cascadia I,* Judge McShane held that the Willamalane ERMA framework requires "BLM to designate trails and establish a Recreation Management Zone before logging begins to ensure adequate protection in the buffer area" and ordered the BLM to "designate and preserve a Recreation Management Zone prior to harvest." *Cascadia I,* 410 F. Supp. 3d at 1156, 1161.

On remand, BLM did not adhere to the *Cascadia I* holding. Instead, BLM "designated" trails and "established" an RMZ, but took no steps "to affirmatively 'preserve' the RMZ 'prior to harvest,' as required by the Court's remand instructions." Dkt. No. 43 at 11 (citing *Cascadia I,* 410 F. Supp. 3d at 1161).

Judge Kasubhai correctly vacated BLM's unlawful action under the APA. 5 U.S.C. § 706(2). The usual and appropriate remedy for such unlawful actions is vacatur. In assessing whether an agency's decision should be vacated, reviewing courts consider two factors: (1) "how serious the agency's errors are" and (2) "the disruptive consequences of an interim change that may itself be changed." *California Communities Against Toxics v. EPA,* 688 F.3d 989, 992 (9th Cir. 2012). Judge Kasubhai found BLM's error serious because BLM ignored the decision in

PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS                    3

*Cascadia I* by failing to take affirmative steps to preserve the RMZ in direct violation of the Willamalane ERMA. Dkt. No. 43 at 23. As Judge Kasubhai explained, BLM already had a second chance to cure the original Project's substantive errors, and the Court could not find a persuasive reason that "would justify giving BLM a third bite at the apple." *Id.* at 23.

Additionally, Judge Kasubhai found the potential for disruptive consequence minimal, such that "departing from the default remedy of vacatur" was unjustified. *Id.* at 25. In rejecting BLM's arguments, Judge Kasubhai held that vacating the project will not foreclose BLM from supplying the public with recreational opportunities in the form of non-motorized trails. Further, the economic disruption claimed by BLM does not rise to the level of remand without vacatur, considering that remand without vacatur is the *exception*, rather than the rule. *Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, at *10, 2016 U.S. Dist. LEXIS 79984, at *31-32 (N.D. Cal. June 20, 2016).  Finally, Judge Kasubhai found that vacatur will not cause irreparable environmental harm.

In conclusion, Plaintiffs agree with Magistrate Kasubhai's finding that the Thurston Hills Project should be vacated in accordance with the APA for violation of FLPMA.

## II.    BLM Failed to Fully and Fairly Analyze Fire Impacts

Plaintiffs object to Judge Kasubhai's decision concerning BLM's analysis of fire impacts, as described below.

### A.  No Action Alternative

BLM did not take the requisite "hard look" at the Thurston Hill Project's effects because BLM's "no action alternative" presumed that the same or similar timber harvest would occur on this site in 10-20 years. Stated differently, BLM compared the effects of the proposed Thurston Hills project now against the effects of the Thurston Hills Project in 10-20 years, *i.e.*, the "no

action alternative." This approach is especially problematic given that this Court previously held the proposed Thurston Hills project violates the RMP. BLM's failure to accurately compare the environmental consequences of the status quo (*no logging*) to the environmental consequences of the Thurston Hills project is arbitrary, capricious, and a violation of NEPA.

BLM is required to take a "hard look" at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment under NEPA and its implementing regulations. Dkt. No. 43 at 12; *see also* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508. In detailed environmental analyses, NEPA requires federal agencies to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflict concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The alternatives analysis "is the heart of the [NEPA document]." 40 C.F.R. § 1502.14. The "no action alternative" is a required aspect of the alternatives analysis that "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity v. U.S. Dept. of Interior,* 623 F.3d 633, 642 (9th Cir. 2010). "In this analysis, it is not sufficient to make speculative, conclusory statements about the impact of an action." Dkt. No. 43 at 13 (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992)); *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)).

On remand, while the BLM did include a fire analysis, BLM again improperly diluted that analysis and failed to disclose the proposed action's actual effects on fire by incorporating a speculative and premature future action into the no action analysis. Judge Kasubhai's finding that

BLM sufficiently disclosed the effects of the Thurston Hills Project when compared to the no action alternative is incorrect because: 1) BLM cannot incorporate effects from the proposed illegal project into the no action alternative; 2) BLM's future regeneration harvest is not "reasonably foreseeable;" and 3) the "no action alternative" in this case requires analyzing the environmental effects if the proposed timber sale *did not take place*.

       1.   *BLM Cannot Incorporate Effects from the Proposed Illegal Project into the No Action Alternative*

Plaintiffs respectfully submit that Judge Kasubhai erred in finding that BLM sufficiently disclosed the effects of the Project when compared to the no action alternative. Dkt. No. 43 at 20. As part of the no action alternative, BLM unlawfully assumed the existence of a "timber harvest project in the Thurston Hills area 10-20 years from now" that is "the same or very similar to the current project." Dkt. No. 43 at 18 (citing the Environmental Assessment at AR 03610-11). This approach is fundamentally flawed because (1) a no-action alternative cannot incorporate the proposed action; and (2) the proposed action at issue here and in *Cascadia I,* the timber harvest, violates FLPMA and is illegal.

The Ninth Circuit has repeatedly held that: "[a] no action alternative in an [EA] is meaningless if it assumes the existence of the very plan being proposed." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quoting *Friend of Yosemite Valley v. Kempthorne*, 439 F. Supp. 2d. 1074, 1105 (E.D. Cal. 2006)); *see also Ctr. for Biological Diversity*, 623 F.3d at 642-43 (finding that the BLM's assumption that the environmental consequences of the proposed action and the no action alternative would be the same was arbitrary and capricious). This illegality is made even more egregious by the fact that the proposed action being incorporated has now been found to be unlawful for a second time. *See Friends of Yosemite Valley,* 520 F.3d at 1037-38 ("the SEIS did not set forth a true 'no-action' alternative because

the SEIS assumes, as the baseline, the existence of the 2000 CMP, which we previously found invalid").

In *Friends of Yosemite Valley*, the Ninth Circuit held that the National Park Service's ("NPS") Supplemental EIS ("SEIS") violated NEPA because the agency's no-action alternative cannot "assume the existence of the very plan being proposed." 520 F.3d at 1038. There, the NPS was statutorily required to prepare a Comprehensive Management Plan ("CMP") for the Merced Wild and Scenic River that quantified and placed limits on recreational uses of the river. *Id* at 1027-28. The Ninth Circuit found NPS's first attempt, the 2000 CMP which permitted recreational use without quantified limits, to be deficient. *Id.* at 1030. On remand, the district court ordered NPS "to develop a new or revised CMP and to comply with NEPA by issuing a supplemental EIS." *Id.* The NPS thereafter issued its Revised CMP and Supplemental EIS ("2005 Revised Plan"), but this revised plan assumed as part of the no-action alternative allowable recreational uses under the court-invalidated 2000 CMP. *Id.* at 1038. Friends of Yosemite Valley challenged the 2005 Revised Plan and prevailed in district court. On appeal, the Ninth Circuit held that:

> The district court correctly ruled that the SEIS did not set forth a true "no-action" alternative because the SEIS assumes, as the baseline, the existence of the 2000 CMP, which we previously found invalid. Such an assumption is logically untenable. The baseline alternative should not have "assume[d] the existence of the very plan being proposed." *Friends of Yosemite Valley,* 439 F. Supp. 2d at 1105. This is so even given the deference owed to the agency's choice of a "no-action" alternative and the ongoing nature of agency management.

520 F.3d at 1037-38. Thus, under binding Ninth Circuit precedent, a no action alternative cannot assume as a baseline the existence of a proposed agency action that a court previously found to be invalid. That is precisely what the BLM did here.

In a similar case, the Ninth Circuit again held that a no action alternative assuming the same environmental consequences of a proposed action regardless of whether the proposed action was implemented was arbitrary and capricious. *Ctr. for Biological Diversity,* 623 F.3d at 636. There, BLM proposed a land exchange with a private mining company. BLM issued a FEIS in June 1999 in which BLM assumed that mining was the foreseeable use for the selected lands, and the environmental impacts of mining operations would occur in all alternatives, including the no action alternative. *Id.* at 639-40. The Ninth Circuit held that BLM's assumption that mining would occur on the selected lands whether or not the land exchange occurred was arbitrary and capricious and a violation of NEPA. *Id.* at 650. The Court further explained that BLM failed to perform a comparative analysis of the likely environmental consequences of the proposed land exchange and the no action alternative and therefore failed to take the requisite "hard look" at environmental consequences of the exchange. *Id.*

As in *Friend of Yosemite Valley* and *Ctr. for Biological Diversity*, BLM here determined that if the Project does not proceed, the same or very similar harvest treatments in the harvest area would occur in the future. 520 F.3d at 1031-2; 623 F.3d at 639-40; AR 03611-12. This is impossible because the proposed logging is unlawful. The BLM constructed the no action alternative this way because it allows BLM to marginalize the fire effects by falsely claiming there is no meaningful difference between fire consequences for the status quo and fire consequences if the logging is implemented. But as *Cascadia I* instructs, this is not true. 410 F. Supp. 3d at 1157-59. BLM's approach violates NEPA's hard look requirement and alternative analysis – the very heart of NEPA. *See Friends of Yosemite Valley*, 520 F.3d at 1026-27; *Ctr. for Biological Diversity*, 623 F.3d at 642-43.

This NEPA error is substantial because BLM's violation of FLPMA was "not a mere procedural misstep" but "the substantive disregard of the Willamalane ERMA framework and the failure to 'designate and preserve a Recreation Management Zone prior to harvest' as ordered by Judge McShane." Dkt. No. 43 at 24. The RMZ covers approximately half of the proposed logging in the Project.[1] BLM therefore cannot assume that the Project area will be harvested in 10-20 years because in that timeframe BLM *will* still be required to "preserve" the RMZ, approximately half of the proposed harvest area.

Judge Kasubhai correctly stated that the no action alternative can include existing management direction for consumptive uses. Dkt. No. 43 at 19. However, existing management direction in the Willamalane ERMA does not permit what BLM is assuming will happen—an unlawful timber harvest project in violation of FLPMA. Thus, BLM's incorporation of a future timber harvest of the same or similar nature as that proposed by BLM here is arbitrary and capricious because there can be no same or similar timber harvest. It is unlawful given the Court's ruling in *Cascadia I*, and therefore BLM's new NEPA construction is "logically untenable." *Friends of Yosemite Valley*, 520 F.3d at 1038.

> 2. *BLM's Future Regeneration Harvest in the Project Area is Not Reasonably Foreseeable*

Judge Kasubhai's finding that BLM "reasonably foresaw implementation of regeneration harvest" in the intermediate timeframe (10-30 years) is misplaced and unsupported by law. Dkt. No. 43 at 19. The Ninth Circuit defines a "reasonably foreseeable" action for the purpose of

---

[1] The RMZ buffer is 100 feet wide along 3.75 miles of trail that overlaps with the regeneration harvest units; AR 3611, 3630 (60% of 8.5 miles of trail shaded or buffered or in reserves), and the area of the RMZ buffer overlapping with regeneration harvest units equals approximately 45.5 acres. This means nearly half the total timber sales acreage is precluded from logging under the ERMA. AR 3678 (109 total acres under Alternative 4).

NEPA analyses to include projects that have been formally proposed and not remote in time. *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1000 (9th Cir. 2013). Specifically for timber sales, the Ninth Circuit has found proposed sales to be "reasonably foreseeable" when the sales are formally proposed, disclosed by name, and include the estimated sale quantities and timelines. *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998). A project that has not yet been disclosed or proposed and is more remote in time is not reasonably foreseeable but rather too speculative and premature to include in a NEPA analysis. *Lindberg v. United States Forest Service*, 132 F. Supp. 3d 1255, 1267-68 (D. Or. 2015) (explaining Forest Service project was not reasonably foreseeable because it was not listed as a Proposed Action, NEPA scoping had not begun, and no funding had been sought or secured); *Jones*, 741 F.3d at 1000; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976) (noting that once contemplated actions become more formal proposals, later impact statements on those projects will take into account the effect of the earlier proposed action).

Here, BLM has not proposed a regeneration harvest 10-20 years in the future, has not submitted a Notice of Intent, has not disclosed any future regeneration harvests by name, or included any estimated sale quantities or timelines. Under Ninth Circuit precedent, a future timber sale in the Project Area is therefore not "reasonably foreseeable."

BLM's only attempt at satisfying the Ninth Circuit's high burden is an internal memo that fails to include any details of a proposed future project or even affirmatively state a future project will happen. Indeed, this non-public internal memo actually states, "it is reasonably foreseeable that the Upper Willamette field office would *analyze* regeneration harvest in this area in 10-20 years." AR 01892 (emphasis added). "Analyze" regeneration harvest does not equate to a "reasonably foreseeable" timber harvest. For a NEPA analysis, "it is not sufficient to make

speculative, conclusory statements about the impact of an action." Dkt. No. 43 at 13 (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992)). BLM's assumption that a future regeneration harvest with the same or similar effects as the proposed action would be implemented in 10-20 years is too speculative and remote in time and not reasonably foreseeable. *Jones*, 741 F.3d at 1000.

Furthermore, as Judge Kasubhai correctly noted, NEPA's "hard look" requires consideration of all "foreseeable and direct and indirect impacts" as well as cumulative impacts. Dkt. No 43 at 13 (quoting *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012)). If a future proposed timber harvest was something BLM believed was "reasonably foreseeable," then it was required by NEPA to include such a harvest in its cumulative impacts and/or indirect effects analysis. *See* 40 C.F.R. § 1508.7 (Cumulative Effects); 40 C.F.R. § 1508.8(b) (Indirect Effects). But nowhere in those sections does such an analysis occur, because BLM improperly shoehorned a future timber harvest into its "no action alternative." If a proposed future action is theoretically a reasonably foreseeable action, NEPA requires BLM to analyze it under the indirect and cumulative effects. Here, however, BLM merely assumed and incorporated the same effects of that future action in the no action alternative. This unlawful shortcutting means BLM avoids analyzing the effects of that timber sale in its cumulative and indirect effects analysis—a shortcut that makes it impossible for BLM and the public to evaluate the environmental impacts of that hypothetical sale. If and when the BLM formally proposes and discloses the details of a regeneration harvest in the project area 10-20 years from now, then the BLM can lawfully submit a new analysis at that time as required by NEPA. *See Kleppe*, 427 U.S. at 410 n.20; *see also* AR 03612 (BLM acknowledging that it would be required to prepare an EA

"for such a future project at that future time, prior to making any implementation decisions). But BLM cannot lawfully lump that sale into the no action alternative.

   3.  *No Action in this Case Requires Analyzing Effects if the Proposed Timber Sale Would Not Take Place*

  The Thurston Hills Project is a federal decision on a proposal for a discrete logging project, and thus no action means the proposed timber sale *would not take place*—in other words, the status quo is standing trees. Judge Kasubhai misinterprets, and the BLM misrepresents, CEQ guidance concerning how the no action alternative is defined and how it has operated in the timber sale context since the passage of NEPA. Further, Judge Kasubhai relies upon the BLM's incorrect and unsupported position that "consistent with the 2016 RMP, the status quo of all HLB is eventual timber harvest." Dkt. No. 43 at 18.

  The term "no action" alternative is not defined in NEPA or NEPA regulations. CEQ provides two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg. 18,026 (Mar. 23, 1981) ("40 Questions Memorandum"). The first interpretation involves "action[s] such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed." *Id.* at 18,027. In this situation, "'no action' is 'no change' from current management direction or level of management intensity." *Id.* The second interpretation of "no action" includes "instances involving federal decisions on proposals for projects." *Id.* "No action" in these cases would mean that the proposed activity would not take place, so the environmental effects from taking no action would be compared with the effects of allowing the proposed or alternative activity to go forward. *Id.*

Judge Kasubhai incorrectly relies on *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Dep't of Interior,* 929 F. Supp. 2d 1039, 1055 (E.D. Cal. 2013) and *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868-69 (9th Cir. 2004) to support the proposition that the BLM is permitted to define the "no action" alternative to include certain future allowable logging activities under the relevant RMP land use allocation. These cases are easily distinguishable because both *Pac. Coast Fed'n of Fishermen's Ass'n* and *Westlands Water Dist.* involved ongoing programs that are required under existing legislation to continue—the ongoing and continued delivery of water from federal facilities pursuant to the Central Valley Project Improvement Act ("CVPIA"). 929 F. Supp. 2d at 1055; 376 F.3d at 868-69.

For example, in *Pac. Coast Fed'n of Fishermen's Ass'n,* the Bureau of Reclamation ("Reclamation") issued an EA an FONSI approving eight (8) interim renewal contracts authorizing the delivery of water to districts served by the Central Valley Project ("CVP") while it worked to finalize its EIS for the long-term (*i.e*., 25-year) renewal contracts.[2] 929 F. Supp. 2d at 1042. In its EA, Reclamation defined the "No Action Alternative" as "continued delivery of CVP water under the interim renewal of existing contracts," which would be similar to the terms and conditions of the prior interim renewal contracts from 1997 and any existing long-term contracts. *Id.* at 1048-49.  Plaintiffs argued that Reclamation should have defined the no action alternative to be suspension of the existing contracts and no water delivery. *Id.* at 1050. The Court, however, explained that under the CVPIA, Reclamation lacked any discretion to

---

[2] Originally passed in 1937, the CVP Act ("CVPA") established water delivery to districts in the Central Valley for irrigation and domestic use.  *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. DOI,* 929 F. Supp. 2d 1039, 1043 (E.D. Cal. 2013). Amended in 1992 with the CVP Improvement Act ("CVPIA"), the CVPIA updated the CVPA and provided "for renewal of existing long-term water service contracts for successive periods of up to 25 years," but prohibited renewal of any of the long-term service contracts until Reclamation completed the appropriate NEPA analysis. *Id.*  Contemplating the eventuality that long-term contracts might expire before Reclamation completed the necessary NEPA process, the CVPIA provided a carve out allowing interim renewal contracts until the long-term renewal EISs were complete. *Id.* at 1043-44.

disapprove requested long-term contract renewals, provided the appropriate environmental review had been completed. *Id.* at 1051-52. The Court further highlighted the "obvious (and conceded) Congressional Intent that the contractual relationship between Reclamation and water users is not to be interrupted." *Id.* at 1052. The Court therefore held that Reclamation properly defined the "no action alternative" as the current status quo of "continued delivery of water under the interim renewal of existing contracts which includes terms and conditions required by non-discretionary CVPIA provisions." *Id.* at 1055. Otherwise, "[t]o construct an alternative that is based on no management at all would be a useless academic exercise." *Id.* at 1050 (citing "40 Questions Memorandum" at 18,027).

Similarly, in *Westlands Water Dist.*, a team of federal, state, and tribal officials released a draft EIS ("DEIS") considering alternatives for restoring the Trinity River fishery and evaluating their environmental consequences as defined by the CVPIA. 376 F.3d at 864. The No Action Alternative used in the DEIS maintained "the status quo, leaving instream flow to the Trinity River at the 340,000 AF/year level prescribed by CVPIA § 3406(b)(23)." *Id*. at 868-69. Although Plaintiffs did not directly challenge the "No Action Alternative," instead challenging the reasonable range of alternatives, the Court found that the No Action Alternative was realistic as it used the minimum flow dictated by the CVPIA, and a no flow alternative was unrealistic and prohibited by Congress. *Id*. at 871.

Here, the Thurston Hills Project is a federal decision on a discrete agency action, or "project," and not an ongoing program. The contrast between the Thurston Hills Project and cases analyzing "ongoing programs" like the CVP is stark: whereas the CVPIA mandates that Reclamation continue uninterrupted delivery of water or to maintain flow at a minimum level of 340,000 AF/year, here there is no existing federal legislation or comparable Congressional intent

requiring BLM to conduct a timber sale in the Project Area. Quite to the contrary, BLM has

substantial discretion in proposing and implementing timber sale projects and which "harvest

practice" (not just regeneration harvest) will be applied in its timber sale projects.[3]

BLM's argument that the 2016 RMP is an ongoing program and the project's location

within the Harvest Land Base ("HLB") indicates that the forest within the Project Area will be

logged as a baseline is flawed. First, the 2016 RMP is merely a land use allocation plan which

determines how the land will be managed by the BLM. There are no congressional mandates

requiring specific timber sale locations, size, or management practices, much less language

indicating that the Thurston Hills Project, specifically, must proceed. Indeed, the 2016 RMP by

itself does not authorize any federal activity to be conducted on the land.[4] Individual logging

projects are major federal actions which significantly affect the human environment, and BLM

must therefore satisfy the NEPA process through use of an EIS, EA/FONSI, or categorical

exclusion before a proposed project can go forward. BLM confirms this fact in the 2020 EA and

Draft FONSI when it states that it would be required to prepare an EA for a future project at a

future time prior to making any implementation decisions. AR 3612.

Second, Judge Kasubhai incorrectly relies on BLM's false claim that "consistent with the

2016 RMP, the status quo of all HLB is eventual timber harvest." Dkt. No. 43 at 18. On this false

claim, BLM ignores its statutory mandates. BLM's logging calculations within the RMP must

specifically factor in management direction within the RMP that may restrict timber harvest. AR

16993. BLM's own RMP requires that all timber harvest within the HLB must be "consistent

---

[3] *See, e.g.*, AR 16456-57 (describing management objectives and range of logging methods allowable for use in the Harvest Land Base).
[4] AR 16405 ("The approved RMP includes land use plan decisions and does not include any implementation decisions. . . . land use plan decisions (objectives, land use allocations, and management direction) do not directly authorize implementation of on-the-ground projects, which the BLM can carry out only after completion of further NEPA compliance and decision-making processes and consultation as appropriate.")

with the management direction." AR 17092. BLM therefore is required to defer or forgo harvest within the HLB for "reasons described in the management direction and this appendix." AR 17092-3. An obvious example is the very recreation management direction at issue in this case. *Cascadia I,* 410 F. Supp. at 1156. Additionally, BLM is forgoing harvest of sites containing wayside aster within the HLB in line with applicable management direction. AR 3623-4. Thus, BLM's assumption that every acre of HLB will be harvested is simply not valid.

Finally, the Thurston Hills Project's no action alternative assumes the Project Area will be subjected to regeneration harvest absent any concrete proposal to support this position. BLM never contemplated in any record document that the Thurston Hills Project is an "ongoing program," and purely legal arguments that attempt to rationalize otherwise unsupported positions in the administrative record are not entitled to deference. *See California Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1150 (9th Cir. 2009) (agency's decision can be upheld only on the basis of the reasoning in that decision.); *see also Snoqualmie Indian Tribe v. F.E.R.C.,* 545 F.3d 1207, 1212 (9th Cir. 2008); *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

Applying the reasoning in *Pac. Coast Fed'n of Fishermen's Ass'n,* comparison of the environmental effects of logging vs. not logging is not a "useless academic exercise," but rather the foundation of all timber sale NEPA analyses. Even in instances where agencies are in the middle of multi-year timber sale contracts that have been partially implemented, the Ninth Circuit has held that the no-action alternative requires an analysis of the effects of the "suspension of harvesting within the entire sale are," or, in other words, not logging. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 n.3 (9th Cir. 1990).

Practically speaking, Judge Kasubhai's position on the no action alternative would undermine the very purpose of NEPA. If BLM may assume in the no action baseline that every acre of HLB will be logged, then every future NEPA analysis for BLM projects in the HLB will be comparing the effects of logging the project area with the effects of logging the project area. There would be no need for the BLM to conduct further NEPA analysis for projects within the HLB, which conflicts with explicit instruction in the RMP. AR 03612.

This leaves only the second CEQ interpretation of "no action" from the 40 Questions Memorandum: a federal decision on a proposal for a project. In that instance, NEPA requires BLM to compare the resulting environmental effects from logging according to the Thurston Hills Project prescription with the resulting environmental effects *if the Project is not implemented*. BLM failed to do so, and the Ninth Circuit is clear that the no action alternative cannot incorrectly assume the same or similar consequences and effects of the proposed project. *See e.g., Friends of Yosemite Valley,* 520 F.3d at 1037-38; *Ctr for Biological Diversity,* 623 F.3d at 650. Thus, BLM unlawfully incorporated a hypothetical future timber sale in the no action alternative.

B.  Changed Stand Baseline Conditions

In *Cascadia I,* Judge McShane found BLM violated NEPA by failing "to incorporate the [2018 fuels] report into the April 2018 Environmental Assessment," which ultimately "deprived the public of its only opportunity to comment." *Id.* at 1159. On remand, the BLM did not incorporate the 2018 fuels analysis, but created a new, substantially different report that changes the baseline conditions.

In the 2018 report, the description of the Project Area was: "relative fire hazard was ranked at the stand-level (FEIS pg. 254). Using this ranking, stands in sec 1 and 31 are

predominantly *mature stands* and are categorized as *mixed to low* fire hazard." AR 3345 (emphasis added).

In the 2019 report, the description of the Project Area was changed to: "[c]urrently, proposed harvest stands are a combination of *young high density* and mature multi-canopy structural stand stages. These structural stand stages are associated with *high to mixed* fire ratings." AR 2291 (emphasis added).

Thus, BLM modified the description of current forest stands from "mature" in 2018 to "young high density" in 2019. It then used this modification to alter the fire related conditions from "mixed to low" in 2018 to "high to mixed" in 2019. *Id.* This change allows BLM to cast a favorable light on its proposed logging, because under the new Fuels Report, the BLM is seemingly replacing one young high-density plantation with another.

The description of the Project Area as "young high density" in the new fire analysis conflicts with every other description of the Project Area in the EA:

"This area is also particularly conducive for trails because of its (existing) mature canopy forest[.]" AR 3627;

"[T]he entire trail system would be located in mature predominantly evergreen forest[.]" *Id*;

Logging would result in the loss of "mature tree canopy[.]" AR 3628; AR 3635 (same   reference to "mature tree canopy").

BLM also admits in the new fuels report that "in 50 years, stands that have been regeneration harvested would be transitioning from young stands to a mature structural stage and the stand level would have a low to mixed rating." AR 2300. The Thurston Hills area was previously clearcut and recently thinned, AR 1956, and now falls within the 70-year age class, AR 3570, which pursuant to the BLM's assessment, would consist of mature stands that "generally lack a developed understory." AR 1952.

PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS          18

Judge Kasubhai found that Plaintiffs waived this claim by failing to raise it in the administrative process. Dkt. No. 43 at 20. Plaintiffs object to this holding, because Plaintiffs did raise this issue in the administrative process, as cited in Plaintiffs' Reply Brief:

> Plaintiff specifically raised this matter in the EA comments and in the protest – the concern was even raised in the heading of a protest point:
>
> **Protest Point #12: Fire Risk and Fire Hazard has Significantly Changed and Contradicts Prior Analysis**
> There are significant differences between the fire analysis in the BLM's initial EA draft for this project and the way these impacts are portrayed now in the February 2020 EA. ….
> …. The EA describes the fire hazard associated with mature forests as "mixed." This description is incomplete and misleading ….

Dkt. No. 31 at 26 (citing AR 15405-06; 395-7).

There is no question that BLM was put on notice concerning objections to the changed stand conditions description, as Plaintiffs specifically referenced changes in analysis, stand descriptions, and associated fire hazard classification in their protest. Accordingly, Plaintiffs' changed stand baseline conditions objection should be preserved. *Lands Council v. McNair,* 629 F.3d 1070, 1076 (9th Cir. 2010) (claimant need not raise an issue using precise legal formulations; alerting the agency in general terms is sufficient to preserve an issue so long as enough clarity is provided that the decisionmaker understands the issue raised); *see also, e.g., Barnes v. U.S. Dep't of Transp.,* 655 F.3d 1124, 1132 (9th Cir. 2011) (federal agency bears primary responsibility to ensure that it complies with NEPA; commentator need not point out obvious specific flaws in order to preserve the ability to challenge a proposed action, so long as the agency has independent knowledge of the issues that concern petitioners); *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 559 (9th Cir. 2000) ("Compliance with NEPA is a primary duty of every federal agency; fulfilment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs.").

Judge Kasubhai relied on several inapposite cases in finding that Plaintiffs waived this argument. First, the Court relied on *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752 (2004). In that case, the Supreme Court found that respondents forfeited objections to an EA on the ground that it failed to adequately discuss potential alternatives to the proposed actions because no other alternatives, beyond those evaluated in the EA, were raised by respondents. *Id.* at 764. Accordingly, the issue was waived because the agency was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available. *Id.* The instant case is plainly distinguishable. Plaintiffs *clearly* raised the issue of changed stand baseline conditions in their protest – indeed, they did so in bolded lettering: "**Fire Risk and Fire Hazard has Significantly Changed and Contradicts Prior Analysis**." Dkt. No. 31 at 26 (citing AR 15405-06; 395-7). This unambiguous language put BLM on notice that Plaintiffs identified objections to the changed stand baseline conditions, and thus BLM had the opportunity to examine the issue raised.

Next, Judge Kasubhai relied on *All. for the Wild Rockies v. Savage,* 897 F.3d 1025 (9th Cir. 2018). In that case, the court stated that "[a]bsent exceptional circumstances. . . belatedly raised issues may not form a basis for reversal of an agency action." *Id.* at 1033 (quoting *Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir. 1991)). In *All. for the Wild Rockies*, plaintiffs did not file an objection until after issuance of the Final Environmental Impact Statement. *Id.* In a typical case, the court stated, this would be untimely. Here, Plaintiffs raised the issue of changed stand baseline conditions in their EA comments and in their protest. Unlike in *All. for the Wild Rockies,* Plaintiffs did not wait for BLM to issue the 2020 EA and Decision to bring up the issue of changed stand baseline conditions.

While the cases cited by the Court accurately state the rules, both cases involved situations in which the issue in question was either not raised at all or raised too late in the process. The administrative record demonstrates that Plaintiffs properly raised the issue of changed stand baseline conditions in a timely manner.

### III.    BLM Failed to Analyze a Reasonable Range of Alternatives

Plaintiffs object to Judge Kasubhai's finding that Plaintiffs' alternatives argument is barred by claim preclusion. As an initial point, on remand, the BLM embarked on a new NEPA process, issuing a new EA, and reaching a new Decision Record. During the accompanying administrative comment and protest period, Plaintiffs raised new arguments which is expressly provided for in the Code of Federal Regulations. 40 C.F.R. § 1501.5(e). Plaintiffs suggested a new alternative that was explicitly tailored to Judge McShane's order in *Cascadia I*: it preserved the trails but otherwise permitted logging in the broader ERMA. AR 145, AR 14856-7. BLM is required to consider these proposed alternatives and certify that it has done so in the decision record. *See* 40 C.F.R. § 1505.2(b) ("the decision maker shall certify in the record of decision that the agency has considered all of the alternatives, information, analyses, and objections submitted by State, Tribal, and local governments and public commenters.").

Plaintiffs suggested alternative was never considered, and BLM does not contest this. BLM instead argues that Plaintiff's claim is precluded by Judge McShane's prior ruling. The preclusion doctrine does not apply because Judge McShane's order did not exist during the *Cascadia I* NEPA process. Therefore, Plaintiffs could not have raised that alternative or litigated the BLM's failure to consider it, and thus preclusion does not apply. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (the relevant inquiry is whether the claim could have been brought previously).

Furthermore, the doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion) apply only when the prior litigation was terminated by a *final judgment* on the merits. *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885-8 (9th Cir. 2000); *see also* Dkt. No. 26 at 23-35. "The party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Offshore Sportswear, Inc. v. Vuarnet International, B.V.*, 114 F.3d 848, 850 (9th Cir. 1997). Where a court's prior decision was an unappealable remand order, as was the case here with this Court's decision in *Cascadia I*, then it "defeat[s]" preclusion because no final judgment was ever rendered. *Id.* at 851 (inability to appeal a remand would have defeated preclusion "on this ground alone").

As a general rule in the Ninth Circuit, "a remand order may be deemed a final order only where the agency appeals the remand." *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1075 (9th Cir. 2010) (citing *Alsea Valley Alliance v. Dept. of Commerce*, 358 F.3d 1181, 1184 (9th Cir. 2004)). Here, the BLM elected not to appeal *Cascadia I*, and therefore Plaintiffs lacked jurisdiction to appeal. Consequently, the Court's remand order in *Cascadia I* cannot be construed as a final judgment. *See Alsea*, 358 F.3d at 1184-5.[5] In other words, Plaintiffs never had an opportunity to appeal Judge McShane's adverse rulings on the NEPA claims because the agency did not appeal, meaning Plaintiffs did not have a "full and fair opportunity to litigate." *Montana v. United States*, 440 U.S. 147, 153-54 (1979) (citing *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48-9 (1897)). Thus, preclusion does not apply. *See Church of Scientology of California v. Linberg*, 529 F. Supp. 945, 957 (C.D. Cal. 1981) (citing *United States v. Wallace & Tiernan Co.*, 336

---

[5] Relatedly, a prevailing party may not normally appeal a decision in its favor. *See Electrical Fittings Corp. v. Thomas & Betts Corp.*, 307 U.S. 241, 242 (1939); *United States v. Good Samaritan Church*, 29 F.3d 487, 488 (9th Cir. 1994).

U.S. 793 (1949) ("prior order could not be treated as final for purposes of res judicata since the prior decision was not appealable")).

Following the order and remand in *Cascadia I*, Plaintiffs requested that BLM analyze an alternative that buffered the trails from harvest within the RMZ or, at the very least, thinned within the RMZ to retain some canopy cover over the trails while allowing for additional volume, while otherwise permitting regeneration harvest. AR 145, AR 14856-7. Plaintiffs argued that this option represented a generous middle ground that would: (1) comply with the Court's Order and the Court's interpretation of the RMP, (2) protect the majority of the recreation values offered and the usability and durability of the trails themselves, (3) allow the BLM to log in accordance with its purpose and need to conduct regeneration harvest and adjust age class, (4) generate commercial timber volume, and (5) increase tree retention across the project area as a whole which could potentially curb the negative wildfire danger effects associated with regeneration harvest logging. *Id.*

Judge Kasubhai determined that Plaintiffs "may not now present additional alternatives about activities in the RMZ, such as no timber harvest or just thinning in the Zone, where they could have done so in the prior litigation." Dkt No. 43 at 21 (citing *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012) ("A plaintiff need not bring every possible claim. But where claims arise from the same factual circumstances, a plaintiff must bring all related claims together or forfeit the opportunity to bring any omitted claim in a subsequent proceeding."). Judge Kasubhai's finding and reliance on *Turtle Island Restoration Network* is misplaced as that case is distinguishable.

The prior proceeding in *Turtle Island Restoration Network* did not involve NEPA, the APA, or any remand orders. 673 F.3d at 917 (citing *Earth Island Inst. v. Christopher*, 913 F. Supp. 559, 562 (Ct. Int'l Trade 1995)). In the prior proceeding, plaintiffs sought, and the court

granted, "a judicial declaration that the defendants [were] not properly enforcing" Section 609(b)

of Public Law 101-162, in addition to an embargo of seafood, until defendants certified

compliance with Section 609. *Earth Island Inst*., 913 F. Supp. at 562. After the State Department

amended the guidelines for shrimp importation, plaintiffs sued again alleging the new provisions

violated Section 609 but lost in front of the Federal Circuit. *Turtle Island Restoration Network*,

673 F.3d at 917. After losing their appeal, however, plaintiffs filed a new suit, this time alleging

the State Department violated NEPA in conducting its Section 609 certifications. *Id.* The Ninth

Circuit, however, properly held that plaintiffs' claims were barred by *res judicata* because the

current challenge arose from the same transactional nucleus of facts. *Id*. at 920.

In that case, there was no question that plaintiffs received a final judgment on the merits

because the prior litigation did not involve a remand order, NEPA, or the APA. *Id*. at 917. Here,

Plaintiffs did not receive a final, appealable order under Ninth Circuit precedent because Judge

McShane in *Cascadia I* remanded the matter to the BLM "to issue a new environmental

assessment." 410 F. Supp. at 1161; *see also Pit River Tribe*, 615 F.3d at 1075; *cf. Pit River Tribe

v. BLM*, 939 F.3d 962, 965 (9th Cir. 2019) (Ninth Circuit concluding it has jurisdiction because

BLM, not Plaintiff, appealed district court's order vacating and remanding agency's decision).

Preclusion simply does not apply, and BLM did not consider Plaintiffs' suggested alternative as

required. 40 C.F.R. § 1505.2(b).

## IV.   BLM Failed to Demonstrate How Timber Harvest in the RMZ Protects and/or Maintains Setting Characteristics

BLM not only failed to demonstrate how the Project's timber harvest protects and/or

maintains the setting characteristics, but the BLM completely failed to even mention the setting

characteristics. Dkt. No. 10 at 27 (explaining the only mention of "setting characteristics" in the

entire EA is in the glossary at AR 3665 under the definition of Recreation Management Zone).

Logging is only permitted within the Willamalane ERMA if the BLM demonstrates that the logging will "maintain[] setting characteristics." AR 16389. Within the RMZ, logging is only permitted to "protect/maintain setting characteristics." The Willamalane ERMA designates the area's setting characteristics as "front country." AR 5411. In the RMP, these setting characteristics fall on a spectrum (Primitive – Backcountry – Middle Country – Front County – Rural), which the BLM also visually depicts. AR 18271. The RMP then describes how logging would influence that setting characteristic designation and provides useful examples. AR 18272 ("the regeneration harvesting of older stands would modify the naturalness of an area from Primitive to Rural. These actions would influence the distribution of recreation for visitors who prefer these different settings.").

In neither the original nor the revised Thurston Hills EA does the BLM does mention the Project Area's setting characteristics, much less analyze the impacts the proposed logging would have on that designation and whether or not the setting characteristics would be protected or maintained.

The Court in *Cascadia I* held that there were no objective standards in the RMP by which to judge changes to the setting characteristics. First, this is not a valid excuse for BLM's non-compliance or failure to analyze compliance with pertinent RMP standards. At best it gives BLM wide discretion on how to comply. But in any case, as Plaintiffs explain above and in their Opening Brief, BLM does indeed have clear, objective mandates for evaluating impacts to setting characteristics in the RMP. Dkt. No. 10 at 16, n.3 (explaining that BLM's recreation objective should not be misconstrued with the setting characteristics); *see also* AR 18278; AR 18281; AR 18269-72.

Again, the RMP explains within ERMA designations that BLM "would place an emphasis on the management and protection of recreation opportunities" and "would provide sufficient management direction to preserve the desired physical Recreation Setting Characteristics within both SRMAs and ERMAs. These restrictions would restrict or prohibit the type of development that would affect these settings and shift the setting characteristics to an undesirable setting." AR 20341; *see also* AR 17007 (BLM's selected RMP alternative will "increase protection of unique recreation settings and increase recreation use").

The BLM's blatant failure to analyze compliance with this standard in the RMP violates FLPMA and NEPA. *See, Oregon Natural Desert Ass'n v. BLM,* 625 F.3d 1092, 1109-10 (9th Cir. 2010) (NEPA analysis must include "considerations made relevant by the substantive statute driving the proposed action."); *see also Native Ecosystems Council v. United States Forest Serv.,* 418 F.3d 953, 963 (9th Cir. 2005) (while the analysis need not be perfect, the court "must still be able reasonably to ascertain from the record" that the agency is in compliance with the plan standard) (citing *SEC v. Chenery Corp,* 332 U.S. 194, 196-97 (1947)). This "setting characteristic" designation is a new approach by the BLM under the 2016 RMP, but this does not excuse the agency from analyzing and complying with mandatory management direction in the RMP.

## CONCLUSION

Based on these objections, Plaintiffs respectfully request that this Court overturn the Magistrate's Findings & Recommendations with regards to Plaintiffs' NEPA claim discussed above and enter Summary Judgement in favor of Plaintiffs on this claim.

Respectfully submitted this 14th day of October, 2021.

s/ Nicholas S. Cady
Nicholas S. Cady (OSB # 114363)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org


s/ B. Parker Jones
B. Parker Jones (OSB # 191163)
Daniel C. Snyder (OSB # 105127)
Law Offices of Charles M. Tebbutt
941 Lawrence Street
Eugene, Oregon 97401
Tel: 541-344-3505
Email: parker@tebbuttlaw.com
Email: dan@tebbuttlaw.com

*Counsel for Plaintiffs*